# Exhibit 1

```
            UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF NEW YORK
            Index No. 1:09-cv-04805
            - - - - - - - - - - - - - - - - - -x
            FEDERAL DEPOSIT INSURANCE CORPORATION
            AS RECEIVER FOR AMTRUST BANK,

                                    Plaintiff,

                  -against-

            PANKAJ MALIK; MALIK & ASSOCIATES, P.C.;
            ARTISAN MORTGAGE COMPANY, INC.; STREAMLINE
            MORTGAGE CORPORATION; GENESIS HOME MORTGAGE
            CORP.; LINK ONE MORTGAGE BANKER LLC; GLOBAL
            FINANCIAL, INC.; RESOURCE ONE, INC.; ACORN
            FUNDING GROUP, INC.; SI MORTGAGE COMPANY;
            NMR ADVANTAGE ABSTRACT LTD; GEORGE ALDERICE;
            NICHOLAS A. PELLEGRINI; ANTONIETTA RUSSO;
            and JOHN DOES 1-10,

                                    Defendants.

            - - - - - - - - - - - - - - - - - -x

                                    335 Madison Avenue
                                    New York, New York

                                    April 20, 2011
                                    11:11 a.m.



               30(b)(6) Deposition of PANKAJ MALIK,

            a Defendant in the above-entitled action,

            held at the above time and place, taken

            before Jessica R. Taft, a Notary Public

            of the State of New York, pursuant to

            Notice.
```

1                          P. MALIK

2          Q     When did you graduate from St.

3     John's law school?

4          A     '93.

5          Q     What licenses do you currently

6     hold?

7          A     Attorney-at-law.  I was admitted

8     in 1994.

9          Q     For which states do you hold

10    licenses currently?

11         A     New York and federal.

12         Q     Which federal courts do you hold

13    admission to practice?

14         A     The Eastern District and the

15    Supreme Court.

16         Q     To which appellate division were

17    you admitted to?

18         A     Second department.

19         Q     Are you currently in good

20    standing with the second department?

21         A     Yes.

22         Q     Upon graduating from St. John's,

23    did you join the firm?

24         A     Yes.

25         Q     What firm was that?

08438f93-fed3-4b62-af3a-95e2874e582e

Page 14

                        P. MALIK

1

2        A    Yes, and then there was also

3    Donovan and Malik.

4        Q    When did Donovan and Malik begin?

5        A    Late 2000.

6        Q    Was it an LLC, an LLP?

7        A    I don't remember.

8        Q    How long did you maintain those

9    three locations?

10       A    The Flushing location I am pretty

11   sure sometime in 2001, 2002 I let go of, and

12   then the partnership between Donovan and

13   Malik, I think we parted ways in 2001,

14   summer of 2001.  So then she took the Long

15   Island office and I kept the Queens office.

16       Q    For the record, the Queens office

17   would be the one located on East Elmhurst,

18   correct?

19       A    Yes, yes.

20       Q    When you and Ms. Donovan parted

21   ways in the summer of 2001, what happened?

22   Did you join another firm?

23       A    No, I incorporated my solo

24   practice into Malik and Associates, P.C.

25       Q    That was in the summer of 2001?

```
1                    P. MALIK
2        A    Yes, I believe August.
3        Q    How many attorneys?
4        A    At the beginning it was two, and
5   then on and off I have had either one or two
6   or no associates since then.
7        Q    So, between 2001 and 2011?
8        A    Yes.
9        Q    One, two, or none?
10       A    Well, no.  There were actually,
11  at one point I had three associates, so --
12  right now I have one, so it has been on and
13  off.
14       Q    Any partners?
15       A    No.
16       Q    In 2001, how big was your staff,
17  or did you have a staff?
18            MR. FURMAN:  What year are you
19       asking?
20            MS. KIM:  2001.
21            MR. FURMAN:  We are here -- I
22       am going to interrupt you, because we
23       have now had over fifty questions that
24       have nothing to do with what the
25       purpose of today's deposition is.
```

Page 45

P. MALIK

1

2          Q      When was that meeting?

3          A      Two or three weeks ago.

4          Q      Who were the attendees at that

5     meeting?

6          A      Myself, Tom, Susan and Alex.  And

7     then the other staff members would pop in

8     when they had issues for Tom.

9          Q      What other topics were discussed

10    at this meeting, other than this 30(b)(6)

11    notice and Mr. Paykin's computer?

12         A      Okay.  The RAM space in server

13    two was almost finished, so we were

14    discussing about getting an upgraded,

15    increasing the memory, and he had to check

16    the server to see if there were any slots

17    available to, so that we could update it.

18    And it was recommended that we get like a

19    500-gig upgrade because we were running out

20    of space, even though we have space on

21    server one.

22              And then we also discussed

23    increasing the on-line back-up from what it

24    was right now, from 90 days to unlimited, so

25    that even if somebody deleted something it

08438f93-fed3-4b62-af3a-95e2874e582e

1                    P. MALIK

2    would forever be backed up so that nothing

3    could ever really be deleted.

4             And then we discussed getting the

5    printers and the copiers -- we wanted it so

6    that instead of having to print something

7    and then fax it, we wanted him to set up

8    something so that we could print and fax at

9    the same time and save paper.  So he was

10   trying to configure that, because ever since

11   we've gotten our new copiers and everything

12   we haven't been able to -- first we have to

13   print it and then fax it and then copy it

14   rather than just doing it in one shot.

15            And then we talked about getting

16   an e-fax, because the fax machines were

17   giving us a hard time and we thought it

18   would be more economical to do an e-fax.

19            There was like a whole agenda:

20   Giving me and Alex access to the server and

21   the public folders remotely, because nobody

22   had access to get into the server outside of

23   the office location, so we wanted to set

24   that up.  He needed my authorization to give

25   Alex that thing, so I okayed that.

08438f93-fed3-4b62-af3a-95e2874e582e

1                    P. MALIK

2           Then I wanted the ability to get

3    my Outlook calendar onto my BlackBerry,

4    because I still can't get my Outlook

5    calendar on my BlackBerry, which is really

6    annoying.

7           And then -- what else was on the

8    agenda?  There was the fact that they had

9    come in and they had upgraded the hard drive

10   in Alex's computer, but the guy that came in

11   never screwed back the back of the hard

12   drive in.  It was open, so we had to call

13   him back to come in and screw it in, screw

14   it back in.

15          What was the other thing?  The

16   antivirus, what kind of antivirus he was

17   using, and I wanted him to make sure

18   everything was upgraded, because Alex felt

19   that some of the computers had, the

20   antivirus was not, the system was not as

21   secure, so we wanted him to make sure that

22   was upgraded.  He said he would take care of

23   that.

24          And then we wanted some e-mails,

25   you know, some -- there is a couple of

P. MALIK

1
2    e-mail names and everything had to be
3    changed.  A couple of people had left in
4    March, so that I wanted him to forward that,
5    those e-mails to somebody else, and we
6    wanted like an automatic reply that if it
7    came into the main web site e-mail, because
8    we just set up a web site, then there would
9    be an automatic reply that somebody would
10   get back to them within 24 to 48 hours.
11            The response time, we felt that
12   sometimes that they could respond faster.
13   The speed, the Internet, everybody was
14   complaining that the Internet is slow.
15            It was a long meeting.  A lot,
16   maybe more things were discussed.  I don't
17   remember every single thing, but that is
18   what I remember.
19        Q    How many hours was this meeting?
20        A    About an hour and a half, two-
21   hour meeting.  And he was with me for some
22   time and then he was out checking the server
23   and the slots and all of that, so he was
24   checking Alex's computer, some of the other
25   issues that some of the other people were

Page 49

P. MALIK

1  having before he left.

2
3      Q    And it was during the course of
4  this one- to two-hour meeting that you
5  discussed this 30(b)(6) notice with Tom?

6      A    You know, I briefly asked him a
7  couple of questions, and only the things
8  that I wasn't familiar with, and that was
9  it.  It was a very small part of the
10 meeting.

11     Q    What weren't you familiar with?

12     A    The types of data processing and
13 storage devices that they used, and where --
14 a couple of questions, back-up facility and
15 things like that.

16     Q    In the course of your preparation
17 for this deposition, did you speak with
18 anyone from Crossland Technologies?

19     A    No.

20     Q    When Crossland Technologies was
21 your IT service provider, vendor, who was
22 your contact at Crossland Technologies?

23     A    Ekram Huk, or Ekram Kahn; I don't
24 remember his last name, but it is E-K-R-A-M.

25     Q    You don't remember his last name,

08438f93-fed3-4b62-af3a-95e2874e582e

Page 50

P. MALIK

2  though?

3      A    It was either Ekram Kahn or Huk.

4  I don't remember.  I only called him Ekram.

5      Q    We will refer to him as Ekram.

6          MR. FURMAN:  I don't think we

7      have a choice.

8          MS. KIM:  I don't think we have

9      a choice, right.

10 BY MS. KIM:

11     Q    Was he the only person you had

12 dealt with from 2003 to the end of the time

13 period that day with your vendor?

14     A    Yes.

15     Q    Was he a customer rep or was he

16 president of the company, or who was he at

17 Crossland?

18     A    You know, I knew Ekram before I

19 knew he was part of Crossland Technologies

20 because he was just taking care of the IT.

21 We were sharing office space before we moved

22 into our own suite in 2003, and he was

23 managing all the IT systems there.

24          And then when I got my own suite,

25 I hired him to do all the hard wiring and

Page 61

                    P. MALIK

1

2   some upgrades?

3        Q    With respect to Roman numeral

4   heading number two, back-up and retention,

5   which topics did you ask Tom about?

6        A    We discussed number 12 and 13.

7   14, 18, 19, and then 20, 21, 22, 23 and 24

8   and 25.

9        Q    With respect to topic number 14,

10  what did you discuss with him?

11       A    That everything was backed up and

12  maintained -- 14?  Electronic --

13       Q    Records and management policies

14  and procedures?

15       A    We really don't have any specific

16  policies like that, no.

17       Q    And you asked Tom about it?

18       A    No.

19       Q    You mentioned 14.

20       A    I mistakenly mentioned 14.  I

21  didn't really read it thoroughly.

22            It wasn't like we sat down and

23  went through it point by point.  It was just

24  like a general discussion, but I do remember

25  we covered some of the topics.

Page 68

                        P. MALIK

1

2   exactly are you asking?

3        Q    You said you discussed this with

4   him, though?

5        A    Yes, and neither one of us could

6   really figure out what you meant.

7        Q    Are files deleted from computers

8   at your company?

9        A    Sometimes.

10       Q    What do you mean by sometimes, on

11  a schedule?

12       A    No.

13       Q    When are they deleted, then?

14       A    What do you mean by files, first

15  of all?

16       Q    Let's take just a, let's take --

17       A    Like a document file, a picture

18  file?

19       Q    Is there a difference between

20  files in terms of deletion?

21       A    I don't know what type of files

22  you are talking about.  There is no schedule

23  to delete any files, if that is what you are

24  asking.

25            You asked me to ask you to

08438f93-fed3-4b62-af3a-95e2874e582e

Page 69

P. MALIK

1
2  rephrase, so please, can you rephrase?  I
3  really don't understand what you are asking.
4      Q    Is there a difference in the
5  deleting process or processes that you use,
6  depending on the file?
7      A    That is not what you asked me.
8  You asked me if files are ever deleted in my
9  office, not if there was a schedule or a
10  process to delete files.
11      Q    And you said yes, and I said is
12  there a schedule --
13          MR. FURMAN:  No, the answer was
14      not yes, the answer was sometimes.
15          MS. KIM:  Sometimes, and then I
16      asked is there a schedule.
17          MR. FURMAN:  Don't
18      mischaracterize the testimony.
19          THE WITNESS:  You never asked
20      me that question.
21  BY MS. KIM:
22      Q    I am asking you now, are they
23  deleted on a schedule?
24      A    No.
25      Q    How are they deleted?

Page 70

P. MALIK

1

2      A      There is no rhyme or like

3  specific process by which they are deleted,

4  but can I say that a file has never been

5  deleted in my office, no.

6      Q      Do you delete files from the

7  computer?

8              MR. FURMAN:  I am going to

9          object, just because there is a

10         terminology here of the use of files

11         which I can comprehend, because --

12             MS. KIM:  Objection to form is

13         fine.

14             MR. FURMAN:  I want to explain

15         my objection.

16             MS. KIM:  No, objection to form

17         is fine under the rules.

18             MR. FURMAN:  I don't want to be

19         caught wrong.

20             MS. KIM:  If you have a

21         question about files --

22             MR. FURMAN:  You are cutting me

23         off, and I want to speak.

24             MS. KIM:  Objection to form is

25         fine, and we are trying to get through

```
1                        P. MALIK
2           this deposition.
3                  MR. FURMAN:  You are cutting me
4           off when I want to speak.
5                  You are using the term "files"
6           which has no context.  If you are
7           asking about, for example, an e-mail
8           or you are asking about some kind of
9           other electronic data, then you have
10          to ask that.  The term "files" could
11          mean a paper file, it could mean a
12          variety of things.  And please don't
13          cut me off when I speak.
14                 MS. KIM:  Objection to form
15          will do just fine.
16                 MR. FURMAN:  Again, please
17          don't cut me off when I spoke.
18                 MS. KIM:  I didn't cut you off
19          there.  I just requested that
20          objection to form under the federal
21          rules is just fine.
22     BY MS. KIM:
23          Q    Now, do you delete files from
24     your computer?  And if you mean that to mean
25     e-mails or PDFs or a Microsoft Word
```

                              P. MALIK

1
2    document --
3         A    What to you mean by it?  What are
4    you looking for, what are you asking?
5         Q    I am just asking a very broad
6    question, if you want to answer yes or no to
7    that?
8              MR. FURMAN:  No, no, please.
9         That is an improper question.  Please
10        ask a question so my client can answer.
11             MS. KIM:  Objection to form
12        under the federal rules is just fine.
13             THE WITNESS:  Are you going to
14        rephrase the question?
15   BY MS. KIM:
16        Q    Do you not understand the question?
17        A    I want you to tell me what type
18   of files you are referring to.
19        Q    Do you delete e-mails?
20        A    Yes.
21        Q    Did you discuss with Mr.
22   Jacoberger topic 24, the locations, if any,
23   where files are archived off the system?
24        A    Yes.
25        Q    What was his response, or what

08438f93-fed3-4b62-af3a-95e2874e582e

Page 73

1                     P. MALIK
2    did he say?
3         A     Utah.
4         Q     Where in Utah?
5         A     I don't know.
6         Q     What company?
7         A     I don't know.
8         Q     Do you pay for the archive of the
9    files, archiving of the files?
10        A     I am assuming it is built into
11   what I pay him on a monthly basis.  I am
12   sure he is not going to give me any services
13   for free.
14        Q     He is responsible for archiving
15   your files?
16        A     Yes.
17        Q     How regularly are files archived?
18        A     I don't know.
19        Q     Do you know when files are archived?
20        A     I am sorry?
21        Q     Do you know when files are archived?
22        A     No.
23        Q     Did you ask Mr. Jacoberger about
24   that?
25        A     No.  That is not in your

08438f93-fed3-4b62-af3a-95e2874e582e

Page 83

1                      P. MALIK
2          Q    Is that your signature there?
3          A    Yes.
4          Q    Thank you.  You can put it aside.
5               Ms. Malik, during the course of
6     discovery in this litigation, we understand
7     from your counsel that your server was
8     improperly installed and that at the time of
9     installation a back-up system had been
10    requested.
11         A    Yes.
12              MR. FURMAN:  Objection to the
13         form.
14    BY MS. KIM;
15         Q    Counsel also told us that
16    approximately one year ago no back-up
17    system -- that one year ago you had
18    discovered that no back-up system was in
19    place, is that correct?
20              MR. FURMAN:  Objection to form.
21              THE WITNESS:  Yes.
22    BY MS. KIM:
23         Q    How did you discover it?
24         A    When I hired Transitional Computing.
25         Q    When you hired they just walked

08438f93-fed3-4b62-af3a-95e2874e582e

Page 84

1                    P. MALIK
2     in and they found it, or how did--
3                MR. FURMAN:  Objection to form.
4                THE WITNESS:  Do you want to
5          rephrase?
6     BY MS. KIM:
7          Q    You may answer.
8          A    Could you rephrase?
9          Q    Is there something you didn't
10    understand about the question?
11         A    Yes.  Could you just rephrase it?
12               MS. KIM:  Would you like to
13         re-read the question, please.
14               (Thereupon, the record was read
15         back by the reporter as recorded above.)
16    BY MS. KIM:
17         Q    How was it discovered?
18               MR. FURMAN:  Which question are
19         we asking?
20    BY MS. KIM;
21         Q    Do you understand what I am
22    asking?
23               MR. FURMAN:  No, because your
24         first question that was read back was
25         essentially asking what Ms. Malik

08438f93-fed3-4b62-af3a-95e2874e582e

Page 85

P. MALIK

1
2      understood someone else's mindset to
3      be.  Now you are asking how was it
4      discovered.
5             Whose knowledge base are you
6      asking about?
7             MS. KIM:  Thanks for your
8      commentary; again, objection to form.
9             If she doesn't understand the
10     question, she clearly has told me when
11     she doesn't understand a question she
12     will let me know.
13            THE WITNESS:  So, are you
14     asking how I discovered it?
15  BY MS. KIM:
16     Q    Well, no, I am asking -- you said
17  it was discovered, so I am asking you how it
18  was discovered?
19     A    What?
20     Q    The fact that no back-up system
21  was in place?
22     A    When Tom came in at our initial
23  meeting, he examined our servers and
24  whatever else IT people examine, and he came
25  in and said that there was no back-up.  And

P. MALIK

1  

2  I was very surprised by that.

3      Q    Why were you surprised?

4      A    Because for all these years that

5  I had been dealing with Ekram, I always told

6  him in case we ever lose data, I want to

7  make sure that everything is backed up.  And

8  he always assured me that everything was

9  backed up, everything was backed up, and,

10  you know, apparently it never was.

11      Q    You mentioned some other IT

12  people.  Who were you referring to?

13      A    What other IT people?

14      Q    When you said they came in, Tom

15  came in, looked at the system.

16      A    Yeah.

17      Q    And then you mentioned other IT

18  people?

19          MR. FURMAN:  No, that wasn't

20      the testimony.

21          THE WITNESS:  No, I didn't.  I

22      never said other IT people.

23  BY MS. KIM:

24      Q    You mentioned, it didn't sound

25  like it was Tom alone.

Page 96

P. MALIK

1

2    Q    Other than the conversation you
3    had about the 30(b)(6) notice you had with
4    Tom?

5    A    Uh-huh, correct.

6    Q    When Tom told you there was no
7    back-up, did he give you a reason as to why
8    no back-up system was in place?

9    A    I don't recall.

10   Q    Did you ask him when you had the
11   conversations about the 30(b)(6) deposition,
12   in preparation for the 30(b)(6) deposition?

13   A    Ask him what?

14   Q    About why there was no back-up in
15   place?

16   A    I don't know, and I don't know
17   why he would even know that.  He wasn't in
18   charge of the IT before he came on board.
19   He just told me that there was none.

20   Q    Did you ask for a reason why
21   there was no back-up in place?

22   A    No.

23   Q    Did you ask for the back-up logs?

24   MR. FURMAN:  What?

25   THE WITNESS:  I have no idea

Page 97

                        P. MALIK

1

2          what those are.

3                    MR. FURMAN:  What did you ask?

4          I didn't understand that.

5                    (Thereupon, the record was read

6          back by the reporter as recorded above.)

7     BY MS. KIM;

8          Q    Did you tell Ekram that there was

9     no back-up system in place?

10         A    I don't remember if I had a

11    conversation with him about it.

12         Q    Did anyone at the company tell

13    Ekram that there was no back-up system in

14    place?

15                   MR. FURMAN:  Asked and

16         answered.

17                   THE WITNESS:  I don't know.

18    BY MS. KIM:

19         Q    Prior to the discovery by Tom of

20    no back-up system being in place, why did

21    you think that the back-up system was

22    working?

23                   MR. FURMAN:  Objection.

24                   THE WITNESS:  Why did I think

25         the back-up system was working?

Page 98

1                    P. MALIK

2    BY MS. KIM:

3         Q    Yes.

4         A    I guess because whenever we did

5    have a conversation with Ekram, I always had

6    told him to make sure that there is,

7    everything was backed up.

8              And it wasn't until sometime in

9    2009, I believe, that we realized that there

10   really wasn't any way to retrieve some items

11   from the thing, and he kept telling me that

12   there was a particular reason why we

13   couldn't retrieve them.  And it wasn't until

14   Tom came in that I discovered that there was

15   never any back-up system in place, so there

16   was no back-up.  Those were his words, that

17   there was no back-up.

18        Q    What did you mean by retrieve

19   from the thing?

20        A    When we got notice of this

21   litigation, or the claims, before we even

22   got the lawsuit papers served, when I got,

23   we started getting the claims, I wanted them

24   to take a look to see if we could find the

25   e-mails wherein all these closings were

08438f93-fed3-4b62-af3a-95e2874e582e

Page 99

P. MALIK

1
2  authorized by Amtrust, and because there
3  were certain e-mails that were exchanged
4  between my office employees and some people
5  at Amtrust, and we could not locate them.
6          So I told Ekram to check the
7  back-up to see if he could locate any
8  communications, and he said he could not.
9      Q    You said that he gave, he had
10 given you some reasons as to why there was
11 no back-up?
12     A    He said that if an e-mail was
13 saved on the Exchange server, then he could
14 retrieve it.  But if e-mails had been
15 deleted, there is no way that he could ever
16 retrieve that, which I learned later on was
17 incorrect information.
18     Q    About what time are we talking
19 about in 2009?
20     A    It was around the time that I
21 first started getting these claims on these
22 files, and it was sometime in 2009, maybe
23 spring or summer, I don't remember when.
24     Q    Did Ekram give you any other
25 reasons as to why the e-mails couldn't be

1                    P. MALIK
2          If there was a problem with the
3     computer in general?
4          A    Everybody had Ekram's number,
5     like I said.  They would just call Ekram.
6     There was no one person designated that if
7     you had a problem you had to go to that
8     person, if that is what you mean.
9          Q    Let's say you wanted to upgrade
10    software?
11                MR. FURMAN:  Objection.
12                THE WITNESS:  We would contact
13        Ekram.
14    BY MS. KIM:
15         Q    Who is "we" is what I am asking?
16         A    Anybody who would make that
17    recommendation to me, and then I would
18    decide if I wanted to spend the money and if
19    it was worth it, and then I would ask Ekram
20    to do it.
21         Q    And you would be in contact with
22    Ekram?
23         A    Yes.
24         Q    Do you remember when the computer
25    server was installed?

08438f93-fed3-4b62-af3a-95e2874e582e

Case 1:09-cv-04805-KAM-JMA   Document 107-4   Filed 11/28/11   Page 28 of 86 PageID #: 1171

1                    P. MALIK
2          A    2003, some point.
3          Q    Season?
4          A    I don't remember.
5          Q    Why were they installed?
6          A    It was recommended because we had
7     so many computers that -- I honestly don't
8     know what the real purpose was, but it was
9     recommended that we get them.
10         Q    Recommended by whom?
11         A    By Ekram.
12         Q    How many computers did you have
13    at the time?
14         A    More than twenty.
15         Q    Would you say the first half or
16    second half of 2003?
17         A    I don't remember.
18         Q    Are there records that you could
19    check to find out when the servers were
20    installed?
21         A    Not really.
22         Q    Did you pay Ekram for the
23    installation of the servers?
24         A    I don't remember.
25         Q    He didn't do it for free, did he?

08438f93-fed3-4b62-af3a-95e2874e582e

Page 121

P. MALIK

2      dated June 16, 2009, addressed to
3      Malik and Associates P.C., Bates
4      stamped PLTF 018255-18256, was marked
5      Exhibit 4 for Identification, as of
6      this date.)
7  BY MS. KIM:
8      Q    What I have identified as Exhibit
9  Number 4 is a letter dated June 16, 2009,
10  addressed to Malik and Associates P.C.  It
11  is Bates stamped PLTF 018255.  It is a
12  two-page document, and the last, the Bates
13  range of the last page is 18256.
14          Ms. Malik, have you finished
15  reviewing this document?
16      A    Yes.
17      Q    Have you seen this document before?
18      A    I believe so.
19      Q    Did you receive it on or about
20  June 16, 2009?
21      A    I don't remember.
22      Q    What is this document?
23      A    It was, it looks to be a claim
24  letter from Amtrust Bank.
25      Q    When you receive or when the

Page 122

1                    P. MALIK

2      company receives a claim letter, what

3      happens next?

4                    MR. FURMAN:  Objection.  It is

5              beyond the scope of today's

6              deposition.  I am instructing my

7              client not to answer that question.

8                    MS. KIM:  She has already

9              testified that she received notices of

10             claim and that she searched e-mails

11             with respect to those notices.

12                   MR. FURMAN:  Ask her about

13             questions that relate to the scope of

14             today's deposition --

15                   MS. KIM:  I am, and she has

16             already answered --

17                   MR. FURMAN:  -- not what she

18             does with a claim letter..

19                   MS. KIM:  It is with respect to

20             the e-mails, if that is one of the

21             processes, and that is her answer.

22                   MR. FURMAN:  You can ask her if

23             she sent an e-mail.  That is fine.

24                   MS. KIM:  No.  I am sorry.  Are

25             there any other objections?

08438f93-fed3-4b62-af3a-95e2874e582e

Page 123

1          P. MALIK

2          MR. FURMAN:  I am going to

3     instruct my client not to answer your

4     question.  Ask another question.

5  BY MS. KIM:

6     Q    When you received a claim letter,

7  did you search for e-mails?

8     A    When I received this claim

9  letter?

10    Q    This claim letter, sure?

11    A    I don't remember when I received

12 it and what I did after that.  I don't know

13 if I received this particular one, if there

14 were a series of them.  I don't remember.

15    Q    Do you have a policy with respect

16 to claim letters in terms of searching for

17 e-mails?

18    A    No.

19    Q    Do claim letters differ in terms

20 of, do you have different reactions when you

21 receive claim letters?  Sometimes you search

22 for e-mails, sometimes you don't?

23         MR. FURMAN:  Objection.  You

24    know --

25         MS. KIM:  Object to form, but

Page 124

1                    P. MALIK

2        you can't --

3              MR. FURMAN:  What you are

4        asking borders on the absurd, okay?

5              MS. KIM:  Object to form.  If

6        you don't like the question, that is

7        fine, but if she doesn't understand

8        it, that is really for her to say.

9              THE WITNESS:  I don't know.

10             MS. KIM:  You don't know, that

11       is fine.

12   BY MS. KIM:

13       Q    Turning to Exhibit 6, if you go

14   down to about almost the bottom of the

15   letter --

16       A    Exhibit 6?

17       Q    I am sorry, Exhibit 4.  If you go

18   to about the bottom of the letter, it says

19   "Amtrust is requesting that you provide us

20   with copies of disbursement logs for the

21   above transactions."

22             Did you provide them with copies?

23             MR. FURMAN:  I am going to

24       instruct my client not to answer.  It

25       doesn't relate to electronic

P. MALIK

1

2    discovery, which is the purpose of

3    today's deposition.

4        MS. KIM:  No, it is also about

5    document retention.

6  BY MS. KIM:

7      Q    Did you provide them with

8  disbursement logs?

9        MR. FURMAN:  I am sorry, you

10    are wrong about what you saying here.

11    This is beyond the scope of today's

12    deposition.

13        MS. KIM:  It is not beyond the

14    scope.  I am asking about --

15        MR. FURMAN:  You can ask if

16    disbursement logs are electronic,

17    sure, and then you can ask a follow-up

18    question, sure.  That I can see.

19        MS. KIM:  We are asking how

20    they maintain their files.

21        MR. FURMAN:  No, I am sorry,

22    that is not the scope of the

23    deposition.

24        MS. KIM:  The records and

25    retention is clearly in the notice.

08438f93-fed3-4b62-af3a-95e2874e582e

Page 126

1                    P. MALIK
2            MR. FURMAN:  No, no.  We will
3       go to the judge on that.  My answer to
4       that is I am instructing my client not
5       to answer your question; happy to see
6       a judge over this.
7               To me this is nothing but a
8       back door attempt to get discovery.
9            MS. KIM:  I am sorry, there is
10      no question pending.
11           MR. FURMAN:  Don't cut me off.
12           MS. KIM:  Please don't make a
13      comment if there is no question
14      pending.
15           MR. FURMAN:  Don't cut me off.
16           MS. KIM:  You don't have to
17      make a your little speeches.
18           MR. FURMAN:  I don't care what
19      you say about me, but don't cut me off.
20           MS. KIM:  Then don't make any
21      more speeches.
22   BY MS. KIM:
23        Q    So, were any e-mails retrievable
24   from the server between 2003 through 2009?
25        A    I don't know.  Thank you.

Page 127

1                    P. MALIK

2        Q    In preparation for this

3   deposition, did you ask anyone if any

4   e-mails were retrievable?

5              MR. FURMAN:  It has already

6        been asked and answered several times

7        now.

8              THE WITNESS:  No.

9   BY MS. KIM:

10       Q    Ms. Malik, please go to Exhibit 1.

11       A    Was that your notice?

12       Q    Yes, the notice, please.

13       A    Okay.

14       Q    If you go to item number 41.

15       A    Yes.

16       Q    The e-mail address R Davila at

17   Malik PC.com.  Whose e-mail address is it?

18       A    Rosa Davila.  It was.

19       Q    Is she still an employee of the

20   firm?

21       A    No.

22       Q    When did she leave?

23       A    Maybe 2009.

24       Q    Early, mid, late?

25       A    I don't remember.

08438f93-fed3-4b62-af3a-95e2874e582e

Page 128

                    P. MALIK

1

2        Q    What was Rosa's position at Malik

3    and Associates?

4        A    She was a paralegal.

5        Q    Was she part of the layoff in 2009?

6        A    I don't remember.

7        Q    What were her primary

8    responsibilities as a paralegal?

9             MR. FURMAN:  Objection.  That

10        has nothing to do with the scope of

11        today's deposition.

12             MS. KIM:  I'm trying to

13        understand what her e-mail account,

14        the scope of it.

15             MR. FURMAN:  The scope of her

16        e-mail account?  This is about

17        document retention, e-mail retention,

18        and the retrieval of e-mails.  What on

19        earth could the scope of her duties

20        have to do with retrievable e-mails?

21             MS. KIM:  What kind of e-mails

22        would she receive?

23             MR. FURMAN:  You are asking

24        what kind of e-mails?  I am going to

25        instruct my client not to answer that.

Page 129

1              P. MALIK

2        What kind of e-mails?  Take that to

3        the judge.

4    BY MS. KIM:

5        Q    What kind of e-mails would she

6    receive, such as was she dealing primarily

7    with foreclosures, would she deal with

8    Amtrust Bank?

9              MR. FURMAN:  Objection.  To the

10       extent you can answer.

11   BY MS. KIM:

12       Q    Did she deal with Amtrust Bank?

13             THE WITNESS:  Is it okay for me

14       to answer?

15             MR. FURMAN:  Yes, if you can

16       answer.

17             THE WITNESS:  Could you repeat

18       the question, please?

19   BY MS. KIM:

20       Q    Yes.  Did Rosa Davila, as part of

21   her duties and responsibilities as a

22   paralegal, did she work with Amtrust Bank?

23             MR. FURMAN:  Objection.

24             THE WITNESS:  For a period of

25       time, she did.

1                   P. MALIK

2    BY MS. KIM:

3         Q    What period of time are we

4    talking about?

5         A    I don't remember specifically.

6         Q    DOCPREP at Malik PC.com.  Did

7    that e-mail address belong to someone?

8         A    Well, it is a general e-mail

9    where we receive bank closing documents, so

10   it has been maintained by more than one

11   person.

12        Q    Who maintains it?

13        A    Not maintain but used, I would

14   say.  So, for a time it was used I believe

15   by Danielle Lewis, for a time it was used

16   by, I don't know, maybe Johanna might have

17   used it for a little while.  I don't know.

18        Q    In 2008, who would have used it?

19        A    Danielle.

20        Q    Why not Johanna?

21        A    Because she had her own e-mail

22   account at the time.  But if Danielle wasn't

23   here, then she would hop in and do what

24   needed to be done, retrieve the documents

25   and things like that.

Page 131

P. MALIK

1

2     Q    Did Danielle have her own e-mail

3  address?

4     A    I don't remember if she had a

5  separate one.

6     Q    Did she work with Amtrust Bank?

7     A    I believe so.

8     Q    In 2008?

9     A    Yes.

10    Q    But you are not sure if she had

11 an e-mail account in connection with the

12 subject loans at issue in this litigation,

13 other than DOCPREP at Malik PC.com?

14         MR. FURMAN:  Objection.

15         THE WITNESS:  Correct.

16 BY MS. KIM:

17    Q    The e-mail address P as Peter

18 Malik111 at Yahoo dot-com is yours?

19    A    Yes.

20    Q    Did anyone else have access to

21 this account?

22    A    No.

23    Q    Did you have a legal assistant in

24 2008?

25    A    Yes.

Page 134

P. MALIK

1    Malik and Associates PC?

3         A    It would have been the closer of
4    the particular loan, it could have been
5    Danielle, it could have been Rosa, it could
6    have been Kushu, who was also -- Kanwarjeet
7    is also known as Kushu.  That would have
8    been about it; anyone really in the closing
9    department.

10        Q    How many people were in the
11   closing department at the time of the
12   subject loans?

13        A    I don't remember.

14        Q    Guesstimate:  More than five,
15   less than five?

16        A    It was -- I really don't
17   remember.  I had looked it up, I had given a
18   list of employees that were in the firm at
19   the time, and I believe that has been
20   provided previously.  So I would refer you
21   to that.

22        Q    In your answers to plaintiff's
23   first set of interrogatories, in Exhibit 3,
24   you identified Kanwarjeet Malik as your
25   brother?

08438f93-fed3-4b62-af3a-95e2874e582e

Page 135

1                    P. MALIK

2         A    Yes.

3         Q    When did your brother leave Malik

4    and Associates P.C.?

5         A    2008.

6         Q    About what time period?

7         A    Sometime towards the end of the

8    year.

9                    (Brief break.)

10   BY MS. KIM:

11        Q    Ms. Malik, returning to item

12   number 41, Mack at Malik PC.com, whose

13   e-mail address is that?

14        A    Mack Smitherman.

15        Q    And his title is bookkeeper?

16        A    No, file clerk.

17        Q    Is he still with the company?

18        A    Yes, he is still with the company.

19        Q    He was with the company in 2008?

20        A    Yes, I believe so.  I would refer

21   back to that list.  I looked at payroll

22   records and give you that list.

23        Q    MSookra at Malik PC.com, whose

24   e-mail address is that?

25        A    Miranda Sookra.

08438f93-fed3-4b62-af3a-95e2874e582e

1                         P. MALIK

2     office once or twice.

3          Q     So the laptop is more of a

4     personal computer for you?

5          A     Yes.

6          Q     Prior to 2010, did any other

7     employees work off their laptops?

8          A     No.

9          Q     Prior to 2010, if an employee

10    left the company, you have their desktops;

11    there was nothing you would do with them?

12         A     No.

13         Q     Would anyone look at them to look

14    at what files were on their desktops?

15         A     No.

16         Q     When you learned that certain

17    e-mails weren't retrievable from the server,

18    around 2009, 2010, were there any desktops

19    you looked at of former employees?

20         A     No.

21         Q     Were there any former employee

22    desktops around?

23         A     Yes, but they were used by their

24    replacement employees, or other people.

25         Q     Once you had a replacement

Page 142

                    P. MALIK

1

2   employee, what happens with the desktop

3   computer?

4        A    Nothing.

5        Q    The person just logs on as a

6   former employee?

7        A    I believe they changed their

8   password, but nothing is done with the

9   actual desktop.  If you are asking about

10  e-mail accounts and passwords, that is

11  different, a different answer.

12       Q    What happens with their e-mail

13  accounts?

14       A    They are locked out.  Sometimes

15  they are forwarded to the person that takes

16  over their position, or they are left kept

17  active for a while so that the new person

18  can keep checking the e-mails, and there is

19  a message sent out to please forward all

20  your inquiries regarding these type of cases

21  to this person, and that is it.

22            And then the passwords are changed

23  and the e-mail account name is changed.

24       Q    And this was the case in 2008?

25       A    Yes.

08438f93-fed3-4b62-af3a-95e2874e582e

Page 146

1              P. MALIK

2        A    I don't know what you mean by

3   closed.  But if they were still accessible,

4   yes, they were still accessible.  I don't

5   know what you mean by closed per se.

6        Q    Were they still accepting e-mails?

7        A    I don't know.  I don't know.  I

8   never checked that.

9        Q    Were they still active?

10       A    I don't know.

11       Q    Prior to 2010, do you know?

12       A    I don't know.

13       Q    Would Susan check their e-mails?

14  I am sorry, former employees' e-mails --

15       A    No.

16       Q    -- to make sure that their e-mail

17  accounts were no longer active?

18       A    Not unless specifically

19  instructed to.

20       Q    Who would instruct her?

21       A    I would.  I would, or my

22  attorneys.

23       Q    When you found out that there

24  were e-mails unretrievable from the server,

25  did you search the employees' desktops?

Page 147

1                    P. MALIK
2         A    No.  At that time, no.  We
3    wouldn't have checked their desktops I don't
4    think, but no.
5         Q    Why not.
6         A    Because everything should have
7    been on the server.  All the e-mails were on
8    the Exchange server.
9         Q    But once you found out that
10   e-mails weren't on the Exchange server
11   because there is no back-up of them, did you
12   check the desktops to make sure that they
13   weren't on their computers?
14        A    I don't know if Ekram did or not.
15   I know I didn't.
16        Q    Did you tell Ekram to do so?
17        A    I just told him to see if he
18   could find certain e-mails, and he told me
19   that he could not, he could not retrieve
20   them.
21        Q    Off the server?
22        A    From wherever.  I didn't
23   specifically ask him where all he had
24   checked.
25        Q    Prior to 2010, when an employee

08438f93-fed3-4b62-af3a-95e2874e582e

1                    P. MALIK

2    that certain e-mails were unretrievable from

3    the server, did you ask your employees to

4    look at all of their e-mail folders?

5         A    Not until -- at what point?

6    Before this deposition, yes.

7         Q    And were any e-mails found?

8         A    Yes.

9         Q    And were they produced to us?

10        A    Yes.

11        Q    What about in 2008?

12             MR. FURMAN:  What about 2008?

13   BY MS. KIM:

14        Q    Did you ask your employees to

15   search their e-mail folders?

16        A    No.

17        Q    What about in 2009 when you

18   received notices of claim, did you ask your

19   employees to search their e-mail folders?

20        A    I had only asked Rosa and Ekram.

21        Q    Would Ekram have e-mail folders

22   to search?

23        A    No.  I had told Ekram to see if

24   he could locate some of these e-mails, and I

25   had asked Rosa to check if she could find it

Page 151

1                         P. MALIK

2      anywhere.

3           Q     Find it anywhere within her

4      computer or his computer?

5           A     Within her computer.

6           Q     And where did Ekram search?

7           A     Like I said, I don't know.  I

8      never specifically asked him where he

9      searched.

10          Q     Did you provide him with a list

11     of employees' computers to search?

12          A     No.  But when we got these

13     discovery demands, my -- you know, I spoke

14     with Tom and I said, look, before I tell

15     them that there is absolutely nothing else

16     available anywhere, can you just tell me

17     where else we could look?

18                And he was the one that said,

19     suggested why don't you go in and look at

20     these individual, because we still had some

21     active -- I didn't know that they were still

22     there -- the old e-mail accounts for these

23     employees.

24                So then that is when we started

25     searching all of those for everything having

08438f93-fed3-4b62-af3a-95e2874e582e

Page 152

P. MALIK

1
2    to do with these properties and these cases
3    and everything, and we were able to recover --
4    whatever we recovered we produced.
5         Q    Where were the old e-mail
6    accounts maintained?
7         A    I don't know.  I don't know if
8    they were in the desktop or the server.
9    Honestly I have no idea.
10        Q    You didn't ask Tom?
11        A    No.
12             And then we gave him the list of
13   all the file names and the property
14   addresses, and then he did some searches and
15   then Susan did some searchs.
16        Q    What do you mean by file names?
17        A    The names of all the borrowers in
18   connection with this lawsuit.
19        Q    Is that how you saved documents,
20   or is that how you would organize documents?
21        A    No, they weren't saved in any
22   particular order, but there were so many
23   e-mails, you know, he needed some kind of --
24   we gave him property addresses, we gave him
25   the borrowers' names, we gave him Barbara

08438f93-fed3-4b62-af3a-95e2874e582e

Page 153

1                      P. MALIK

2    Guarino's name again, Amtrust, and

3    everything that came up we produced.

4          Q    Did you give him the names of any

5    of the other defendants in this case?

6          A    No.

7          Q    Did you provide him with these

8    names and this list of properties by e-mail?

9          A    I believe so.

10         Q    When did you send this e-mail to Tom?

11         A    It was around the time that these

12   interrogatories and things were exchanged, I

13   believe.  It was around that time when we

14   had document production and things like that.

15         Q    With Ekram you didn't provide him

16   with a list of properties or individuals?

17         A    No.  I don't even believe we were

18   in litigation at that time.  We just had the

19   notices of the claims.

20         Q    Other than the discovery requests

21   in this action, have you ever been asked for

22   electronic documents prior to the discovery

23   demands in this case?

24         A    No.

25         Q    In your interrogatories, or your

1              P. MALIK

2    answers to plaintiff's interrogatories,

3    Exhibit 2 -- I am sorry.  In your answers to

4    interrogatories, Exhibit Number 3, on page

5    four you identified a number of litigations

6    that you have been involved in as a party.

7         A    Yes.

8         Q    In the Ashok Goel versus Malik

9    and Associates P.C., the first case listed

10   there, when was that case commenced?

11        A    Many, many, many years ago.  I

12   don't remember.  I don't have an index

13   number there.

14        Q    If I said 2004, would that sound

15   familiar to you?

16        A    It could be.  I don't know.  I

17   was thinking --

18             MR. FURMAN:  What does this

19        have to do with the purpose of today's

20        deposition?

21             MS. KIM:  If you would like to

22        look at the notice, the last section.

23   BY MS. KIM:

24        Q    Is that case still ongoing?

25        A    Yes.

Page 155

1                      P. MALIK

2        Q    Have the parties gone through

3   discovery?

4              MR. FURMAN:  Objection.  I am

5         going to just advise my client not to

6         answer that question.  I want -- you

7         referred me to --

8              MS. KIM:  You want me to point

9         you out to the notice where it says

10        information in regard to other

11        litigation?

12             MR. FURMAN:  Information about

13        production -- my client is not going

14        to give you answers about other

15        litigation that could prejudice her

16        position in those cases.

17             MR. MUCCIA:  I am sorry; are we

18        now agreed that it is asked for in the

19        notice?

20             MR. FURMAN:  I am not agreeing

21        to anything.

22             MR. MUCCIA:  It is not asked

23        for in the notice?

24             MS. KIM:  You didn't object

25        prior to this.

08438f93-fed3-4b62-af3a-95e2874e582e

P. MALIK

1
2          MR. FURMAN:  It doesn't matter
3      to me what is asked for.  I am going
4      to instruct my client not to answer
5      it.  Go to the judge and ask for it.
6          You want information on
7      production of documents in other
8      litigation?  Sorry, I am not going to
9      allow my client to answer that
10     question, and by all means we will
11     call the judge right now or we will do
12     it by letter, whatever you would like
13     to do.  However you want to do it is
14     fine by me.
15         MR. MUCCIA:  You got the
16     instruction.  Move on.  It is an
17     indefensible position.
18  BY MS. KIM:
19     Q    Ms. Malik, in your interrogatory
20  responses you list six actions there?
21     A    Yes.
22     Q    Which of them are still ongoing?
23     A    The first two.
24     Q    And the last four, what has
25  happened to them?

Page 157

                    P. MALIK

1

2       A     They have either all been settled

3   or dismissed against my firm.

4              MS. KIM:  Counsel, with respect

5        to the first two matters, if I ask her

6        any questions with respect to the

7        discovery or any documents produced or

8        requested in those matters, are you

9        going to give her the same instruction

10       not to answer?

11             MR. FURMAN:  Absolutely.

12       Absolutely.  Those are pending

13       litigations.  My client could

14       conceivably be prejudiced by any

15       questions that she would answer under

16       oath that relate to separate actions.

17             MS. KIM:  If I am asking about

18       e-mail or electronic documents

19       produced in that litigation?

20             MR. FURMAN:  In those cases?

21             MS. KIM:  Yes.

22             MR. FURMAN:  Yes, I am going to

23       instruct my client not to answer those

24       questions..

25             MS. KIM:  How is she going to

1                        P. MALIK

2          be prejudiced?

3                     MR. FURMAN:  I don't have to

4          answer your question.  I am going to

5          instruct my client not to answer.

6                     It is obvious how she could be

7          prejudiced.  You are asking my client

8          questions about an unrelated case

9          under oath where conceivably whatever

10         answer she could give could be used in

11         discovery in those particular cases.

12                    You tell me how she would not

13         be prejudiced by that.  I will be

14         happy to hear your answer to that.

15                    MS. KIM:  What about the cases

16         identified in numbers three through

17         six which have been settled or

18         dismissed against her or the firm?

19         Are you going to give her the same

20         instruction?

21                    MR. FURMAN:  I am baffled by

22         the relevance of asking.

23                    MS. KIM:  I am not asking about

24         the relevance.  Are you going to give

25         her the same instruction?

08438f93-fed3-4b62-af3a-95e2874e582e

1                   P. MALIK

2           MR. FURMAN:  I am going to

3     instruct my client to answer questions

4     that relate to electronic discovery in

5     relation to this particular case.

6           You are asking about

7     electronic, I assume, production of

8     electronic discovery in other cases.

9     You know, if we are ordered by the

10    court after you want to brief it, I

11    would be happy to do that.  If we are

12    ordered by the court to produce Ms.

13    Malik, we are going to produce her

14    obviously for --

15          MR. MUCCIA:  Is that an

16    instruction, Mark?

17          MS. KIM:  That is what we are

18    asking.  Are you going to instruct her

19    not to answer questions about

20    discovery or discovery demands --

21          MR. FURMAN:  In unrelated

22    litigation, yes.

23          MS. KIM:  No, in the three

24    through six, those cases that have

25    settled and/or been dismissed against

Page 160

P. MALIK

1      her.

2              MR. FURMAN:  I don't know to

3      what degree my client could be

4      prejudiced if these claims could be

5      somehow resuscitated.  I am going to

6      instruct my client not to answer, yes.

7      I will.

8              There is a whole host of

9      issues.  There is attorney/client

10     issues that relate to whatever my

11     client may have discussed with her

12     lawyers.  I wasn't her lawyer in those

13     cases.  It is palpably improper.

14             So, you know, if you want to go

15     to the court with this, you know, I'll

16     deal with it.

17 BY MS. KIM:

18     Q    In 2008, was the company on a

19 centralized computer network environment?

20             MR. FURMAN:  What?

21             THE WITNESS:  What is that?

22 BY MS. KIM:

23     Q    What was, how was there a

24 network?

Page 168

                        P. MALIK
1
2    search for documents?
3         A    Just went to the file.
4         Q    Were you the only person working
5    on that file?
6         A    Yes.
7         Q    No one was assisting you with
8    that file?
9         A    I don't remember who my secretary
10   was at the time, but she would have just
11   been working with me.
12        Q    Did you place any sort of
13   litigation hold or send out any sort of
14   notice to hold any documents relating to
15   that matter when you received the request?
16        A    To whom would I have sent such a
17   hold, and what is it?
18        Q    What are you asking about what is it?
19        A    What is a litigation hold?
20             MR. FURMAN:  What is a
21        litigation hold?  I have no idea what
22        you are talking about.
23   BY MS. KIM:
24        Q    You don't know what a litigation
25   hold is?

Page 169

1                    P. MALIK

2        A    I don't.

3             MR. FURMAN:  I don't think

4    anyone in this room knows that.

5             MR. MUCCIA:  I do.  It is a

6    pretty well known thing.

7             MR. FURMAN:  I promise you I

8    will Google it.

9             THE WITNESS:  I have never

10   heard of it.

11            MR. FURMAN:  I will probably do

12   it right now as we speak.

13            THE WITNESS:  I have been doing

14   litigation for many, many years, maybe

15   not in federal court, but I have never

16   heard what a litigation hold is.

17 BY MS. KIM:

18       Q    You have been doing litigation

19 for many years.  Have you issued requests

20 seeking electronic documents?

21       A    I am sorry?

22       Q    Have you issued requests seeking

23 electronic document?

24       A    Yes, probably.

25       Q    Probably or -- that's a yes or

Page 170

1                     P. MALIK

2    no.  It's not a --

3         A    I believe so.

4         Q    Have your clients ever received a

5    request for electronic documents?

6         A    I don't know.

7              MR. FURMAN:  Don't answer what

8         your clients do.

9              MS. KIM:  You don't know.

10             MR. FURMAN:  The answer is

11        nothing because you are asking for

12        something that is privileged and none

13        of your business.

14   BY MS. KIM:

15        Q    Have your clients ever asked you

16   for copies of electronic documents?

17             MR. FURMAN:  That is also

18        privileged.

19             MS. KIM:  It's not privileged

20        when it comes to Amtrust.

21             MR. FURMAN:  Then ask about

22        Amtrust.

23   BY MS. KIM:

24        Q    Has Amtrust ever asked you for

25   copies of electronic documents?

08438f93-fed3-4b62-af3a-95e2874e582e

1               P. MALIK

2       A     In connection with these

3  discovery demands and those claim letters,

4  whatever they asked for.

5             And they could have also

6  requested e-mail of closing documents

7  because Amtrust was an e-sign bank.  So a

8  lot of their documents were just delivered

9  to them via e-mail and not hard copies.  So,

10 yes.

11      Q     What would happen with the hard

12 copies?

13      A     They would never be generated.

14 There would only be a couple of documents

15 that would be hard copies.  Everything else

16 would be electronic.

17      Q     And what would you do with the

18 hard copies?

19      A     We would just send it to the bank.

20      Q     Did you retain any copies?

21      A     Whatever we retained we produced,

22 whatever was in my physical files.

23      Q     You didn't retain any copies on

24 your server on your desktops?

25      A     I don't know.

08438f93-fed3-4b62-af3a-95e2874e582e

1                    P. MALIK

2          Q     You don't know.  You didn't ask

3     anyone?

4          A     No.

5          Q     Is there any policy with respect

6     to e-docs?

7          A     No.

8          Q     In 2008, no?

9          A     No.

10          Q     Now?

11          A     No.

12          Q     How many banks does the firm deal

13     with?

14          A     When, and in what period?

15          Q     I am sorry, in 2008 how many

16     banks?

17          A     Every bank under the sun, except

18     for maybe Emigrant.

19          Q     Was Amtrust the only bank doing

20     work by e-docs?

21          A     No.  All, mostly all the banks

22     were delivering documents to us, but we were

23     required to print them out and have a proper

24     three-set package prepared and send them

25     back hard copies.  Amtrust was different in

08438f93-fed3-4b62-af3a-95e2874e582e

Page 173

1                    P. MALIK
2    that regard.
3         Q    Amtrust was the only bank in
4    2008?
5         A    Yes.
6         Q    Now?
7         A    That was doing e-signing.
8         Q    That was doing e-signing.  Now,
9    currently, do banks do e-signing?
10        A    No, none that I deal with.
11             MR. FURMAN:  I just want to
12        respond and to say to Mr. Muccia, I
13        did -- there is such a thing as a
14        litigation hold, and I stand
15        corrected.  And evidently you learn
16        something new every day.
17             MR. MUCCIA:  I am glad to do
18        that for you.
19             THE WITNESS:  Could somebody
20        tell me what a litigation hold is?
21             MR. FURMAN:  It is a letter --
22             MR. MUCCIA:  Just below the
23        neck.
24             THE WITNESS:  That would be the
25        pinched nerve, my pinched nerve.

08438f93-fed3-4b62-af3a-95e2874e582e

Page 174

1          P. MALIK

2          MR. FURMAN:  It is a letter

3      that you send in litigation saying

4      hold all documents.

5          (Discussion off the record.)

6  BY MS. KIM:

7      Q    Ms. Malik, if you go back to

8  Exhibit Number 1 on your notice, item

9  number 15?

10     A    I didn't know they actually

11 published a decision on this.  That is

12 interesting.

13     Q    You didn't ask Tom about the

14 litigation hold notifications?

15     A    There were none.

16     Q    But you didn't know what it was,

17 you said?

18          MR. FURMAN:  No, no.

19          THE WITNESS:  If I didn't know

20     what that was, how would he have known?

21          MR. FURMAN:  Are you referring

22     to anything in particular when you say

23     litigation hold?  Is there a letter, a

24     document or something that we can

25     refer to, because I don't know what

Page 175

1                    P. MALIK

2          you are talking about.

3                    MR. MUCCIA:  I thought you just

4          looked it up.

5                    MR. FURMAN:  It is a concept.

6          I understand the concept.

7                    MS. KIM:  I can refer you to a

8          couple cases.

9                    MR. FURMAN:  Cases and concept

10         is fine.  Show me a litigation hold

11         letter that my client received.

12    BY MS. KIM:

13         Q    You said with respect to the

14    other banks and their closings you printed

15    out everything under the sun and kept them

16    in hard copies in your files.  You did not

17    print out anything for Amtrust?

18                   MR. FURMAN:  Mischaracterizes

19         the testimony.

20    BY MS. KIM:

21         Q    For Amtrust in 2008 you printed

22    nothing?

23         A    That is not what I said.

24         Q    What did you print out, or did

25    you print out anything for Amtrust?

Page 176

P. MALIK

1

2      A      A couple of documents, I don't

3   remember exactly which ones.  But I think

4   that at least for our records, even though

5   the e-signed version went to Amtrust

6   electronically, we printed out a whole set

7   for our file.  So there was a complete set

8   of documents at least maintained in our

9   physical file.

10      Q      So you did print out a whole set?

11      A      Yes, but we didn't print out and

12   make three copies, because the bank got a

13   majority of the disclosures by e-mail.

14          We printed out a whole set of the

15   disclosures that were sent to them by e-mail

16   for our file, kept them in the file, and

17   then we did three copies of the note and

18   mortgage and some other documents that were

19   signed hard copies.  So the documents that

20   are printed and put in our file, I don't

21   know if they were signed copies or if they

22   were, if they were signed or, you know,

23   just, because there was no signature

24   required on those documents.  They just had

25   to come in and click the mouse or e-verify

08438f93-fed3-4b62-af3a-95e2874e582e

Page 177

1                    P. MALIK
2    or e-sign, however that procedure worked.
3         Q    When you say "they," do you mean,
4    who?  Who do you mean?  You say they click?
5         A    The borrower.
6         Q    The borrower clicks.  Does the
7    borrower click at year office?
8         A    Yes, for those particular Amtrust
9    e-sign closings.
10        Q    Are all the loans at issue in
11   this litigation, are they all e-signing?
12        A    I do not believe so.
13        Q    If they weren't e-signing, what
14   did you do?
15        A    Like we would do a traditional
16   bank closing:  Print out the package, make
17   three copies, have three hard signatures.  I
18   give one copy to the borrower, send one hard
19   copy back to the bank and keep one copy in
20   file.
21        Q    How did you communicate with
22   Amtrust?  When I say "you" I mean you and
23   your employees who worked with Amtrust on
24   the closings?
25        A    Phone and e-mail.

1                    P. MALIK

2          Q    How did you communicate with the

3     title companies involved in the subject loans?

4          A    Phone and e-mail, I would imagine.

5          Q    You would imagine or did you

6     check before this deposition?

7          A    Did I check what?  I did not

8     check anything like that.  I just know that

9     that was how we communicated with other

10    people, other companies.

11         Q    What about the brokers, how did

12    you communicate with them?

13         A    Same, by phone and e-mail.

14         Q    What about the seller's attorneys?

15         A    Fax, phone, e-mail.  Also fax for

16    all of the above.

17         Q    Would you retain copies of the

18    faxes?

19         A    Yes.

20         Q    And I am talking about with

21    regard to these subject loans?

22         A    Yes.

23         Q    Did you retain copies of the

24    e-mail communications with regards to the

25    subject loans?

08438f93-fed3-4b62-af3a-95e2874e582e

1                       P. MALIK

2         A     Whatever we retained was already

3    provided.  Everything in the file, our file

4    was provided.

5         Q     How quickly do employees delete

6    e-mails after closings?

7                   MR. FURMAN:  Objection.

8                   THE WITNESS:  I don't know.

9    BY MS. KIM:

10        Q     Is there any policy in place with

11   regards to deleting e-mails at the company?

12        A     At what time?

13        Q     In 2008.

14        A     No.

15        Q     Now?

16        A     Not really, just that I want hard

17   copies printed out and put in files.

18        Q     So if anyone had a question about

19   a closing, let's say a month afterward,

20   there maybe could be no e-mail to refer back

21   to in 2008?

22        A     Correct.

23        Q     When did you implement this

24   policy where you asked your employees if

25   there is some communication that they print

08438f93-fed3-4b62-af3a-95e2874e582e

Page 180

                        P. MALIK

1

2   it out in hard copy and put it in the file?

3        A    2010.

4        Q    After the back-up system had been

5   put in place?

6        A    Yes.

7        Q    After you received the claim from

8   Amtrust, did you instruct your employees or

9   your staff or anyone at the company

10  regarding electronic records?

11       A    About what?

12       Q    About, did you give them any

13  instructions whether to save them, whether

14  to give them to you?

15       A    I don't remember.

16       Q    You don't recall, in 2008 you

17  don't recall?

18       A    No.  I never received any claims

19  in 2008.

20       Q    In 2009?

21       A    I don't recall.

22       Q    Did you ask any employees -- I

23  mean are there any employees who would

24  recall?

25       A    I don't know.

Page 181

1              P. MALIK

2      Q    When you received a copy of the

3  complaint in this action, did you give any

4  instructions to your employees regarding

5  Amtrust documents?

6            MR. FURMAN:  Objection.

7       Wouldn't that be privileged under the

8       work product?

9            MS. KIM:  I am trying to find

10       out about these record retentions.

11            THE WITNESS:  Electronic

12       documents?

13  BY MS. KIM:

14      Q    Yes.

15      A    I don't remember.

16      Q    When you received a copy of the

17  discovery demands, did you give any

18  instructions to your employees regarding

19  electronic documents belonging to Amtrust?

20      A    Instructions regarding what?

21      Q    The electronic documents

22  concerning or relating to Amtrust?

23      A    I don't remember.

24            MS. KIM:  Can we take a quick

25       five-minute break?

08438f93-fed3-4b62-af3a-95e2874e582e

1          P. MALIK

2      Q    Was there any sort of policy of

3  using personal accounts or other e-mails

4  other than Malik PC.com?

5      A    No, and I don't believe anybody

6  did, but I don't know for sure.

7      Q    Did you ask any of your employees

8  what e-mail accounts they used with respect

9  to the Amtrust accounts?

10     A    No.

11     Q    Prior to this deposition, did you

12  ask any of your employees what e-mail

13  accounts they used?

14     A    No.

15     Q    You testified earlier that Tom

16  had told you that Utah is where the files

17  are archived?

18     A    Yes.

19     Q    Do you know if the archive is a

20  remote and secure location?

21     A    I don't know.

22     Q    Did you ask Tom?

23     A    No.

24     Q    What is archived in Utah?

25     A    I don't know.

08438f93-fed3-4b62-af3a-95e2874e582e

Page 196

1                       P. MALIK
2     reindexed, purged, repaired or archived?
3     That wasn't the question.
4          Q    They were trying to find an
5     e-mail that they had deleted?
6          A    But that is not reindexed,
7     purged, repaired or archived.
8          Q    What I am asking, do you recall
9     any incident in which --
10         A    I don't recall any specific
11    incident, no.  But I am sure it must, it may
12    have happened.  I don't know that it didn't.
13         Q    What about draft documents?  Do
14    you do your documents in Microsoft Word or
15    in Word Perfect?
16         A    Sometimes both.
17         Q    Do your employees work in
18    Microsoft Word or Word Perfect?
19         A    Both.
20         Q    Have there been any incidents
21    where the system has crashed and you are
22    trying to retrieve the document, a copy of
23    the document?
24         A    Yes; not that the system is
25    crashed, but they were looking --

1                   P. MALIK

2        Q    But the program has crashed?

3        A    Not that the program has crashed,

4    but that they were looking for a document.

5        Q    Was that in 2011?

6        A    I am just telling you generally,

7    yes, there have been incidents.  I don't

8    know when.

9        Q    When did these incidents begin?

10        A    It is not a beginning.  I mean

11    throughout the time that I have been using a

12    computer, I can't tell you.  There have been

13    incidents where people have said, employees

14    have told me that they've lost a document

15    and they have tried to retrieve it.

16        Q    And what happens then?

17        A    Sometimes it is retrievable and

18    sometimes they could get it and sometimes

19    they couldn't.

20        Q    How would they find out if they

21    couldn't get it or not?

22        A    In every incident it would be

23    either they would look through the desktop,

24    they would look through the server, which we

25    had the servers at the time, or they would

08438f93-fed3-4b62-af3a-95e2874e582e

                    P. MALIK

1

2        A     What do you mean replacement

3    policy?

4        Q     Do you replace computers?

5        A     Yes.

6        Q     How frequently?

7        A     When we need to, when the

8    computer doesn't work any more.

9        Q     In 2010, have you replaced any

10    computers?

11        A     I believe so.

12        Q     How many?

13        A     Maybe one or two.

14        Q     2009?

15        A     I don't remember.

16        Q     Who would know?

17        A     Ekram maybe.

18        Q     Would your bookkeeper know?

19        A     No.

20        Q     To buy a computer, who would they

21    ask?  Did they ask you to buy a new computer

22    or who would inform you that a new computer

23    would need to be purchased?

24        A     If a computer broke down, then

25    they would ask me and then I would authorize

1                    P. MALIK
2    either Ekram to bring in a new computer or
3    we would order it from our account at Dell.
4         Q    What happened with the old
5    computers?
6         A    We dismantle them and then, you
7    know, I guess just discard them.  They are
8    broken and discarded.
9         Q    Who is "we"?
10        A    It would be Tom or whoever the IT
11   person was.
12        Q    And prior to 2010?
13        A    It would have been Ekram.
14        Q    Would Ekram come to the office
15   and pick up the computer and take it with him?
16        A    Yes.
17        Q    And Tom does the same?
18        A    Yes.
19        Q    How many computers were replaced
20   in 2009?
21        A    I don't remember.
22        Q    2008?
23        A    I don't remember.
24        Q    Would Ekram have that information?
25        A    Probably, if we bought them from

Page 212

1                    P. MALIK
2    him.
3         Q    Dell would have had the
4    information too, if you bought them from
5    Dell?
6         A    I don't think we had an account
7    with Dell in '08.  I believe we had the
8    account with Dell in '09 at some point, but
9    there could have been other people that we
10   had bought the computer from.
11        Q    For tax purposes, would you
12   maintain the invoices for these purchases?
13             MR. FURMAN:  Objection.
14             THE WITNESS:  I am sure they
15        would be somewhere.  I don't know.
16             (Brief break.)
17   BY MS. KIM:
18        Q    Before the break, we were
19   discussing when you would discard old
20   computers prior to 2010, Ekram would pick up
21   the computers.
22        A    I believe so, but I think we
23   still had some old computers lying around
24   that I think we just threw away.
25        Q    In 2008, do you recall how many

1                    P. MALIK

2    computers Ekram took or how many computers

3    were thrown away?

4         A    No.

5         Q    2009?

6         A    No.

7         Q    2010?

8         A    No.

9         Q    If Ekram would come by and pick

10   up the old computer, what would happen with

11   the hard drive?

12        A    I don't know.

13        Q    Would you do anything with the

14   hard drive?

15        A    I don't know.

16        Q    Would you ask Ekram to do

17   anything with the hard drive?

18        A    No.

19        Q    Was there any sort of policy with

20   respect to the old hard drive --

21        A    No.

22        Q    -- that was going to be taken by

23   Ekram?

24        A    No.

25        Q    Why would you decide with other

08438f93-fed3-4b62-af3a-95e2874e582e

Page 214

P. MALIK

1
2  computers just to throw them away rather
3  than have Ekram pick them up?
4        A    Because it could have been that
5  we had asked him repeatedly and he never
6  came by, and we just picked them up and
7  threw them out because I was tired of seeing
8  them lying around.
9        Q    But the computers that you
10  discarded, would you do anything with their
11  hard drives?
12        A    No.
13        Q    Would you do anything with the
14  computers prior to discarding them?
15        A    No.
16        Q    Would you have anyone go through
17  the computers trying to retrieve any files
18  from those computers?
19        A    No.
20        Q    What about in 2010?
21        A    We didn't throw any out.
22        Q    You didn't throw out any computers?
23        A    No.
24        Q    Did Tom take away any computers?
25        A    I don't know.

08438f93-fed3-4b62-af3a-95e2874e582e

Page 215

P. MALIK

1

2     Q     How come you don't know?

3     A     I don't know if he did in 2010.

4     Q     Did you ask Tom to remove any

5     computers?

6     A     The only thing -- did I ask him

7     to remove any computers?

8     Q     Yes.

9     A     I don't remember if we replaced

10    anything, if something had, if -- I don't

11    remember.

12    Q     What about so far in 2011?

13    A     I don't remember.  I don't

14    believe so.

15    Q     Did you throw away any computers?

16    A     No, I don't think so.

17    Q     And you didn't throw away any

18    computers in 2010?

19    A     I said I don't remember.

20    Q     What about your home computers

21    prior to 2010?

22    A     What about them?

23    Q     Did you replace any of them?

24    A     Yes.

25    Q     What did you do with the old

Page 216

1                   P. MALIK
2    computers?
3         A    Throw them out.
4         Q    Did you have anyone look at
5    computers prior to throwing them out?
6         A    No.
7         Q    How did you throw them out?
8         A    In the trash.
9         Q    What did you do with the hard
10   drives?
11        A    Nothing.
12        Q    This is prior to 2010?
13        A    Yes.
14        Q    How many --
15        A    Was it 2010?  We got a new
16   computer I think 2010.
17        Q    Did you throw away any computers
18   in 2008?
19        A    I don't remember.
20        Q    You don't recall if you threw
21   away any home computers prior to 2010?
22        A    No.
23        Q    How many computers did you throw
24   away in 2010?
25        A    Probably one.

1                    P. MALIK
2        Q    Why do you say probably?  Were
3    there two that could have been thrown out?
4        A    No, I think it was just one.
5        Q    What about 2011?
6        A    None at home, no.
7        Q    The computer that you threw out
8    in 2010, what was it?  Was it a desktop or a
9    laptop?
10        A    Desktop.
11        Q    What about computer hardware?
12    With old computer hardware, computers that
13    you were going to throw out, prior to 2010
14    did you have any sort of policy regarding
15    their disposal or recycling?
16        A    No.
17        Q    And after 2010?
18        A    No.
19        Q    Did you sell the hardware?
20        A    No.  Can you sell hardware?  I
21    didn't even know.
22        Q    Parts.
23        A    Interesting.
24        Q    What about used disks or drives,
25    what do you do with them prior to 2010?

08438f93-fed3-4b62-af3a-95e2874e582e

Page 220

1                  P. MALIK

2        Q    You don't know if anyone looked
3    at it?

4        A    No.

5        Q    When you found out that e-mails
6    were not retrievable from the server, did
7    you ask anyone to look at your computer to
8    see if there were any e-mails on the
9    computer at the office?

10       A    No.

11       Q    Did you ask anyone to look at
12   your computer at home?

13       A    No.

14       Q    At that time -- I am sorry, in
15   2009, did you have one or two home computers?

16       A    In 2009 we had one laptop and one
17   home desktop.

18       Q    Two computers?

19       A    No, because I wouldn't ask them
20   to check my computer.

21       Q    Why not?

22       A    My e-mail is not, my Outlook
23   e-mail is not accessible on my computer.

24       Q    Then how did it work where you
25   would work off your e-mail?

Page 221

1                    P. MALIK

2          A    I never worked off Malik P.C.

3    e-mail.

4          Q    Did you work off your Yahoo

5    e-mail?

6          A    Yes.

7          Q    So then what happened with the

8    documents off the Yahoo account?

9          A    It wouldn't be on a desktop, it

10   would be in the e-mail, in the Yahoo e-mail.

11         Q    But you didn't save any e-mails

12   or documents from the Yahoo account onto

13   your desktop?

14         A    No.

15         Q    Or onto your laptop?

16         A    I may have, but not in connection

17   with this lawsuit.

18         Q    So you had no one to examine it

19   to confirm whether there were any?

20         A    No, because I checked the Yahoo

21   e-mail itself for any e-mails, and there

22   were none.

23         Q    Just to clarify, you mean there

24   were no e-mails regarding Amtrust?

25         A    Yes.

08438f93-fed3-4b62-af3a-95e2874e582e

1                      P. MALIK

2          Q    You said you used your Yahoo

3    account for work purposes?

4          A    Yes.

5          Q    So you used it for other clients

6    but not Amtrust?

7          A    I did not say that.

8               MR. FURMAN:  Objection.

9    BY MS. KIM:

10         Q    You used it for Amtrust?

11         A    I may have, yes.

12         Q    In 2010, did anyone examine your

13   desktop for materials in connection with

14   this lawsuit?

15         A    I don't know.

16         Q    Did you ask anyone?

17         A    To examine my desktop?

18         Q    Correct.  At the office?

19         A    No, specifically, no.

20         Q    What about in response to the

21   discovery requests, did you ask anyone?

22         A    I told them to check to see if

23   they could find anything.  If they checked

24   my desktop they may have.  I don't know.

25         Q    Who is "they"?

1                    P. MALIK

2          A     Anybody, like Susan or Danielle,

3    like I said, the two people that I asked

4    them to search the individual e-mail

5    accounts.

6          Q     What about your desktop, did they

7    search that?

8          A     I don't know.

9          Q     You didn't ask them to?

10         A     Specifically, no.  I asked them

11   to search.  As part of that search they

12   could have searched it, I don't know.  If

13   you want to provide a separate demand, I

14   will get that answer to that question, but I

15   don't know right now.

16         Q     What about, in 2010 how many

17   computers did you have at home?

18         A     Two laptops and one desktop.

19         Q     Of the three computers, did

20   anyone examine those computers?

21         A     No.

22         Q     Or files in connection with this

23   lawsuit?

24         A     No.

25         Q     What about in 2011?

Page 224

                    P. MALIK
1
2        A    No.   There wouldn't be any point.
3   Those computers weren't in existence around
4   the time that you are asking about.  That
5   was 2008.  And also I think my office
6   desktop I got after 2008.
7        Q    Did you use your computers at
8   home to access your Yahoo account?
9        A    Yes.
10            MS. KIM:  We are going to
11       adjourn this deposition.  We are going
12       to seek rulings with respect to your
13       instructions not to answer and with
14       respect to whether this witness is an
15       adequate 30(b)(6) witness.  We will
16       reconvene subject to those rulings.
17            MR. FURMAN:  Okay.  I am not
18       adopting your editorializing of what
19       we are concluding.  As far as I am
20       concerned, we are concluding.
21            MS. KIM:  We are not
22       concluding.
23            MR. MUCCIA:  There is a
24       difference of opinion.  I understand
25       your opinion and you understand ours.