# Exhibit 2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK



FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y
★ NOV 0 4 2009 ★
BROOKLYN OFFICE

AMTRUST BANK,
1801 East 9th Street
Suite 200
Cleveland, OH  44114

      Plaintiff,

v.

PANKAJ MALIK; MALIK & ASSOCIATES;
P.C.; ARTISAN MORTGAGE COMPANY, INC.;
STREAMLINE MORTGAGE CORPORATION;
GENESIS HOME MORTGAGE CORP.; LINK
ONE MORTGAGE BANKERS LLC; GLOBAL
FINANCIAL, INC.; RESOURCE ONE, INC.;
ACORN FUNDING GROUP, INC.; SI
MORTGAGE COMPANY; NMR ADVANTAGE
ABSTRACT LTD.; GEORGE ALDERDICE;
NICHOLAS A. PELLEGRINI; ANTONIETTA
RUSSO; and JOHN DOES 1-10

      Defendants.

Case No.:



**COMPLAINT**

TRAGER, J.

**Jury Demand Attached**

AZRACK, M.J.

For its complaint against Defendants, Plaintiff AmTrust Bank ("AmTrust"), alleges as follows:

### SUMMARY OF FRAUDULENT TRANSACTIONS

1.    AmTrust disbursed more than nine million dollars that it intended to be used to fund twenty-six mortgage loans.  AmTrust has since discovered that this series of loan transactions are fraudulent. The fraudulent nature of these transactions was concealed and hidden from AmTrust at the time the loans closed. The twenty-six loans involve "straw" borrowers presenting phony employment histories and false asset statements, the use of falsified checks, shell corporation sellers, inflated appraisals, and adulterated title commitments.  Each Defendant

2.      Each of the twenty-six fraudulent loans involved in the scheme used a single closing attorney, Pankaj Malik, of Malik & Associates, PC ("Malik"), who was obligated to protect AmTrust's interests, but who repeatedly failed in her duties and permitted these fraudulent transactions to take place.

3.      Upon information and belief, the suspected fraudulent activities that form the basis of this action originated when several of the Defendants devised a scheme to recruit persons (the "Borrowers") who, in return for cash payments, were willing to submit false loan applications, sign sales contracts that misrepresented the transaction, and sign mortgage loan documents based on fraudulent transactions.

4.      In approximately eight months, between April 16, 2008 and December 12, 2008, the Borrowers applied for a total of twenty-six (26) mortgage loans (the "Subject Loans") from AmTrust, representing that they wanted to use the loan proceeds to purchase residential properties from the Sellers and/or obtain second mortgages.

5.      In many instances, at the time the Borrowers applied for the loans and signed sales contracts, and frequently at the closing of the sale, the purported Sellers did not actually own the properties.

6.      Instead, the Borrowers and Sellers were coordinating their efforts in order to divert a portion of the loan proceeds for their own gain and for the gain of the other Defendants who were participating in the suspected fraud.

7.      To achieve this end, the Borrowers represented to AmTrust that they were purchasing the properties for what AmTrust was led to believe was fair value, but which were actually for amounts that were grossly inflated using false appraisal values to misrepresent the actual value of the properties.

8.      Meanwhile, the Sellers also arranged to purchase the same properties from the actual owners for a fraction of the price that was reported on the loan applications involving the Borrowers on the AmTrust mortgages.

9.      Generally, when the AmTrust loan closed, the Seller then used a portion of the loan proceeds from AmTrust to fund its purchase of the property from the true owner and then participated in a "flip" transaction, whereby the property was simultaneously re-deeded to the AmTrust Borrower.

10.     In this manner, Defendants were able to fund the purchase of the properties from the actual owners of record, and upon information and belief, abscond with amounts ranging from tens of thousands to hundreds of thousands of dollars in fraudulently obtained loan proceeds.

11.     To facilitate these fraudulent transactions, the parties utilized inflated appraisals, fraudulent title commitments, falsified checks, and shell corporations to conceal their fraud.

12.     AmTrust entered into contracts ("Master Broker Agreements") with a number of mortgage brokers (the "Brokers") who, among other activities, identified potential buyers, prepared loan applications, verified the income and employment of prospective buyers and submitted loan packages to AmTrust for funding approval. As a mortgage broker for AmTrust, the Brokers were contractually obligated to provide AmTrust with truthful and accurate loan origination documents and to repurchase any loans that were obtained based on misrepresentations or inaccurate or incomplete loan information. In breach of their contractual obligations, the Brokers repeatedly processed fraudulent loan applications and other loan origination documents and then refused to repurchase the loans once the suspected fraud was discovered.

13.     As the closing attorney, Malik was hired to be AmTrust's lawyer to act as the closing attorney for each of the Subject Loans. She owed AmTrust a duty to follow specific instructions with regard to closing each of the Subject Loans. She was required to identify potential signs of fraud, and halt the closing of any loan that appeared to be associated with a fraudulent transaction or that appeared to be part of a flip transaction. Malik repeatedly breached her duties to AmTrust.

14.     Due to the failure of the Brokers to abide by their Master Broker Agreement with AmTrust and the malpractice of Malik, whom AmTrust had hired to protect its interests, AmTrust only learned of the fraud after several of the loans began to default.

15.     Upon information and belief, the scope of the suspected fraudulent activities involving AmTrust's mortgage loan funds may be broader than what is currently known and detailed in this Complaint and more parties, who have not yet been identified, may have participated in other similar types of improper activities involving residential mortgage loans funded by AmTrust.

16.     Although some of the Defendants have actively conspired to conceal or delay discovery of the scheme, the same falsified checks have been used in other transactions that are not the subject of this Complaint.

17.     Upon information and belief, tracing the manner in which the funds were disbursed from the Subject Loan transactions will uncover additional fraudulent schemes and uncover participation by additional persons.

18.     AmTrust sold the Subject Loans that Malik closed in the secondary market, unaware of the fraud. As a result of Defendants' fraud, contractual breaches, negligence, and failures to fulfill their fiduciary duties, AmTrust has been required to repurchase each of the

4

loans involved in the fraud scheme at great expense and is left with loans that are either in default or are likely to soon become in default. AmTrust is either unsecured or secured by collateral that is severely undervalued or impaired on the Subject Loans.

19.     AmTrust is engaged in the process of repurchasing each of the Subject Loans from the secondary market and is now left with twenty-six (26) defective loans, totaling over $9.7 million in mortgage indebtedness.

## JURISDICTION AND VENUE

20.     AmTrust is a federally chartered savings bank with its principal place of business in Ohio, and is not a resident of New York. Defendants are citizens of New York.

21.     This Court has diversity jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 (a) as Plaintiff is an Ohio domiciliary and Defendants are each domiciled in or citizens of New York, or states other than Ohio, and the amount in controversy exceeds $75,000.

22.     This Court has personal jurisdiction over all Defendants because they reside and/or transact business in the State of New York.

23.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 (a) because the Subject Loans took place in this district, the real properties securing the Subject Loans (with the exception of two) are located in this district, and Defendants are located in this district.

## PARTIES

**I.  The Plaintiff:**

24.     AmTrust is a savings bank chartered under federal law with its principal place of business in Cleveland, Ohio, the accounts of which are insured by the Federal Deposit Insurance Corporation ("FDIC").

## II.  The Defendants:

### A.    The Brokers:

25.     AmTrust entered into a Master Broker Agreement with each of the following Brokers: Artisan Mortgage Company, Inc., Streamline Mortgage Corporation, Genesis Home Mortgage Corporation, Link One Mortgage Bankers LLC, Global Financial, Inc., Resource One, Inc., Acorn Funding Group, Inc. and SI Mortgage Company (collectively, the "Brokers").  The terms of the Master Broker Agreement are the same for each of the Brokers with whom AmTrust contracted.  An example of the Master Broker Agreement is attached as Exhibit A.

26.     Artisan Mortgage Company, Inc. ("Artisan")  is a New York corporation with its principal place of business at 235 Carman Street, Patchogue, New York.  Artisan is a mortgage broker which, among other activities, originates residential mortgage loans and arranges for funding of such loans from mortgage lenders such as AmTrust.

27.     AmTrust contracted with Artisan to provide brokerage services pursuant to a Master Broker Agreement, dated August 29, 2007.  Artisan was the broker for eight of the Subject Loans, for the properties located at: 7 Irvington Street, Valley Stream, New York (first and second mortgages); 111-32 170th Street, Jamaica, New York; 9 Cypress Court, Brooklyn, New York (first and second mortgages); 298 A Marion Street, Brooklyn, New York (first and second mortgages); 87-33 125th Street, Richmond Hill, New York (first and second mortgages).

28.     Streamline Mortgage Corporation. ("Streamline")  is a New York corporation with its principal place of business at 365 Route 25A, Mt. Sinai, New York.  Streamline is a mortgage broker which, among other activities, originates residential mortgage loans and arranges for funding of such loans from mortgage lenders such as AmTrust.

6

29.     AmTrust contracted with Streamline to provide brokerage services pursuant to a Master Broker Agreement, dated October 9, 2007.  Streamline was the broker for four of the Subject Loans, for the properties located at:  105-25 Remington Street, Jamaica, New York; 80-32 88th Road, Woodhaven, New York (first and second mortgages); 108-42 51st Avenue, Corona, New York.

30.     Genesis Home Mortgage Corp. ("Genesis")  is a New York corporation with its principal place of business at 2150 Joshua's Path, Ste. 202, Hauppage, New York.  Genesis is a mortgage broker which, among other activities, originates residential mortgage loans and arranges for funding of such loans from mortgage lenders such as AmTrust.

31.     AmTrust contracted with Genesis to provide brokerage services pursuant to a Master Broker Agreement, dated September 5, 2007.  Genesis was the broker for four of the Subject Loans, for the properties located at: 1095 Gipson Street, Far Rockaway, New York; 403 Quincy Street, Brooklyn, New York; 1566 Bergen Street, Brooklyn, New York; 129 North Grove Street, Freeport, New York.

32.     Global Financial, Inc. ("Global")  is a New York corporation with its principal place of business at 337 Merrick Road, Suite 3, Lynbrook, New York.  Global is a mortgage broker which, among other activities, originates residential mortgage loans and arranges for funding of such loans from mortgage lenders such as AmTrust.

33.     AmTrust contracted with Global to provide brokerage services pursuant to a Master Broker Agreement, dated February 21, 2008.  Global was the broker for three of the Subject Loans, for the properties located at: 110-49 167th Street, Jamaica, New York; 179 Main Street, Mastic Beach, New York; 98-31 211th Street, Queens Village, New York.

34.     Resource One, Inc. ("Resource One") is a New York corporation with its principal place of business at 30 Jericho Executive Plaza, Jericho, New York.  Resource One is a mortgage broker which, among other activities, originates residential mortgage loans and arranges for funding of such loans from mortgage lenders such as AmTrust.

35.     AmTrust contracted with Resource One to provide brokerage services pursuant to a Master Broker Agreement, dated August 25, 2008.  Resource One was the broker for three of the Subject Loans, for the properties located at: 1014 C Kelly Street, Bronx, New York; 324 Ridgewood Avenue, Brooklyn, New York; 17 Stewart Avenue, Hempstead, New York.

36.     Link One Mortgage Bankers, LLC ("Link One") is a New York limited liability corporation with its principal place of business at 380 N. Broadway, Suite 400, Jericho, New York.  Link One is a mortgage broker which, among other activities, originates residential mortgage loans and arranges for funding of such loans from mortgage lenders such as AmTrust.

37.     AmTrust contracted with Link One to provide brokerage services pursuant to a Master Broker Agreement, dated August 16, 2007.  Link One was the broker for one of the Subject Loans, for the property located at: 697 Hempstead Boulevard, Uniondale, New York.

38.     Acorn Funding Group, Inc. ("Acorn") is a New York corporation with its principal place of business at 363D Hempstead Avenue, Malverne, New York.  Acorn is a mortgage broker which, among other activities, originates residential mortgage loans and arranges for funding of such loans from mortgage lenders such as AmTrust.

39.     AmTrust contracted with Acorn to provide brokerage services pursuant to a Master Broker Agreement, dated March 2, 2007.  Acorn was the broker for one of the Subject Loans, for the property located at: 1389 Crotona Avenue, Bronx, New York.

40.     SI Mortgage Company ("SI") is a Michigan corporation with its principal place of business at 51650 Oro Road, Shelby Township, Michigan.  SI is a mortgage broker which, among other activities, originates residential mortgage loans and arranges for funding of such loans from mortgage lenders such as AmTrust.

41.     AmTrust contracted with SI to provide brokerage services pursuant to a Master Broker Agreement, dated July 23, 2007.  SI was the broker for one of the Subject Loans, for the property located at 104-23 133rd Street, South Richmond Hill, New York;

**B.**     **The Settlement Agent:**

42.     Pankaj Malik is an individual with a last known address at 75-35 31st Avenue, Suite 207A, East Elmhurst, New York.  Pankaj Malik is an attorney licensed in the State of New York.

43.     Upon information and belief, Pankaj Malik is a principal in the law firm Malik & Associates, P.C. ("Malik & Associates").  Malik & Associates is a New York professional corporation with its principal place of business at  75-35 31st Avenue, Suite 207A, East Elmhurst, New York.

44.     In addition to whatever fiduciary responsibilities that may have been owed to others concerning the Subject Loans, Malik and her law firm, Malik and Associates (referred to collectively as "Malik") were engaged to act as AmTrust's attorney for the Subject Loans.  Malik agreed to be bound by AmTrust's Master Closing Instructions and Supplemental Closing Instructions, a sample of which are attached hereto as Exhibit B (collectively "Closing Instructions").

C.     **The Sellers' Attorneys:**

45.     George Robert Alderdice ("Alderdice") is an individual with a last known address at 1045 Route 109, Suite 100, Lindenhurst, New York.

46.     Alderdice is an attorney licensed in the State of New York.

47.     Alderdice acted as the Seller's attorney for two of the Subject Loans.

48.     Alderdice actively participated in the fraud by, among other things, accepting a falsified check and representing to Malik and AmTrust that the check had been placed into a segregated account to be used as earnest money deposits for the transaction.

49.     Upon information and belief, Antonietta Russo ("Russo") is an individual with a last known address at 1268 Hempstead Turnpike, Elmont, New York.

50.     Russo is an attorney licensed in the State of New York.

51.     Russo acted as the Seller's attorney for one of the Subject Loans.

52.     Russo actively participated in the fraud by, among other things, accepting a falsified check and representing to Malik and AmTrust that the check had been placed into a segregated account to be used as earnest money deposits for the transaction.

53.     Nicholas A. Pellegrini ("Pellegrini") is an individual with a last known address at 320 Nassau Boulevard, Garden City, New York.

54.     Pellegrini is an attorney licensed in the State of New York.

55.     Pellegrini acted as the Seller's attorney for one of the Subject Loans.

56.     Pellegrini actively participated in the fraud by, among other things, accepting a falsified check and representing to Malik and AmTrust that the check had been placed into a segregated account to be used as earnest money deposits for the transaction.

**D.**    **The Title Agent:**

57.    NMR Advantage Abstract Ltd.("NMR") is a New York limited liability company with its principal place of business at 734 Walt Whitman Road, Suite 302, Melville, New York. NMR issued fraudulent title commitments in connection with two of the Subject Loans to conceal the fraudulent nature of the transactions.

**E.**    **The Subject Loans:**

58.    The Subject Loans that are the subject of this Complaint are the loans related to the purported sales of the properties at the following locations:

|     | Borrower: | Address: |
| --- | --- | --- |
| a. | Arash Gilardi | 1014 C Kelly Street, Bronx, New York; |
| b. | Elma Bennett | 1389 Crotona Avenue, Bronx,  New York; |
| c. | Thomas Felice | 7 Irvington Street, Valley Stream, New York; |
| d. | Jesus Fernandez | 324 Ridgewood Avenue, Brooklyn, New York; |
| e. | Joseph Gomes | 111-32 170th Street, Jamaica, New York; |
| f. | Denanauth Hansraj | 105-25 Remington Street, Jamaica, New York; |
| g. | Keisha Harris | 110-49 167th Street, Jamaica, New York; |
| h. | Adrienne Jackson | 179 Main Street, Mastic Beach, New York; |
| i. | Olabisi Lawal | 1095 Gipson Street, Far Rockaway, New York; |
| j. | Daphne McClendon | 403 Quincy Street, Brooklyn, New York; |
| k. | Abu Noushad | 9 Cypress Court, Brooklyn, New York; |
| l. | Payton Osazuwa | 1566 Bergen Street, Brooklyn, New York; |
| m. | Rusty Ramlogan | 697 Hempstead Boulevard, Uniondale, New York; |
| n. | Luiz Rodriguez | 80-32 88th Road, Woodhaven, New York; |
| o. | Tanim Sarowar | 129 North Grove Street, Freeport, New York; |

11

| | | |
|---|---|---|
| p. | Gurdeep Singh | 104-23 133rd Street, South Richmond Hill, New York; |
| q. | Rajesh Sookhoo | 298 A Marion Street, Brooklyn, New York; |
| r. | Abul Talukder | 87-33 125th Street, Richmond Hill, New York; |
| s. | Angelica Villamar | 17 Stewart Avenue, Hempstead, New York; |
| t. | Patricia Whyte | 98-31 211th Street, Queens Village, New York; and |
| u. | Fernando Chamorro | 108-42 51st Avenue, Corona, New York. |

**F.** **The Unknown Co-Conspirators:**

59.    John Does 1-10 are co-conspirators, who have not yet been identified.

### FIRST CAUSE OF ACTION
### (Breach of the Master Broker Agreement by the Brokers)

60.    AmTrust incorporates the allegations contained in all the paragraphs of the Complaint into this Cause of Action.

61.    AmTrust entered into a Master Broker Agreement with Artisan on August 20, 2007.

62.    The Master Broker Agreement sets forth the contractual relationship between AmTrust and Artisan.

63.    The entire business relationship between AmTrust and Artisan is set forth in the Master Broker Agreement.

64.    AmTrust entered into a Master Broker Agreement with Streamline on October 9, 2007.

65.    The Master Broker Agreement sets forth the contractual relationship between AmTrust and Streamline.

66.    The entire business relationship between AmTrust and Streamline is set forth in the Master Broker Agreement.

67.     AmTrust entered into a Master Broker Agreement with Genesis on September 5, 2007.

68.     The Master Broker Agreement sets forth the contractual relationship between AmTrust and Genesis.

69.     The entire business relationship between AmTrust and Genesis is set forth in the Master Broker Agreement.

70.     AmTrust entered into a Master Broker Agreement with Link One on August 16, 2007.

71.     The Master Broker Agreement sets forth the contractual relationship between AmTrust and Link One.

72.     The entire business relationship between AmTrust and Link One is set forth in the Master Broker Agreement.

73.     AmTrust entered into a Master Broker Agreement with Global on February 21, 2008.

74.     The Master Broker Agreement sets forth the contractual relationship between AmTrust and Global.

75.     The entire business relationship between AmTrust and Global is set forth in the Master Broker Agreement.

76.     AmTrust entered into a Master Broker Agreement with Acorn on March 2, 2007.

77.     The Master Broker Agreement sets forth the contractual relationship between AmTrust and Acorn.

78.     The entire business relationship between AmTrust and Acorn is set forth in the Master Broker Agreement.

79.     AmTrust entered into a Master Broker Agreement with SI on July 23, 2007

80.     The Master Broker Agreement sets forth the contractual relationship between AmTrust and SI.

81.     The entire business relationship between AmTrust and SI is set forth in the Master Broker Agreement.

82.     AmTrust entered into a Master Broker Agreement with Resource One on August 25, 2008.

83.     The Master Broker Agreement sets forth the contractual relationship between AmTrust and Resource One.

84.     The entire business relationship between AmTrust and Resource One is set forth in the Master Broker Agreement.

85.     The loan files originated by the Brokers contained numerous misrepresentations including, without limitation, false verifications of employment, assets and income for Borrowers, inflated appraisals, sales contracts using falsified earnest-money checks, and Sellers who did not own the properties being sold at the time of the AmTrust loan closings.

86.     The Brokers breached the contractual obligations and duties they owed to AmTrust in connection with the Subject Loans in numerous ways, including, without limitation:

a.     the failure to deliver to AmTrust all Loan Documents filed for record as required by Paragraph 7.3 of the Master Broker Agreement;

b.     the failure to provide to AmTrust a copy of the applicable Title Insurance Policy as required by Paragraph 7.3 of the Master Broker Agreement; and

c.     the breach of one or more representations and warranties set forth in the Master Broker Agreement, and/or the breach of one or more of the representations and warranties set forth in the Seller's Guide, which is incorporated by reference into the Master Broker Agreement, as set forth in Paragraph 8.1 of the Master Broker Agreement.

87.     AmTrust made written demand on each of the Brokers that they repurchase each of the respective Subject Loans which they originated pursuant to Section IX of the Master Broker Agreement, including, without limitation, as required by Paragraph 9.1 of the Master Broker Agreement.

88.     Each Broker has failed and refused to honor their repurchase obligations under the Master Broker Agreement.

89.     As a direct and proximate result of the breaches by the Brokers of the contractual obligations set forth in the Master Broker Agreement, AmTrust suffered financial losses, in an amount to be determined at trial, but in any event, in excess of $75,000 for each of the Subject Loans.

90.     AmTrust has been damaged a result of the Brokers' breaches of the Master Broker Agreement in connection with each of the Subject Loans.  AmTrust is entitled to have the Brokers repurchase each of the Subject Loans as required by Section IX of the Master Broker Agreement and/or AmTrust is entitled to be held harmless and indemnified by the Brokers and to recover from the Brokers for all of its losses, including, without limitation, recovery of the amount of the funds AmTrust loaned the Borrowers in connection with each of the Subject Loans, plus all costs, fees, interest and expenses, including reasonable attorneys' fees, as set forth in Section X of the Master Broker Agreement.

## SECOND CAUSE OF ACTION
**(Attorney Malpractice by Pankaj Malik and Malik & Associates, P.C.)**

91.     AmTrust incorporates the allegations contained in all the paragraphs of the Complaint into this Cause of Action.

92.     Pankaj Malik is an attorney licensed to practice in the State of New York.

15

93.     Malik was retained to serve as AmTrust's closing attorney and owed AmTrust contractual and fiduciary duties in connection with her role as AmTrust's closing attorney.

94.     Malik executed AmTrust's Closing Instructions, confirming that she was AmTrust's closing attorney and that she was to follow AmTrust's directives contained in the Closing Instructions for each of the Subject Loans.

95.     Malik was paid for her services pursuant to the Closing Instructions.

96.     Malik was to close the Subject Loans for which she served as AmTrust's closing attorney in strict accordance with the Closing Instructions.

97.     Pursuant to the Closing Instructions, Malik was required to notify AmTrust if any of the provisions of the sale contracts conflicted with the Closing Instructions.

98.     Malik was professionally negligent and repeatedly breached her fiduciary and contractual duties to AmTrust, including, without limitation, by:

    a.    failing to ensure that the HUD-1 Settlement Statements for the Subject Loans truthfully and accurately reflected each loan transaction;

    b.    failing to distribute AmTrust's funds and make payments in accordance with the HUD-1 Settlement Statements, including by making unauthorized disbursements of AmTrust's funds;

    c.    closing loans without authorization or approval from AmTrust when the purported seller of the property was not the record owner of the property or had not been the record owner of the property for at least one year prior to the closing date;

    d.    failing to account for the funds that AmTrust had sent to her;

    e.    failing to provide to AmTrust disbursement logs and bank records documenting the receipts and disbursements for the Subject Loans;

    f.    failing to record or cause to be recorded mortgage documents for the Subject Loans reflecting that AmTrust had a superior first lien on the properties;

    g.    failing to obtain a valid title insurance policy in connection with each of the Subject Loans, as required by the Closing Instructions;

16

h.      failing to close the Subject Loans in strict compliance with the Real Estate Settlement Procedures Act (RESPA) and Regulation 2;

i.      closing loans in which the seller was an entity other than a natural person without obtaining the appropriate authorizing and organizational documents for the seller; and

j.      failing to follow requirements for use of a Power of Attorney in connection with a loan closing.

99.     Malik is liable to AmTrust for losses AmTrust suffered as a result of Malik's breach of the contractual and fiduciary duties she owed to AmTrust.

100.    As a result of the conduct by Malik, breaching the contractual and fiduciary duties she owed to AmTrust, the Subject Loans were closed, which AmTrust, with proper notification from Malik, would not have closed; loans were closed in violation of the Closing Instructions; AmTrust did not receive required title insurance policies; some of AmTrust's mortgages were not properly recorded; AmTrust's funds were not properly disbursed in accordance with HUD-1 Settlement Statements; AmTrust did not receive a first and superior deed of trust or mortgage lien for all the Subject Loans; and AmTrust did not receive a proper accounting for the funds it had provided for the Subject Loans.

101.    Malik was obligated to provide information to AmTrust concerning the receipt and disbursement of loan proceeds for each of the Subject Loans.

102.    AmTrust has made repeated requests demanding that Malik provide to her client, AmTrust, records including disbursement logs, checks, and other records reflecting the manner in which funds for each of the Subject Loans were handled.

103.    Malik has failed to produce complete records of these disbursements for each of the Subject Loans to AmTrust. AmTrust is entitled to these records and Malik has no good reason for failing to produce these records to AmTrust.

104. The financial records Malik was required to maintain are a unique compilation of information reflecting the financial transactions for each of the Subject Loans.

105. The financial records which Malik is withholding are material to identifying others who participated in or benefited from fraudulent loans and are material to AmTrust's efforts to mitigate its losses.

106. AmTrust suffered financial losses as a direct and proximate result of Malik's breaches of her contractual and fiduciary duties in an amount to be determined at trial, but in any event, in excess of $75,000 for each of the Subject Loan transactions in which she participated.

### THIRD CAUSE OF ACTION
### (Breach of Fiduciary Duty by Pankaj Malik and Malik and Associates, P.C.)

107. AmTrust incorporates the allegations contained in all the paragraphs of the Complaint into this Cause of Action.

108. Malik was responsible for serving as AmTrust's closing attorney on behalf of AmTrust at the closing of each of the Subject Loans, and she owed AmTrust a fiduciary duty including, without limitation, a duty of loyalty and a duty of care.

109. Malik knew or should have known about many of the improper property flip transactions, the misrepresentations, phantom sales, inflated property values, and related party transactions employed by various individuals and entities to accomplish a scheme to defraud AmTrust, yet she failed to protect AmTrust's interests.

110. In fact, Malik received and signed the Closing Instructions from AmTrust, which explicitly set forth certain warning signs of fraudulent or undesirable mortgage loans.

111. Despite the fact that several of those warning signs were present in each of the Subject Loan transactions, Malik breached her duties of care owing to AmTrust, failed to notify AmTrust of suspicious activities including improper flip transactions, and instead pushed ahead

18

with the closings, causing AmTrust to fund more than $9.7 million in mortgage loans, several of which are now in default.

112.   Malik failed to notify AmTrust of problems and suspicious activities and to seek authorization before closing and failed to halt closings of the Subject Loans as required by the Closing Instructions.

113.   AmTrust would not have authorized the funding or closing of the Subject Loans but for Malik's failure to notify AmTrust of the suspicious activities involved with the Subject Loans.

114.   Malik failed to prepare accurate HUD-1 Settlement Statements and failed to distribute funds in accordance with the HUD-1 Settlement Statements, but she signed and verified that the HUD-1 Settlement Statements were accurate, when they were not.  Further, she failed to account for the funds she had received from AmTrust.

115.   Malik failed to file, or cause to be filed, mortgage documents to secure first lien positions in favor of AmTrust.

116.   Malik failed to take all required steps to obtain ATLA title insurance policies for each of the Subject Loans.

117.   AmTrust has notified Malik of suspected fraudulent activities involving the loans she closed as AmTrust's closing attorney.

118.   AmTrust demanded that Malik produce financial records reflecting the receipt and disbursement of funds relating to each of the Subject Loans.

119.   Malik was in a unique position to collect the financial records related to the Subject Loans and she had a duty to maintain accurate records reflecting the handling of funds for each of the Subject Loans.

120.    Malik had a duty to produce to AmTrust the financial records reflecting the receipt and disbursement of funds for each of the Subject Loans.

121.    Malik has failed to produce complete financial records for all of the Subject Loans, despite demands from AmTrust to produce them.

122.    AmTrust was damaged by the actions of Malik and is entitled to judgment against Malik in an amount to be determined at trial, but not less than $75,000 for each of the Subject Loan transactions in which she participated.

## FOURTH CAUSE OF ACTION
### (Conversion by Pankaj Malik and the Malik & Associates, P.C.)

123.    AmTrust incorporates the allegations contained in all the paragraphs of the Complaint into this Cause of Action.

124.    Malik received wire transfers from AmTrust and, as AmTrust's attorney, was to close the Subject Loans in strict accordance with the Closing Instructions.

125.    Upon information and belief, with respect to some of the Subject Loans, Malik failed to follow the Closing Instructions by distributing AmTrust's funds in a fashion other than reflected in the HUD-1 Settlement Statements and as required by the Closing Instructions.

126.    By closing some of the Subject Loan transactions and distributing AmTrust's funds in a fashion other than reflected in the HUD-1 Settlement Statements and as required by the Closing Instructions, Malik exercised control at least over some of AmTrust's funds in an unauthorized manner and thus exercised unauthorized dominion and control over at least some of AmTrust's funds to the exclusion of AmTrust's interests in the funds.

127.    AmTrust was damaged by Malik's conversion of its funds and is entitled to an accurate accounting of all of the loan funds AmTrust entrusted to her and to recover the losses it suffered in connection with the Subject Loans from Malik in an amount to be determined at trial,

but in any event not less than $75,000 for each of the Subject Loan transactions in which she participated.

## FIFTH CAUSE OF ACTION
### (Conspiracy by the Sellers' Attorneys and by John Does 1-10)

128.    AmTrust incorporates the allegations contained in all the paragraphs of the Complaint into this Cause of Action.

129.    The Sellers' Attorneys conspired with others, including but not limited to unnamed John Does 1-10, to engage in, enable, and conceal a series of fraudulent loan transactions from AmTrust.  Other yet unidentified entities or individuals may have participated in, enabled, and/or concealed the actions of the Conspirators.

130.    The Conspirators worked together with the common purpose of fraudulently inducing AmTrust into disbursing mortgage loan proceeds, some of which the Conspirators then diverted for their personal gain.

131.    Each of the Conspirators knowingly furthered and/or concealed the Conspiracy, was aware of one or more co-conspirators and that those co-conspirators were acting to further the Conspiracy, committed overt acts to further the Conspiracy, and profited from the tortious acts of their co-conspirators.

132.    The Sellers' Attorneys furthered the Conspiracy by, among other things, misrepresenting that they had been presented with valid earnest money deposits when, in reality, the checks that were purportedly deposited by The Sellers' Attorneys were falsified and used in multiple transactions.  Upon information and belief, The Sellers' Attorneys further participated in the Conspiracy by using their bank accounts and received transfers through wire transactions and/or the U.S. mail or otherwise to divert and conceal AmTrust's funds and by knowingly assisting the Sellers in engaging in fraudulent transactions.

21

133.    By engaging in this fraudulent conduct, and in agreeing and conspiring among themselves to engage in this conduct, the Conspirators acted intentionally, maliciously, and in a willful and wanton manner.

134.    As a direct and proximate result of the Conspirators' conduct, AmTrust has suffered damages and continues to suffer damages in excess of $75,000.

## SIXTH CAUSE OF ACTION
### (Fraud by Sellers' Attorneys)

135.    AmTrust incorporates the allegations contained in all the paragraphs of the Complaint into this Cause of Action.

136.    AmTrust incorporates by reference the paragraphs herein entitled "The Subject Loan Transactions," describing in detail each of the AmTrust Subject Loans.

137.    George Alderdice, Antionetta Russo, and Nicholas Pellegrini (collectively, the "Sellers' Attorneys") actively participated in the Conspiracy to defraud AmTrust in connection with the Subject Loans.

138.    The Sellers' Attorneys actively assisted the flip transactions for the Subject Loans relating to the purported sales of the following properties: 697 Hempstead Boulevard, Uniondale, NY; 324 Ridgewood Avenue, Brooklyn, NY; 17 Stewart Avenue, Hempstead, NY.

139.    For each of the Subject Loans in which they were involved, the contract of sale provided that the Sellers' Attorneys had received and placed earnest money deposits or down payments into a segregated account.

140.    By creating these contracts and/or knowingly allowing these contracts to be presented to Malik and AmTrust, the Sellers' Attorneys represented to AmTrust that the checks that had purportedly been used for the earnest money deposits and down payments were valid and that the deposits had actually been made by the Borrowers.

141.    Contrary to the Sellers' Attorneys' representations to Malik and AmTrust, the checks purported to represent valid earnest money deposits were not valid.

142.    For the Subject Loan related to the purported purchase of the property located at 697 Hempstead Boulevard, Uniondale, NY, the cashier's check purportedly used for the earnest-money deposit, bearing No. 131129022, in the amount of $10,000, and made payable to George Alderdice, was falsified. This check is purportedly payable through Integrated Payment Systems, which confirmed that the check number is not valid. This check was used in another AmTrust loan transaction, not a subject of this Complaint, for which Alderdice was the Seller's attorney.

143.    For the Subject Loan related to the purported purchase of the property located at 324 Ridgewood Avenue, Brooklyn, NY, the cashier's check purportedly used for the earnest-money deposit, bearing No. 969082520, in the amount of $90,000, and made payable to "Nanette Aridas as Attorney" was falsified. The routing and account numbers on the check are invalid. This check claims to be payable through Integrated Payment Systems, but Integrated Payment Systems confirms that the check is invalid.

144.    For the Subject Loan related to the purported purchase of the property at 17 Stewart Avenue, Hempstead, NY, the bank check, bearing No. 769354807, in the amount of $80,000, and made payable to Paul Rivas, that was purportedly used for the earnest-money deposit, was falsified. This check is purportedly payable through Integrated Payment Systems, but Integrated Payment Systems confirms that the check is invalid

145.    The Sellers' Attorneys made these misrepresentations for the purpose of inducing AmTrust to disburse mortgage loan proceeds.

146.     AmTrust relied on the Sellers' Attorneys' misrepresentations by approving and disbursing its funds for the Subject Loans.

147.     Upon information and belief, through the use of the U.S. mail, wire transfers, and otherwise, the Sellers' Attorneys further facilitated the frauds related to the Subject Loans by accepting large sums of money from Malik, taking a portion of these funds for their own gain, and disbursing other funds to their co-conspirators.

148.     The Sellers' Attorneys participated with the Sellers, the Borrowers, the Appraisers, and the Title Agents to obtain funds from AmTrust under false pretenses and to deceive AmTrust into believing it was making legitimate mortgage loans to the Borrowers.

149.     The Sellers' Attorneys' fraudulent conduct was done intentionally, maliciously, and in a willful and wanton manner.

150.     AmTrust was damaged by the Sellers' Attorneys' fraudulent conduct in an amount to be determined at trial, but in any event, in excess of $75,000 for each of the transactions in which they participated, as described herein.

## SEVENTH CAUSE OF ACTION
### (Breach of Contract by NMR Advantage Abstract Ltd.)

151.     AmTrust incorporates the allegations contained in all the paragraphs of the Complaint into this Cause of Action.

152.     NMR issued title commitments to AmTrust in respect to the Subject Loans relating to the properties located at 111-32 170th Street, Jamaica, NY, title commitment # NAA 08-546-Q dated 8/15/08; and 110-49 167th Street, Jamaica, NY title commitment # NAA-08-365-Q-U dated 6/1/08.

153.     By issuing the title commitments, NMR entered into a binding contractual duty to AmTrust to obtain title insurance policies with respect of the Subject Properties.

24

154.   Moreover, by issuing the title commitments, NMR agreed to reimburse AmTrust for any losses caused should AmTrust not obtain a valid, first-priority lien to the Subject Properties.

155.   AmTrust's mortgage for one of these properties does not have first-lien priority status.

156.   NMR has breached its contractual obligations to AmTrust by, among other things, failing to obtain title insurance policies for the properties and failing to reimburse AmTrust for its losses due to the loss of first-lien priority status of its mortgages or the failure to timely file AmTrust's mortgage.

157.   By reason of NMR's contractual breaches, AmTrust has been damaged and left unsecured or undersecured with respect to the mortgage loans issued for the Subject Properties.

158.   AmTrust is entitled to judgment against NMR in amounts to be determined at trial but not less than $75,000 for each of the Subject Loan transactions.

## EIGHTH CAUSE OF ACTION
### (Breach of Fiduciary Duty by NMR Advantage Abstract Ltd.)

159.   AmTrust incorporates the allegations contained in all the paragraphs of the Complaint into this Cause of Action.

160.   NMR issued title commitments to AmTrust for the Subject Loans relating to the properties located at 111-32 170th Street, Jamaica, NY, and 110-49 167th Street, Jamaica, NY.

161.   By issuing the title commitments, NMR represented to AmTrust that it would obtain title insurance policies with respect of the Subject Properties, intending and knowing that AmTrust would rely on such representations, and thereby placed themselves in fiduciary positions with respect to AmTrust.

162.   NMR failed to obtain a title insurance policy for 110-49 167th Street, Jamaica, NY.

163.   NMR failed to notify AmTrust that it did not and did not intend to obtain a title insurance policy.

164.   NMR's failure to obtain the title insurance policy and to notify of AmTrust of its intention in this regard has damaged AmTrust and caused it to be uninsured on the fraudulently obtained mortgage loan AmTrust issued in respect to the Subject Loan for the property described herein.

165.   Upon information and belief, NMR, through one or more of their representatives or agents, also attended the closings of the Subject Loans and undertook the duty to record, or cause to be recorded, the mortgages and deeds relating to the Subject Properties.

166.   NMR failed to record, or cause to be recorded, the mortgage securing AmTrust's mortgage loan for the property at 110-49 167th Street, Jamaica, NY.

167.   NMR, in order to conceal a "flip" transaction, waited 8 months to record, or cause to be recorded, the mortgage securing AmTrust's mortgage loan for the property at 111-32 170th Street, Jamaica, NY.

168.   NMR's failures to obtain the title insurance policy and NMR's failure to timely record, or cause to be recorded, AmTrust's mortgages are breaches of NMR's a fiduciary duties to AmTrust.

169.   By reason of NMR's breaches of their fiduciary duties, AmTrust has been damaged and left unsecured or undersecured with respect to the mortgage loans issued for the Subject Properties.

26

170.    AmTrust is entitled to judgment against NMR in an amount to be determined at trial but not less than $75,000 for each Subject Loan transactions.

### NINTH CAUSE OF ACTION
### (Negligence by NMR Advantage Abstract Ltd.)

171.    AmTrust incorporates the allegations contained in all the paragraphs of the Complaint into this Cause of Action.

172.    NMR issued title commitments to AmTrust in respect to the Subject Loans relating to the properties located at 111-32 170th Street, Jamaica, NY, and 110-49 167th Street, Jamaica, NY.

173.    By issuing the title commitments, NMR represented to AmTrust that it would obtain title insurance policies with respect to the Subject Properties, intending and knowing that AmTrust would rely on such representations, and thereby placed themselves in fiduciary positions with respect to AmTrust.

174.    NMR failed to obtain title insurance policies on one of the listed properties, 110-49 167th Street, Jamaica, NY.

175.    NMR's failure to obtain the title insurance policy has damaged AmTrust and caused AmTrust to be uninsured on the fraudulently obtained mortgage loans AmTrust issued with respect to the Subject Loans for the properties described herein.

176.    Upon information and belief, NMR, through one or more of their representatives or agents, also attended the closings of the Subject Loans and undertook the duty to record, or cause to be recorded, the mortgages and deeds relating to the Subject Properties.

177.    NMR failed to record, or cause to be recorded, the mortgage securing AmTrust's mortgage loan for the property at  110-49 167th Street, Jamaica, NY.

178.     NMR failed to timely record, or cause to be recorded, the mortgage securing AmTrust's mortgage loan for the property at 111-32 170th Street, Jamaica, NY.

179.     NMR's failures to obtain title insurance policies and NMR's failure to timely record, or cause to be recorded, AmTrust's mortgages are negligent breaches of its duties and have caused damage to AmTrust.

180.     By reason of NMR's negligence, AmTrust has been damaged and left unsecured or undersecured with respect to the mortgage loans issued for the Subject Properties.

181.     AmTrust is entitled to judgment against NMR in an amount to be determined at trial but not less than $75,000 for each of the Subject Loan transactions.

## THE SUBJECT LOANS

### *Transaction – 403 Quincy Street, Brooklyn, NY*

182.     This transaction involved a "flip transaction" whereby Daphne McClendon ("McClendon") obtained a mortgage loan from AmTrust to purportedly fund the purchase of the property located at 403 Quincy Street, Brooklyn, New York from CLRTG Inc. ("CLRTG") for $640,000.

183.     On or about November 7, 2008, AmTrust funded a mortgage loan for McClendon's purchase of the property by disbursing a wire transfer to Malik, AmTrust's closing attorney, to fund a mortgage loan in the amount of $544,000.

184.     The property description is as follows:

> ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Brooklyn, County of Kings, City and State of New York, bounded and described as follows:

> BEGINNING at a point on the northerly side of Quincy Street distant 131 feet 3 inches easterly from the corner formed by the intersection of the easterly side of Tompkins Avenue and the northerly side of Quincy Street;

RUNNING THENCE northerly parallel with Tompkins Avenue and part of the distance through the center line of the party wall, 100 feet;

THENCE easterly and parallel with Quincy Street, 18 feet 9 inches;

THENCE southerly parallel with Tompkins Avenue, 100 feet to the northerly side of Quincy Street;

THENCE westerly along the northerly side of Quincy Street, 18 feet 9 inches to the point or place of BEGINNING.

185.    In connection with this transaction, McClendon executed a Mortgage in favor of AmTrust in the amount of $544,000, and a Note payable to AmTrust in the amount of $544,000, both dated November 7, 2008.

186.    This mortgage loan was brokered by Genesis pursuant to the Master Broker Agreement.

187.    The Genesis loan officer who processed this loan was Fernando Chamorro.

188.    Upon information and belief, Tamara Baraket ("Baraket") acted as the attorney for the Seller, CLRTG, in connection with this transaction and attended the closing.

189.    According to the HUD-1 settlement statement, there were no prior mortgages to be paid off in connection with this transaction and the Seller was to receive $628,399 in cash.

190.    Upon information and belief, this $628,399 was disbursed directly to Baraket as CLRTG's attorney.

191.    At the time of the loan closing, CLRTG did not have title to the property.

192.    Upon information and belief, CLRTG used a portion of the loan proceeds to fund its purchase of the property on the date of the closing. This deed transferring the property to CLRTG was not recorded until December 9, 2008, more than a month after the closing of the AmTrust loan.

29

193.    After using the funds obtained from AmTrust to fund its own purchase of the property for $445,000, far less than the $640,000 price listed on its contract with McClendon, CLRTG then transferred the property to McClendon.

194.    Victor Woo ("Woo") appraised the real property in connection with McClendon's mortgage application.

195.    Woo represented that in preparing the appraisal, he analyzed a copy of the contract for sale.

196.    After reviewing the contract for sale, Woo represented that the property was valued at $640,000, the exact amount listed on the contract for sale of the property.

197.    Woo deliberately overstated the value of the property.  CLRTG purchased the property for $445,000 several days before the closing of the AmTrust loan.

198.    Woo also misrepresented that the owner of public record was CLRTG, when in fact the owner of public record was Michelle (German) Webb.

199.    NMR was the title agent in connection with this transaction.

200.    Upon information and belief, an agent or employee of NMR was present at the closing of this transaction.

201.    NMR provided a title commitment in connection with transaction.  The title commitment noted that the deed to CLRTG, the seller, from Michelle German a/k/a Michelle Webb dated April 9, 2008  is "to be recorded," thereby noting that the seller did not possess title to the property at the time of the closing.  The property was transferred from Michelle German to CLRTG on 10/3/08, recorded 12/9/08, a month after the closing of the AmTrust loan.  The property was transferred from CLRTG to McClendon on 12/9/08.

202. Malik was responsible for serving as AmTrust's attorney in connection with this mortgage loan pursuant to AmTrust's Closing Instructions and she failed to follow the Closing Instructions.

203. Malik failed to stop the transaction when the title commitment noted that the seller did not have title to the property at the time the mortgage loan closed, failed to prepare an accurate HUD-1 Settlement Statement, failed to distribute funds in accordance with the HUD-1 Settlement Statement, and failed to account for the funds that AmTrust had sent to her.

204. Upon information and belief, Defendants and others known to them orchestrated this transaction.

***Transaction – 1566 Bergen Street, Brooklyn, New York***

205. This transaction involved a "flip transaction" whereby Payton Osazuwa ("Osazuwa") obtained a mortgage loan from AmTrust to purportedly fund the purchase of the property located at 1566 Bergen Street, Brooklyn, New York from McDonald M. Cherubin ("Cherubin") for $710,000.

206. On or about September 22, 2008, AmTrust funded a mortgage loan for Osazuwa's purchase of the property by disbursing a wire transfer to Malik, AmTrust's closing attorney, to fund a mortgage loan in the amount of $639,000.

207. The property description is as follows:

> All that certain plot, piece or parcel of land, situate, lying and being in the Borough of Brooklyn, County of Kings, City and State of New York, bounded and described as follows:
>
> BEGINNING at a point on the southerly side of Bergen Street, distant 159 feet westerly from the southwesterly corner of Bergen Street and Utica Avenue;
>
> RUNNING THENCE southerly, parallel with Utica Avenue and part of the distance through a party wall, 100 feet;

THENCE easterly, parallel with Bergen Street, 22 feet 3 1/2 inches;

THENCE southerly, parallel with Utica Avenue, 25 feet;

THENCE westerly, parallel with Bergen Street, 39 feet 3 1/2 inches;

THENCE northerly, parallel with Utica Avenue, 125 feet to the southerly side of Bergen Street;

THENCE easterly, along the southerly side of Bergen Street, 17 feet to the point or place of BEGINNING.

208.    In connection with this transaction, Osazuwa executed a Mortgage in favor of AmTrust in the amount of $639,000, and a Note payable to AmTrust in the amount of $639,000, both dated September 22, 2008.

209.    This mortgage loan was brokered by Genesis pursuant to the Master Broker Agreement.

210.    The Genesis loan officer who processed this loan was Fernando Chamorro.

211.    Upon information and belief, Osazuwa falsified his income, employment history, assets, and that the building would be owner-occupied in his loan application.

212.    Otis A. Thompson ("Thompson") acted as the attorney for the Seller, Cherubin, in connection with this transaction and, upon information and belief, attended the closing.

213.    According to the HUD-1 settlement statement, there were two  prior mortgages to be paid off in the amounts of $356,000 and $7,000  in connection with this transaction and the Seller was to receive $332,917.50 in cash.

214.    Upon information and belief, $332,917.50 was disbursed directly to Thompson as Cherubin's attorney.

215.    At the time of the loan closing, Cherubin did not have title to the property.

216.   Upon information and belief, Cherubin used a portion of the loan proceeds to fund his purchase of the property on the date of the closing.  There were undisclosed transactions transferring the property from Cherubin to Gush, LLC, and then transferring the property from Gush, LLC to Osazuwa.

217.   After using the funds obtained from AmTrust to fund the  purchase of the property for far less than the $710,000 price listed on his contract with Osazuwa, Cherubin and Gush, LLC then transferred the property to Osazuwa.

218.   Hilbert appraised the real property in connection with Osazuwa's mortgage application.

219.   Hilbert  represented that in preparing the appraisal, he analyzed a copy of the contract for sale.

220.   After reviewing the contract for sale, Hilbert represented that the property was valued at $710,000, the exact amount listed on the contract for sale of the property.

221.   Hilbert deliberately overstated the value of the property.  Gush LLC purchased the property for $384,000 on the day of the closing of the AmTrust loan.

222.   Hilbert also misrepresented that the owner of public record was Cherubin.

223.   H & Z Abstract ("H & Z") was the title agent in connection with this transaction.

224.   Upon information and belief, an agent or employee of H & Z was present at the closing of this transaction.

225.   H & Z provided a title commitment in connection with transaction.  The title commitment noted that Cherubin was the owner of record at the time of closing, when in fact Gush, LLC and Cherubin  transferred the property to Osazuwa, the AmTrust borrower. According to the public records, "Cherubun" transferred the property to Gush LLC on 9/22/08,

recorded 10/27/08, approximately one month after the closing of the AmTrust loan. Gush LLC transferred the property to Osazuwa on 9/22/08, recorded 11/3/08. Then "Cherubun" also transferred the property to Osazuwa on 9/22/08, recorded 12/4/08, more than two months after the closing of the AmTrust loan.

226. Malik was responsible for serving as AmTrust's attorney in connection with this mortgage loan pursuant to AmTrust's Closing Instructions and she failed to follow the Closing Instructions.

227. Malik failed to stop the transaction when the seller did not have title to the property at the time the mortgage loan closed, failed to prepare an accurate HUD-1 Settlement Statement, failed to distribute funds in accordance with the HUD-1 Settlement Statement, and failed to account for the funds that AmTrust had sent to her.

228. Upon information and belief, Defendants and others known to them orchestrated this transaction.

**Transaction – 108-42 51st Ave., Corona, New York**

229. This transaction involved a "flip transaction" whereby Fernando Chamorro ("Chamorro") obtained a mortgage loan from AmTrust to purportedly fund the purchase of the property located at 108-42 51st Ave, Corona, New York from Nadia Fernandez for $650,000.

230. Upon information and belief, Nadia Fernandez is Fernando Chamorro's wife.

231. On or about April 16, 2008, AmTrust funded a mortgage loan for Chamorro 's purchase of the property by disbursing a wire transfer to Malik, AmTrust's closing attorney, to fund a mortgage loan in the amount of $487,000.

232. The property is described as follows:

34

All that certain plot, piece or parcel of land situate lying and being in the Borough and County of Queens and State of New York, bounded and described as follows:

BEGINNING at a point on the southerly side of 51st Avenue, distant 350 feet westerly from the corner formed by the intersection of the westerly side of 111th Street with the southerly side of 51st Avenue;

RUNNING THENCE southerly parallel with the westerly side of 111th Street, 100 feet;

THENCE westerly parallel with the southerly side of 51st Avenue, 25 feet;

THENCE northerly again parallel with the westerly side of 111th Street, 100 feet;

THENCE easterly along the southerly side of 51st Avenue, 25 feet back to the point or place of BEGINNING.

233. In connection with this transaction, Chamorro executed a Mortgage in favor of AmTrust in the amount of $487,000, and a Note payable to AmTrust in the amount of $487,000, both dated April 16, 2008.

234. Chamorro is a loan officer for Streamline and Genesis and has served as the loan officer for numerous AmTrust loans.

235. This mortgage loan was brokered by Streamline pursuant to the Master Broker Agreement.

236. The Streamline loan officer who processed this loan was Ilan Peleg.

237. According to the HUD-1 settlement statement, there was a prior mortgage of $460,908.75 to be paid off in connection with this transaction and the Seller was to receive $151,313.75 in cash.

238. Upon information and belief, $151,313.75 was disbursed directly to Ramon Martinez as Nadia Fernandez's attorney.

35

239.    At the time of the loan closing, Nadia Fernandez, Chamorro's wife, did not have title to the property.

240.    Upon information and belief, on April 16, 2008, Nadia Fernandez used a portion of the loan proceeds to fund her purchase of the property from Carlos Fajardo, the actual owner of the property at the time the AmTrust loan closed.  This deed transferring the property to Nadia Fernandez was not recorded until April 29, 2008, almost two weeks after the closing of the AmTrust loan.

241.    After using the funds obtained from AmTrust to fund her purchase of the property for far less than the $650,000 price listed on the contract with Chamorro, Nadia Fernandez then transferred the property to Chamorro on April 16, 2008, recording the deed on May 5, 2008.

242.    Boris Musheyev ("Musheyev") appraised the real property in connection with Chamorro's mortgage application.

243.    Musheyev  represented that in preparing the appraisal, he knew the contract price for the property.

244.    Musheyev represented that the property was valued at $650,000, the exact amount listed on the contract for sale of the property.

245.    Musheyev deliberately overstated the value of the property.  Nadia Fernandez purchased the property for $505,000 on the same date as the AmTrust closing.

246.    Musheyev also falsely stated that the owner of public record was Nadia Fernandez when the true owner was still Carlos Fajardo.  In complete contradiction to Musheyev's assertion that Fernandez is the owner of public record in one line of the appraisal, another line of the appraisal states that the property seller is not the owner of public record.

247.    Ideal Abstract was the title agent in connection with this transaction.

248.    Upon information and belief, an agent or employee of Ideal Abstract was present at the closing of this transaction.

249.    Ideal Abstract provided a title commitment in connection with transaction.  The title commitment noted that the deed from Carlos Fajardo to Nadia Fernandez is "to be recorded," thereby noting that the seller did not possess title to the property at the time of the closing.  Nadia Fernandez did not have title to the property at the time Ideal Abstract made this representation.  Nadia Fernandez obtained title to the property by virtue of a deed dated 4/16/08 that was not recorded until 4/29/08.

250.    Malik was responsible for serving as AmTrust's attorney in connection with this mortgage loan pursuant to AmTrust's Closing Instructions and she failed to follow the Closing Instructions.

251.    Malik failed to stop the transaction when the seller did not have title to the property at the time the mortgage loan closed, failed to prepare an accurate HUD-1 Settlement Statement, failed to distribute funds in accordance with the HUD-1 Settlement Statement, and failed to account for the funds that AmTrust had sent to her.

252.    Upon information and belief, Defendants and others known to them orchestrated this transaction.

### Transaction – 87-33 125th Street, Richmond Hill, New York

253.    This transaction involved a "flip transaction" whereby Abul Talukder ("Talukder") obtained a first and second mortgage loan from AmTrust to purportedly fund the purchase of the property located at 87-33 125th Street, Richmond Hill, New York from Advantage Real Estate and Development, LLC d/b/a Right Advantage Realty ("Advantage") for $680,000.

254. On or about July 21, 2008, AmTrust funded a mortgage loan for Talukder's purchase of the property by disbursing a wire transfer to Malik, AmTrust's closing attorney, to fund a first mortgage loan in the amount of $530,000, and to fund a second mortgage loan in the amount of $77,000.

255. The property description is as follows:

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough and County of Queens, City and State of New York, bounded and described as follows:

BEGINNING at a point on the easterly side of 125th Street (formerly Ward Street) distant 439.82 feet northerly from the corner formed by the intersection of the northerly side of 89th Avenue (formerly Stewart Avenue) with the easterly side of 125th Street;

RUNNING THENCE easterly parallel with 89th Avenue and part of the distance through a party wall, 100 feet;

THENCE northerly parallel with 125th Street, 20 feet;

THENCE westerly again parallel with 89th Avenue and part of the distance through a party wall, 100 fee [sic] to the easterly side of 125th Street;

THENCE southerly along the easterly side of 125th Street, 20 feet to the point or place of BEGINNING.

256. In connection with this transaction, Talukder executed a first Mortgage in favor of AmTrust in the amount of $530,000, and a Note payable to AmTrust in the amount of $530,000, both dated July 21, 2008.

257. In connection with this transaction, Talukder executed a second Mortgage in favor of AmTrust in the amount of $77,000, and a Note payable to AmTrust in the amount of $77,000, both dated July 18, 2008.

258. These mortgage loans were brokered by Artisan pursuant to the Master Broker Agreement.

259. The Artisan loan officer who processed this loan was James Tagliarino.

260. According to the HUD-1 settlement statement, there were no prior mortgages to be paid off in connection with this transaction and the Seller was to receive $667,265 in cash.

261. Upon information and belief, $667,265 was disbursed directly to Advantage's attorney, whose identity is unknown.

262. At the time of the loan closing, Advantage did not have title to the property.

263. Upon information and belief, Advantage used a portion of the loan proceeds to fund its purchase of the property on the date of the closing. This deed transferring the property to Advantage was not recorded until December 8, 2008, more than four months after the closing of the AmTrust loan.

264. After using the funds obtained from AmTrust to fund its own purchase of the property for far less than the $680,000 price listed on its contract with Talukder, Advantage then transferred the property to Talukder.

265. Hector Suazo ("Suazo") appraised the real property in connection with Talukder's mortgage application.

266. Suazo appraised the property for $685,000, deliberately overstating the value of the property. Advantage, the seller, purchased the property for $515,000 on the date of the closing of the AmTrust loan.

267. Suazo stated in the appraisal that "Shanu Miah," not Advantage, was the owner of public record at the time of the appraisal. Suazo also indicated that the Seller (Advantage) was the owner of public record.

268. NMR was the title agent in connection with this transaction.

269.     Upon information and belief, an agent or employee of NMR was present at the closing of this transaction.

270.     NMR provided a title commitment in connection with transaction. The title commitment noted that the deed to the seller Advantage is "presently being recorded," thereby noting that the seller did not possess title to the property at the time of the closing. When Advantage did obtain title to the property, it was by virtue of a deed dated 7/21/08 that was not recorded until 12/8/08, almost five months after the closing of the AmTrust loan.

271.     Malik was responsible for serving as AmTrust's attorney in connection with these mortgage loans pursuant to AmTrust's Closing Instructions and she failed to follow the Closing Instructions.

272.     Malik failed to stop the transaction when the title commitment noted that the seller did not have title to the property at the time the mortgage loan closed, failed to prepare an accurate HUD-1 Settlement Statement, failed to distribute funds in accordance with the HUD-1 Settlement Statement, and failed to account for the funds that AmTrust had sent to her.

273.     Upon information and belief, Defendants and others known to them orchestrated this transaction.

*Transaction – 1389 Crotona Avenue, Bronx, New York*

274.     This transaction involved a "flip transaction" whereby Elma Bennett ("Bennett") obtained a mortgage loan from AmTrust to purportedly fund the purchase of the property located at 1389 Crotona Avenue, Bronx, New York from Anthony Dingle ("Dingle") for $480,000.

275.     On or about August 7, 2008, AmTrust funded a mortgage loan for Bennett's purchase of the property by disbursing a wire transfer to Malik, AmTrust's closing attorney, to fund a mortgage loan in the amount of $375,000.

276. The property description is as follows:

ALL that certain plot, piece or parcel of land, situate, lying and being in the County of Bronx, City and State of New York, bounded and described as follows:

BEGINNING at a point on the westerly side of Crotona Avenue, distant along same, 114.02 feet northerly from the corner formed by the intersection of the northerly side of Jefferson Street with the westerly side of Crotona Avenue;

THENCE westerly, at right angles with Crotona Avenue, 100 feet;

THENCE northerly parallel with Crotona Avenue, 25 feet;

THENCE easterly and again at right angles with Crotona Avenue, 100 feet to the westerly side of Crotona Avenue;

THENCE southerly along the same, 25 feet to the point or place of BEGINNING.

277. In connection with this transaction, Bennett executed a Mortgage in favor of AmTrust in the amount of $375,000, and a Note payable to AmTrust in the amount of $375,000, both dated August 7, 2008.

278. This mortgage loan was brokered by Acorn pursuant to the Master Broker Agreement.

279. The Acorn loan officer who processed this loan was Suzanne Henry.

280. Valdas Duoba ("Duoba") acted as the attorney for the Seller, Dingle, in connection with this transaction and attended the closing.

281. Bennett was given a buyer's allowance of $105,000 in connection with this transaction, as a "gift of equity" from the seller Dingle, Bennett's brother.

282. In this transaction, there are two signed versions of the HUD-1 settlement statement, both dated August 7, 2008.

41

283.    According to the first HUD-1 settlement statement, there was one prior mortgage to be paid off in connection with this transaction in the amount of $298,350.31, and the Seller was to receive $147,149.69 in cash.

284.    According to the second HUD-1 settlement statement, there was one prior mortgage to be paid off in connection with this transaction in the amount of $298,350.31, and the Seller was to receive $140,354.69 in cash.

285.    Upon information and belief, either $147,149.69 or $140,354.69 was disbursed directly to Duoba as Dingle's attorney.

286.    At the time of the loan closing, Dingle did not have title to the property.

287.    Upon information and belief, Dingle used a portion of the loan proceeds to fund his purchase of the property on the date of the closing.  This deed transferring the property to Dingle was not recorded until September 11, 2008, more than a month after the AmTrust loan closed.

288.    After using the funds obtained from AmTrust to fund his own purchase of the property for far less than the $480,000 price listed on his contract with Bennett, Dingle then transferred the property to Bennett.

289.    Christopher Clarke ("Clarke") appraised the real property in connection with Bennett's mortgage application.

290.    Clarke represented that in preparing the appraisal, he analyzed a copy of the contract for sale.

291.    After reviewing the contract for sale, Clarke represented that the property was valued at $480,000, the exact amount listed on the contract for sale of the property.

292.     Clarke deliberately overstated the value of the property.  The seller, Dingle, purchased the property for $330,000 approximately one month after the closing of the AmTrust loan.

293.     Clarke also misrepresented that the owner of public record was Anthony Dingle, when in fact the owner of record was Forbes LLC.

294.     H & Z was the title agent in connection with this transaction.

295.     Upon information and belief, an agent or employee of H & Z was present at the closing of this transaction.

296.     H & Z provided a title commitment in connection with transaction.  The title commitment noted that Dingle was the owner of the property at the time of the closing, having acquired the property "by deed from Shirley Dingle dated 11/13/2006 recorded on 12/27/2006 in CRFN 200600070309."  According to public records, Dingle transferred the property to Forbes LLC on 8/7/08, recorded on 9/11/08.  Forbes LLC was the owner of the property at the time of the closing, and transferred the property to Bennett on 8/7/08, recorded 11/5/08, almost three months after the closing of the AmTrust loan.

297.     Malik was responsible for serving as AmTrust's attorney in connection with this mortgage loan pursuant to AmTrust's Closing Instructions and she failed to follow the Closing Instructions.

298.     Malik failed to stop the transaction when the seller did not have title to the property at the time the mortgage loan closed, failed to prepare an accurate HUD-1 Settlement Statement, failed to distribute funds in accordance with the HUD-1 Settlement Statement, and failed to account for the funds that AmTrust had sent to her.

299.    Upon information and belief, Defendants and others known to them orchestrated this transaction.

**Transaction –697 Hempstead Boulevard, Uniondale, New York**

300.    This transaction involved a "flip transaction" whereby Rusty Ramlogan ("Ramlogan") obtained a mortgage loan from AmTrust to purportedly fund the purchase of the property located at 697 Hempstead Boulevard, Uniondale, New York from Bell Property & Management ("Bell Property") for $440,000.

301.    On or about October 6, 2008, AmTrust funded a mortgage loan for Ramlogan's purchase of the property by disbursing a wire transfer to Malik, AmTrust's closing attorney, to fund a mortgage loan in the amount of $352,000.

302.    The property description is as follows:

All that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being at Hempstead, County of Nassau and State of New York, known and designated as and by the lots numbered 131, 132, and 133 on a certain map entitled "Map of Hempstead Manor, Section 6, situated at Hempstead, Nassau County, N.Y., Property of O.L. Schwencke Land and Investment Co., Fairfield and Dows, Engineers, Mineola, N.Y." and filed in the Office of the Clerk of the County of Nassau on February 26, 1913 as Map No. 217, Case No. 1734, which said lots are more particularly bounded and described as follows:

BEGINNING at a point on the Northerly side of Hempstead Boulevard, distant 280.00 feet westerly from the corner formed by the Intersection of the northerly side of Hempstead Boulevard with the westerly side of Omond Street;

RUNNING THENCE westerly along the northerly side of Hempstead Boulevard, 60.00 feet;

THENCE northerly at right angles to the northerly side of Hempstead Boulevard, 100 feet;

THENCE easterly parallel with the northerly side of Hempstead Boulevard, 60.00 feet;

THENCE southerly again at right angles to the northerly side of Hempstead Boulevard, 100.00 feet to the northerly side of Hempstead Boulevard, to the point or place of BEGINNING.

303.    In connection with this transaction, Ramlogan executed a Mortgage in favor of AmTrust in the amount of $352,000, and a Note payable to AmTrust in the amount of $352,000, both dated October 6, 2008.

304.    This mortgage loan was brokered by Link One pursuant to the Master Broker Agreement.

305.    The Link One loan officer who processed this loan was Sonja Sorchinsky.

306.    Upon information and belief, Ramlogan falsified his income, employment history, and that the building would be owner-occupied in his loan application.

307.    Ramlogan also utilized a falsified earnest money check, in the amount of $10,000, check number 131129022, payable to "George Alderdice," dated August 28, 2008, this check was also used as an earnest money deposit in another AmTrust loan transaction.

308.    Alderdice acted as the attorney for the Seller, Bell Property, in connection with this transaction and attended the closing.

309.    The purchase contract, dated 8/28/08, expressly stated that Alderdice, as Bell Property's attorney, was to hold the earnest-money deposit in a segregated bank account.

310.    The HUD-1 Settlement Statement also noted that this earnest money had been paid.  Upon information and belief, Alderdice's client, Bell Property, signed the HUD-1 certifying that it was true and accurate during the closing and in front of Alderdice.

311.    By attending and participating in the closing and by helping his client review the documents and sign the HUD-1, Alderdice fraudulently represented to Malik and AmTrust that

he had deposited the earnest-money check in a segregated bank account and that the check was valid when the check had actually been falsified.

312.    Ramlogan was given a buyer's allowance of $23,140.68 in connection with this transaction.

313.    According to the HUD-1 settlement statement, there were no prior mortgages to be paid off in connection with this transaction and the Seller was to receive $406,999.77 in cash.

314.    Upon information and belief, $406,999.77 was disbursed directly to Alderdice as Bell Property's attorney.

315.    At the time of the loan closing, Bell Property did not have title to the property.

316.    Upon information and belief, Bell Property used a portion of the loan proceeds to fund its purchase of the property on the date of the closing.  This deed transferring the property to Bell Property was not recorded until May 1, 2009.

317.    After using the funds obtained from AmTrust to fund its own purchase of the property for far less than the $440,000 price listed on his contract with Ramlogan, Bell Property then transferred the property to Ramlogan on 9/8/08.

318.    Allison Ram ("Ram") appraised the real property in connection with Ramlogan's mortgage application.

319.    Ram represented that in preparing the appraisal, she analyzed a copy of the contract for sale.

320.    After reviewing the contract for sale, Ram represented that the property was valued at $440,000, the exact amount listed on the contract for sale of the property.

321.    Ram also misrepresented that the owner of public record was Bell Property.

46

322.    Morningstar Abstract, LLC ("Morningstar") was the title agent in connection with this transaction.

323.    Upon information and belief, an agent or employee of Morningstar was present at the closing of this transaction.

324.    Morningstar provided a title commitment in connection with transaction. The title commitment noted that the deed to the seller is "being recorded," thereby noting that the seller did not possess title to the property at the time of the closing. Actually, Bell Property did not have title to the property at the time Morningstar made this representation. When Bell Property did obtain title to the property, it was by virtue of a deed dated 9/8/08 that was not recorded until 5/1/09, almost seven months after the closing of the AmTrust loan.

325.    Malik was responsible for serving as AmTrust's attorney in connection with this mortgage loan pursuant to AmTrust's Closing Instructions, and she failed to follow the Closing Instructions.

326.    Malik failed to stop the transaction when the title commitment noted that the seller did not have title to the property at the time the mortgage loan closed, failed to prepare an accurate HUD-1 Settlement Statement, failed to distribute funds in accordance with the HUD-1 Settlement Statement, and failed to account for the funds that AmTrust had sent to him.

327.    Upon information and belief, Defendants and others known to them orchestrated this transaction.

*Transaction – 110-49 167th Street, Jamaica, New York*

328.    This is a transaction whereby Keisha Harris ("Harris") obtained a mortgage loan from AmTrust to purportedly fund the purchase of the property located at 110-49 167th Street, Jamaica, New York from Adrian Thomas ("Thomas") for $460,000.

329.    On or about August 8, 2008, AmTrust funded a mortgage loan for Harris's purchase of the property by disbursing a wire transfer to Malik, AmTrust's closing attorney, to fund a mortgage loan in the amount of $391,000.

330.    The property description is as follows:

All that certain plot, piece or parcel of land, situate, lying and being in the Borough and County of Queens, City and State of New York, designated on a certain map entitled, "Revised Map of Jamaica Terrace, Section 2" property of Benjamin H. Sweet, situate in the Fourth Ward, Borough of Queens, City of New York, surveyed December 12, 1906, S.H. McLaughlin, C.E. & C.S., and filed in the Queens County Clerk's, now Register's Office, bounded and described according to said map as follows:

BEGINNING at a point on the easterly side of 167th Street, formerly known as Woodland Avenue, distant 100 feet northerly from the corner formed by the intersection of the easterly side of 167th Street and the northerly side of 111th Avenue formerly known as Remsen Street;

RUNNING THENCE easterly parallel with 11th Avenue, 100 feet;

THENCE northerly parallel with 167th Street, 30 feet;

THENCE westerly again at parallel with 111th Avenue, 100 feet to the easterly side of 167th Street;

THENCE southerly along the easterly side of 167th Street, 30 feet to the point or place of BEGINNING.

331.    In connection with this transaction, Harris executed a Mortgage in favor of AmTrust in the amount of $391,000, and a Note payable to AmTrust in the amount of $391,000, both dated August 8, 2008.

332.    This mortgage loan was brokered by Global Financial pursuant to the Master Broker Agreement.

333.    The Global Financial loan officer who processed this loan was Roddy Isidore.

334.    Upon information and belief, Harris falsified her income, employment history, assets, and that the building would be owner-occupied in his loan application.

48

335.    The identity of the attorney for the Seller, Thomas, is unknown.

336.    Harris was given a buyer's allowance of $27,600 in connection with this transaction.

337.    According to the HUD-1 settlement statement, there were no prior mortgages to be paid off in connection with this transaction and the Seller was to receive $425,385 in cash.

338.    Upon information and belief, this $425,385 was disbursed directly to Thomas's attorney.

339.    Charles Brown ("Brown") appraised the real property in connection with Harris's mortgage application.

340.    Brown represented that in preparing the appraisal, he analyzed a copy of the contract for sale.

341.    After reviewing the contract for sale, Brown represented that the property was valued at $460,000, the exact amount listed on the contract for sale of the property.

342.    Brown deliberately overstated the value of the property.  Upon information and belief, the current value of the property is $340,000.

343.    NMR was the title agent in connection with this transaction.

344.    Upon information and belief, an agent or employee of NMR was present at the closing of this transaction.

345.    NMR provided a title commitment in connection with transaction.

346.    Upon information and belief, Harris never held title to the property.

347.    The mortgage between Harris and AmTrust was never recorded.

348.   Malik was responsible for serving as AmTrust's attorney in connection with this mortgage loan pursuant to AmTrust's Closing Instructions and she failed to follow the Closing Instructions.

349.   Malik failed to ensure that AmTrust's mortgage was recorded, failed to prepare an accurate HUD-1 Settlement Statement, failed to distribute funds in accordance with the HUD-1 Settlement Statement, and failed to account for the funds that AmTrust had sent to her.

350.   Upon information and belief, Defendants and others known to them orchestrated this transaction.

***Transaction –98-31 211th Street, Queens Village, New York***

351.   This transaction involved a "flip transaction" whereby Patricia Whyte aka Patricia L. Hall ("Whyte") obtained a mortgage loan from AmTrust to purportedly fund the purchase of the property located at 98-31 211th Street, Queens Village, New York from Denzel Anderson ("Anderson") for $560,000.

352.   On or about October 15, 2008, AmTrust funded a mortgage loan for Whyte's purchase of the property by disbursing a wire transfer to Malik, AmTrust's closing attorney, to fund a mortgage loan in the amount of $448,000.

353.   The property description is as follows:

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough and County of Queens, City and State of New York, bounded and described as follows:

BEGINNING at a point on the easterly side of 211th Street distant 100 feet northerly from the corner formed by the intersection of the easterly side of 211th Street with the northerly side of 99th Avenue;

RUNNING THENCE easterly at right angles to the easterly side of 211th Street, 80 feet;

THENCE northerly parallel with easterly side of 211th Street, 20 feet to the southerly side of land of Long Island Railroad;

THENCE westerly at right angles to the easterly of 211th Street and along the southerly line of land of Long Island Railroad, 80 feet to the easterly side of 211th Street;

THENCE southerly along the easterly side of 211th Street, 20 feet to the point or place of BEGINNING.

354.    In connection with this transaction, Whyte executed a Mortgage in favor of AmTrust in the amount of $448,000, and a Note payable to AmTrust in the amount of $448,000, both dated October 15, 2008.

355.    This mortgage loan was brokered by Global pursuant to the Master Broker Agreement.

356.    The Global loan officer who processed this loan was Roddy Isidore.

357.    Malik acted as the attorney for the Seller, Anderson, in connection with this transaction and attended the closing.

358.    According to the HUD-1 settlement statement, there were no prior mortgages to be paid off in connection with this transaction and the Seller was to receive $549,633 in cash.

359.    Upon information and belief, this $549,633 was disbursed directly to Malik as Anderson's attorney.

360.    At the time of the loan closing, Anderson did not have title to the property.

361.    Upon information and belief, Anderson used a portion of the loan proceeds to fund his purchase of the property on the date of the closing. This deed transferring the property to Anderson was not recorded until October 29, 2008, more than two weeks after Whyte's loan closed.

362.    After using the funds obtained from AmTrust to fund his own purchase of the property for far less than the $560,000 price listed on his contract with Whyte, Anderson then transferred the property to Whyte.

363.    Alison Ram ("Ram") appraised the real property in connection with Whyte's mortgage application.

364.    Ram represented that in preparing the appraisal, she analyzed a copy of the contract for sale.

365.    After reviewing the contract for sale, Ram represented that the property was valued at $570,000, $10,000 more than the amount listed on the contract for sale of the property.

366.    Ram deliberately overstated the value of the property.  The seller, Anderson, purchased the property for $295,000 on the date of the closing of the AmTrust loan.

367.    Ram also misrepresented that the owner of public record was Anderson, when in fact the owner of record was Countrywide Home Loans, Inc.

368.    NMR was the title agent in connection with this transaction.

369.    Upon information and belief, an agent or employee of NMR was present at the closing of this transaction.

370.    NMR provided a title commitment in connection with transaction.  The title commitment noted that Anderson was the owner of the property at the time of the closing, having acquired the property "by virtue of a deed made by COUNTRYWIDE HOME LOANS, INC. dated August 13, 2007 to be recorded in the Office of the New York City Register for Queens County," thereby noting that the Seller did not possess title to the property at the time of the closing.  According to public records, Countrywide Home Loans, Inc. was the owner of the property at the time of the closing, and transferred the property to Anderson on October 15,

2008, recorded on October 29, 2008, after the closing of the AmTrust loan. Anderson then transferred the property to Whyte, with the deed being recorded on November 5, 2008.

371. Malik was responsible for serving as AmTrust's attorney in connection with this mortgage loan pursuant to AmTrust's Closing Instructions and she failed to follow the Closing Instructions.

372. Malik failed to stop the transaction when the seller did not have title to the property at the time the mortgage loan closed, failed to prepare an accurate HUD-1 Settlement Statement, failed to distribute funds in accordance with the HUD-1 Settlement Statement, and failed to account for the funds that AmTrust had sent to her.

373. Upon information and belief, Defendants and others known to them orchestrated this transaction.

**Transaction –298 A Marion Street, Brooklyn, New York**

374. This transaction involved a "flip transaction" whereby Rajash Sookhoo ("Sookhoo") obtained a first and second mortgage loan from AmTrust to purportedly fund the purchase of the property located at 298 A Marion Street, Brooklyn, New York from David Cohen ("Cohen") for $760,000.

375. On or about June 6, 2008, AmTrust funded mortgage loans for Sookhoo's purchase of the property by disbursing a wire transfer to Malik, AmTrust's closing attorney, to fund a first mortgage loan in the amount of $533,000, and to fund a second mortgage loan in the amount of $150,000.

376. The property description is as follows:

> ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Brooklyn, City and State of New York, bounded and described as follows:

53

BEGINNING at a point on the southerly side of Marion Street, distant 167 feet 6 inches westerly from the corner formed by the intersection of the westerly line of Saratoga Avenue with the southerly line of Marion Street;

RUNNING THENCE southerly along the line parallel with the westerly side of Saratoga Avenue and part of the distance through the remains of the party wall, 100 feet 0 inches;

THENCE westerly along the line parallel with the southerly side of Marion Street, 17 feet 1 inch;

THENCE northerly and parallel wit the first mentioned course, 100 feet 0 inches and part of the distance through a party wall to the point on the southerly side of Marion Street;

THENCE easterly along said southerly side of Marion Street, 17 feet 1 inch to the point or place of BEGINNING.

377.   In connection with this transaction, Sookhoo executed a first Mortgage in favor of AmTrust in the amount of $533,000, and a Note payable to AmTrust in the amount of $533,000, both dated June 6, 2008. Sookhoo also executed a second Mortgage in favor of AmTrust in the amount of $150,000, and a Note payable to AmTrust in the amount of $150,000, both dated June 6, 2008.

378.   This mortgage loan was brokered by Artisan pursuant to the Master Broker Agreement.

379.   The Artisan loan officer who processed this loan was James Tagliarino.

380.   The identity of the Seller's attorney is unknown.

381.   Sookhoo was given a buyer's allowance of $23,500 in connection with this transaction.

382.   According to the HUD-1 settlement statement, there were no prior mortgages to be paid off in connection with this transaction and the Seller was to receive $722,055 in cash.

383.   Upon information and belief, following the closing, $722,055 was disbursed directly to Cohen's attorney.

384.   At the time of the loan closing, Cohen did not have title to the property.

385.   Upon information and belief, Cohen used a portion of the loan proceeds to fund his purchase of the property on the date of the closing. The property was deeded three times on June 6, 2008, with the final deed to Sookhoo. This deed transferring the property to Cohen was not recorded until August 28, 2008 more than two months after the closing of the AmTrust loan. Further, although Cohen is listed as the Seller on the HUD-1 settlement statement, an additional purchase contract for the same property lists Charles Harbour ("Harbour") as the Seller, and Harbour in fact signed the HUD-1 settlement statement at Closing.

386.   After using the funds obtained from AmTrust to fund his own purchase of the property for far less than the $760,000 price listed on his contract with Sookhoo, Cohen then transferred the property to Sookhoo.

387.   Domenico Antonelli ("Antonelli") appraised the real property in connection with Sookhoo's mortgage applications.

388.   Antonelli represented that in preparing the appraisal, he analyzed a copy of the contract for sale.

389.   After reviewing the contract for sale, Clarke represented that the property was valued at $760,000, the exact amount listed on the contract for sale of the property.

390.   Antonelli deliberately overstated the value of the property. Upon information and belief, the present value of the property is $700,000.

391.   Antonelli also misrepresented that the owner of public record was Cohen. Cohen was not deeded the property until after the appraisal was completed.

392.   NMR was the title agent in connection with this transaction.

393.   Upon information and belief, an agent or employee of NMR was present at the closing of this transaction.

394.   NMR provided a title commitment in connection with transaction.  The title commitment noted that Cohen was the owner of the property at the time of the closing, having acquired the property "by virtue of a deed made by 705 WARWICK REALTY, INC. presently being recorded in the Office of the New York City Register, Kings County," indicating that the Seller did not have title to the property at the time the loan closed.  According to public records, on 6/6/08, the property was deeded three times: from 705 Warwick Realty, Inc to David Cohen, from David Cohen to Charles Harbour, and from Charles Harbour to the AmTrust borrower, Sookhoo.

395.   Malik was responsible for serving as AmTrust's attorney in connection with this mortgage loan pursuant to AmTrust's Closing Instructions and she failed to follow the Closing Instructions.

396.   Malik failed to stop the transaction when the seller did not have title to the property at the time the mortgage loan closed, failed to prepare an accurate HUD-1 Settlement Statement, failed to distribute funds in accordance with the HUD-1 Settlement Statement, and failed to account for the funds that AmTrust had sent to her.

397.   Upon information and belief, Defendants and others known to them orchestrated this transaction.

**Transaction – 1095 Gipson Street, Far Rockaway, New York**

398.   This transaction involved a "flip transaction" whereby Olabisi Lawal ("Lawal") obtained a mortgage loan from AmTrust to purportedly fund the purchase of the property located

at 1095 Gipson Street, Far Rockaway, New York from Jamaica Treasure, Inc. ("Jamaica

Treasure") for $525,000.

399.    On or about December 1, 2008, AmTrust funded a mortgage loan for Lawal's

purchase of the property by disbursing a wire transfer to Malik, AmTrust's closing attorney, to

fund a mortgage loan in the amount of $472,500.

400.    The property description is as follows:

> ALL that certain plot, piece or parcel of land, situate, lying and being in
> the Fifth Ward of the Borough and County of Queens, City and State of
> New York, bounded and described as follows:
>
> BEGINNING at the corner formed by the intersection of the westerly side
> of Gipson Street, also known as North Avenue, with the southerly side of
> Healy Avenue, also known as Clinton Avenue;
>
> RUNNING THENCE westerly at an interior angle of 106 degrees 23
> minutes along the southerly side of Healy Avenue, 70 feet, to a point;
>
> THENCE in a southwesterly direction and at right angles to the southerly
> side of Healy Avenue, 58.50 feet, to a stake;
>
> THENCE easterly at an exterior angle of 93 degrees 35 minutes 30
> seconds, 85.79 feet to the westerly side of Gipson Street;
>
> THENCE northerly along the westerly side of Gipson Street, 55.375 feet,
> to the point or place of BEGINNING.

401.    In connection with this transaction, Lawal executed a Mortgage in favor of

AmTrust in the amount of $472,500, and a Note payable to AmTrust in the amount of $472,500,

both dated December 1, 2008.

402.    This mortgage loan was brokered by Genesis pursuant to the Master Broker

Agreement.

403.    The Genesis loan officer who processed this loan was Fernando Chamorro.

404.    Baraket acted as the attorney for the Seller, Jamaica Treasure, in connection with

this transaction and attended the closing.

405.   According to the HUD-1 settlement statement, there were no prior mortgages to be paid off in connection with this transaction and the Seller was to receive $515,054.75 in cash.

406.   Upon information and belief, this $515,054.75 was disbursed directly to Baraket as Jamaica Treasure's attorney.

407.   At the time of the loan closing, Jamaica Treasure did not have title to the property.

408.   Upon information and belief, Jamaica Treasure used a portion of the loan proceeds to fund its purchase of the property on the date of the closing.  This deed transferring the property to Jamaica Treasure was not recorded until January 20, 2009, almost two months after Lawal's loan closed.

409.   After using the funds obtained from AmTrust to fund its own purchase of the property for far less than the $525,000 price listed on its contract with Lawal, Jamaica Treasure then transferred the property to Lawal.

410.   Woo appraised the real property in connection with Lawal's mortgage application.

411.   Woo represented that in preparing the appraisal, he analyzed a copy of the contract for sale.

412.   After reviewing the contract for sale, Woo represented that the property was valued at $525,000, the exact amount listed on the contract for sale of the property.

413.   Woo deliberately overstated the value of the property.  The seller, Jamaica Treasure, purchased the property for $401,000 more than a month after the closing of the AmTrust loan.

414.   Woo also misrepresented that the owner of public record was Jamaica Treasure, when in fact the owner of record was Musibau Odesayna.

415.   NMR was the title agent in connection with this transaction.

416.   Upon information and belief, an agent or employee of NMR was present at the closing of this transaction.

417.   NMR provided a title commitment in connection with transaction.  The title commitment noted that Jamaica Treasure was the owner of the property at the time of the closing, having acquired the property "by virtue of a deed from GAFAR RAFIU dated January 23, 2007 and recorded February 13, 2007 as CFRN 2007000083910 in the Office of the New York City Register for Queens County."  According to public records, Rafiu transferred the property to Musibau Odesayna, with the deed recorded on 2/13/07.  Odesayna was the owner of the property at the time of the closing, and transferred the property to Jamaica Treasure, with the deed recorded on 1/20/09. Jamaica Treasure then transferred the property to Lawal, with the deed recorded on 1/20/09, more than a month after the closing of the AmTrust loan.

418.   Malik was responsible for serving as AmTrust's attorney in connection with this mortgage loan pursuant to AmTrust's Closing Instructions and she failed to follow the Closing Instructions.

419.   Malik failed to stop the transaction when the seller did not have title to the property at the time the mortgage loan closed, failed to prepare an accurate HUD-1 Settlement Statement, failed to distribute funds in accordance with the HUD-1 Settlement Statement, and failed to account for the funds that AmTrust had sent to her.

420.   Upon information and belief, Defendants and others known to them orchestrated this transaction.

*Transaction – 104-23 133rd Street, South Richmond Hill, New York*

421.   This transaction involved a "flip transaction" whereby Gurdeep Singh ("Singh") obtained a mortgage loan from AmTrust to purportedly fund the purchase of the property located at 104-23 133rd Street, South Richmond Hill, New York from Agro Delight, Inc. ("Agro Delight") for $650,000.

422.   On or about November 12, 2008, AmTrust funded a mortgage loan for Singh's purchase of the property by disbursing a wire transfer to Malik, AmTrust's closing attorney, to fund a mortgage loan in the amount of $519,000.

423.   The property description is as follows:

> ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough and County of Queens, City and State of New York, bounded and described as follows:
>
> BEGINNING at a point on the easterly side of 133rd Street, formerly Nebraska Avenue, distant 150 feet northerly from the corner formed by the intersection of the northerly side of 105th Avenue, formerly Wyoming Avenue, with the easterly side of 133rd Street;
>
> RUNNING THENCE easterly and parallel with 105th Avenue, 100 feet;
>
> THENCE northerly and parallel with 133rd Street, 25 feet;
>
> THENCE westerly and again parallel with 105th Avenue, 100 feet to the easterly side of 133rd Street;
>
> THENCE southerly along easterly side of 133rd Street, 25 feet to the point or place of BEGINNING.

424.   In connection with this transaction, Singh executed a Mortgage in favor of AmTrust in the amount of $519,000, and a Note payable to AmTrust in the amount of $519,000, both dated November 12, 2008.

425.   This mortgage loan was brokered by SI pursuant to the Master Broker Agreement.

426.   The SI Mortgage loan officer who processed this loan was Rajeev Gandhi.

427.    Malik acted as the attorney for the Seller, Agro Delight, in connection with this transaction and attended the closing.

428.    Singh was given a buyer's allowance of $19,500 in connection with this transaction.

429.    According to the HUD-1 settlement statement, there were no prior mortgages to be paid off in connection with this transaction and the Seller was to receive $618,818.50 in cash.

430.    Upon information and belief, this $618,818.50 was disbursed directly to Malik as Agro Delight's attorney.

431.    At the time of the loan closing, Agro Delight did not have title to the property.

432.    Upon information and belief, Agro Delight used a portion of the loan proceeds to fund its purchase of the property. This deed transferring the property to Agro Delight was not recorded until December 9, 2008, almost a month after Singh's loan closed.

433.    After using the funds obtained from AmTrust to fund its own purchase of the property for $375,000, far less than the $650,000 price listed on its contract with Singh, Agro Delight then transferred the property to Singh.

434.    Samuel Halpert ("Halpert") appraised the real property in connection with Singh's mortgage application.

435.    Halpert represented that in preparing the appraisal, he analyzed a copy of the contract for sale.

436.    After reviewing the contract for sale, Halpert represented that the property was valued at $650,000, the exact amount listed on the contract for sale of the property.

437.    Halpert deliberately overstated the value of the property.  Agro Delight purchased the property for $375,000 approximately one month before the closing of the AmTrust loan, with the deed having been recorded approximately one month after the closing of the AmTrust loan.

438.    Halpert also misrepresented that the owner of public record was Agro Delight, when in fact the owner of record was Deutsche Bank National Trust Company.

439.    NMR was the title agent in connection with this transaction.

440.    Upon information and belief, an agent or employee of NMR was present at the closing of this transaction.

441.    NMR provided a title commitment in connection with transaction.  The title commitment noted that Agro Delight was the owner of the property at the time of the closing, having acquired the property "by virtue of a deed from DEUTSCHE BANK NATIONAL TRUST COMPANY to be recorded in the Office of the New York City Register for Queens County," indicating that the Seller did not have title to the property at the time of the closing. According to public records, Deutsche Bank National Trust Company was the owner of the property at the time of the closing, and transferred the property to Agro Delight on October 16, 2008, recorded on December 9, 2008, almost a month after the closing of the AmTrust loan. Agro Delight then transferred the property to Singh, on November 11, 2008, recorded on November 21, 2008.

442.    Malik was responsible for serving as AmTrust's attorney in connection with this mortgage loan pursuant to AmTrust's Closing Instructions and she failed to follow the Closing Instructions.

443.    Malik failed to stop the transaction when the seller did not have title to the property at the time the mortgage loan closed, failed to prepare an accurate HUD-1 Settlement

Statement, failed to distribute funds in accordance with the HUD-1 Settlement Statement, and failed to account for the funds that AmTrust had sent to her.

444.    Upon information and belief, Defendants and others known to them orchestrated this transaction.

**Transaction – 111-32 170th Street, Jamaica, New York**

445.    This transaction involved a "flip transaction" whereby Joseph Gomes ("Gomes") obtained a mortgage loan from AmTrust to purportedly fund the purchase of the property located at 111-32 170th Street, Jamaica, New York from New AJ, Inc. ("New AJ") for $480,000.

446.    On or about October 15, 2008, AmTrust funded a mortgage loan for Gomes's purchase of the property by disbursing a wire transfer to Malik, AmTrust's closing attorney, to fund a mortgage loan in the amount of $360,000.

447.    The property description is as follows:

> ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough and County of Queens, City and State of New York, bounded and described as follows:
>
> BEGINNING at a point on the westerly side of 170th Street (formerly known as Martha Avenue) distant 270 feet northerly from the corner formed by the intersection of the westerly side of 170th Street and the northerly side of Sayres Avenue (formerly known as Baisley Street);
>
> RUNNING THENCE westerly at right angles to 170th Street, 100 feet;
>
> THENCE northerly parallel with 170th Street, 50 feet;
>
> THENCE easterly and again at right angles to 170th Street, 100 feet to the westerly side of 170th Street;
>
> THENCE southerly along westerly side of 170th Street, 50 feet to the point or place of BEGINNING.

448.    In connection with this transaction, Gomes executed a Mortgage in favor of AmTrust in the amount of $360,000, and a Note payable to AmTrust in the amount of $360,000, both dated October 15, 2008.

449.    This mortgage loan was brokered by Artisan pursuant to the Master Broker Agreement.

450.    The Artisan loan officer who processed this loan was Jim Barry.

451.    Wally Duval ("Duval") acted as the attorney for the Seller, New AJ, in connection with this transaction and attended the closing.

452.    According to the HUD-1 settlement statement, there were no prior mortgages to be paid off in connection with this transaction and the Seller was to receive $473,426 in cash.

453.    Upon information and belief, this $473,426 was disbursed directly to Duval as New AJ's attorney.

454.    At the time of the loan closing, New AJ did not have title to the property.

455.    Upon information and belief, New AJ used a portion of the loan proceeds to fund its purchase of the property.

456.    After using the funds obtained from AmTrust to fund its own purchase of the property for far less than the $480,000 price listed on its contract with Gomes, New AJ then transferred the property to Gomes.

457.    Leon Granovsky ("Granovsky") appraised the real property in connection with Gomes's mortgage application.

458.    Granovsky provided two different appraisals for the property.  One appraisal was "signed" on August 21, 2008, while the other was "signed" on October 2, 2008.