# Exhibit 2, part 2

459.    In the August 21, 2008 appraisal, Granovsky represented that "New AJ Inc." was the owner of the property, when in fact the owner of record was Joseph B. Williams.

460.    In the other appraisal, "signed" on October 2, 2008, Granovsky represented that "Williams" was the owner of the property, when in fact the owner of record was Joseph B. Williams.

461.    Granovsky represented that in preparing the appraisal, he analyzed a copy of the contract for sale.

462.    After reviewing the contract for sale, Granovsky represented that the property was valued at $480,000, the exact amount listed on the contract for sale of the property.

463.    NMR was the title agent in connection with this transaction.

464.    Upon information and belief, an agent or employee of NMR was present at the closing of this transaction.

465.    NMR provided a title commitment in connection with transaction. The title commitment noted that New AJ was the owner of the property at the time of the closing, having acquired the property "by virtue of a deed made by JOSEPH BERNARD WILLIAMS & ROBERTA M. WILLIAMS  dated September 10, 2007 presently being recorded in the Office of the New York City Register for Queens County," thereby indicating that the Seller did not have title to the property at the time of the Closing.  The public records show that Williams transferred the property to New AJ on October 1, 2008, with the deed recorded on July 8, 2009.  New AJ then transferred the property to Gomes on October 15, 2008, recorded on July 8, 2009.

466.    Malik was responsible for serving as AmTrust's attorney in connection with this mortgage loan pursuant to AmTrust's Closing Instructions and she failed to follow the Closing Instructions.

467.    Malik failed to stop the transaction when the seller did not have title to the property at the time the mortgage loan closed, failed to prepare an accurate HUD-1 Settlement Statement, failed to distribute funds in accordance with the HUD-1 Settlement Statement, and failed to account for the funds that AmTrust had sent to her.

468.    Upon information and belief, Defendants and others known to them orchestrated this transaction.

***Transaction – 129 North Grove Street, Freeport, New York***

469.    This transaction involved a "flip transaction" whereby Tanim Sarowar ("Sarowar") obtained a mortgage loan from AmTrust to purportedly fund the purchase of the property located at 129 North Grove Street, Freeport, New York from Ultra Quick Construction Corp. ("Ultra Quick") for $420,000.

470.    On or about July 30, 2008, AmTrust funded a mortgage loan for Sarowar's purchase of the property by disbursing a wire transfer to Malik, AmTrust's closing attorney, to fund a mortgage loan in the amount of $369,600.

471.    The property description is as follows:

ALL that certain plot, piece or parcel of land, situate, lying and being in the incorporated Village of Freeport, Town of Hempstead, County of Nassau and State of New York, bounded and described as follows:

BEGINNING at a point on the westerly side of North Grove Street, distant 140.00 feet Southerly from the corner formed by the intersection of the westerly side of North Grove Street with the Southerly side of West Lane Avenue;

RUNNING THENCE westerly parallel with West Lena Avenue, 150.00 feet;

RUNNING THENCE Southerly parallel with North Grove Street, 50.00 feet;

RUNNING THENCE Easterly parallel with West Lane Avenue, 150.00 feet to the Westerly side of North Grove Street;

RUNNING THENCE Northerly along the Westerly side of North Grove Street, 50.00 feet to the point or place of BEGINNING.

472.   In connection with this transaction, Sarowar executed a Mortgage in favor of AmTrust in the amount of $369,600, and a Note payable to AmTrust in the amount of $369,600, both dated July 30, 2008.

473.   This mortgage loan was brokered by Genesis pursuant to the Master Broker Agreement.

474.   The Genesis loan officer who processed this loan was Fernando Chamorro.

475.   Viscardi, Basner & Bigelow ("Viscardi") acted as the attorney for the Seller, Ultra Quick, in connection with this transaction and attended the closing.

476.   Sarowar was given a buyer's allowance of $25,200 in connection with this transaction.

477.   According to the HUD-1 settlement statement, there was one prior mortgage to be paid off in connection with this transaction in the amount of $230,620.98 and the Seller was to receive $161,999.02 in cash.

478.   Upon information and belief, this $161,999.02 was disbursed directly to Viscardi as Ultra Quick's attorney.

479.   At the time of the loan closing, Ultra Quick did not have title to the property.

480.   Upon information and belief, Ultra Quick used a portion of the loan proceeds to fund its purchase of the property.

481.   After using the funds obtained from AmTrust to fund its own purchase of the property for far less than the $420,000 price listed on its contract with Sarowar, Ultra Quick then transferred the property to Sarowar.

482.    Thomas Griffin ("Griffin") appraised the real property in connection with Sarowar's mortgage application.

483.    Griffin represented that in preparing the appraisal, he analyzed a copy of the contract for sale.

484.    After reviewing the contract for sale, Griffin represented that the property was valued at $420,000, the exact amount listed on the contract for sale of the property.

485.    Griffin deliberately overstated the value of the property.  Upon information and belief, the present value of the property is $325,000.

486.    Griffin also misrepresented that the owner of public record was Ultra Quick, when in fact the owner of record was Paulette Grant.

487.    Juris Abstract was the title agent in connection with this transaction.

488.    Upon information and belief, an agent or employee of Juris Abstract was present at the closing of this transaction.

489.    Juris Abstract provided two title commitments in connection with transaction. The first title commitment dated May 2, 2008 noted that Paulette Grant was the owner of the property by virtue of a deed made by Paulette Holmes dated 8/27/2002, recorded on 01/16/2003 in Liber 11575, Page 543.

490.    A recertified title commitment dated July 30, 2008, the date of the closing, noted that Ultra Quick was the owner of the property at the time of the closing, having acquired the property " by virtue of a deed made by Paulette Holmes dated 8/27/2002, recorded on 01/16/2003 in Liber 11575, Page 543."   According to public records, Paulette Grant was the owner of the property at the time of the closing, and transferred the property to Ultra Quick on July 30, 2008.  The deed from Paulette Grant to Ultra Quick was not recorded until October 8,

2008, more than two months after the closing of the AmTrust loan.  Ultra Quick transferred the property to Sarowar on 7/30/08, recorded on 10/15/08.

491.    Malik was responsible for serving as AmTrust's attorney in connection with this mortgage loan pursuant to AmTrust's Closing Instructions and she failed to follow the Closing Instructions.

492.    Malik failed to stop the transaction when the seller did not have title to the property at the time the mortgage loan closed, failed to prepare an accurate HUD-1 Settlement Statement, failed to distribute funds in accordance with the HUD-1 Settlement Statement, and failed to account for the funds that AmTrust had sent to her.

493.    Upon information and belief, Defendants and others known to them orchestrated this transaction.

**Transaction – 179 Main Street, Mastic Beach, New York**

494.    This transaction involved a "flip transaction" whereby Adrienne Jackson ("Jackson") obtained a mortgage loan from AmTrust to purportedly fund the purchase of the property located at 179 Main Street, Mastic Beach, New York from Linda Linbrunner ("Linbrunner") for $305,000.

495.    On or about August 8, 2008, AmTrust funded a mortgage loan for Jackson's purchase of the property by disbursing a wire transfer to Malik, AmTrust's closing attorney, to fund a mortgage loan in the amount of $259,250.

496.    The property description is as follows:

> ALL that certain plot, piece or parcel of land, situate, lying and being in the Town of Brookhaven, County of Suffolk and State of New York, known and designated as follows: Lots Numbered 7147 and 7148 as designated and delineated on the map entitled "Map of Mastic Park, Section 8" situate at Mastic, in the Town of Brookhaven, County of Suffolk, Long Island, subdivision from original survey certified by May

and Smith C.E. Patchogue, New York, January 1922 and filed in the Suffolk County Clerks Office on March 13, 1922 as Map Number 245, said lots when taken together are bounded and described as follows:

BEGINNING at a point on the northerly side of Main Street said point being distant 400.00 feet westerly from the corner formed by the intersection of the westerly side of Babylon Street with the northerly side of Main Street and from said point beginning;

RUNNING THENCE along the northerly side of Main Street, North 88 degrees 02 minutes 00 seconds West 40.00 feet;

THENCE North 1 degree 58 minutes 00 seconds East 100.00 feet;

THENCE South 88 degrees 02 minutes 00 seconds East 40.00 feet;

THENCE South 1 degree 58 minutes 00 seconds West 100.00 feet to the northerly side of Main Street, the point or place of BEGINNING.

497.     In connection with this transaction, Jackson executed a Mortgage in favor of AmTrust in the amount of $259,250, and a Note payable to AmTrust in the amount of $259,250, both dated August 8, 2008.

498.     This mortgage loan was brokered by Global Financial pursuant to the Master Broker Agreement.

499.     The Global Financial loan officer who processed this loan was Roddy Isidore.

500.     Cory Covert ("Covert") acted as the attorney for the Seller, Linbrunner, in connection with this transaction and attended the closing.

501.     According to the HUD-1 settlement statement, there were no prior mortgages to be paid off in connection with this transaction and the Seller was to receive $303,130 in cash.

502.     Upon information and belief, this $303,130 was disbursed directly to Covert as Linbrunner's attorney.

503.     Upon information and belief, Jackson falsified her income, employment history, assets, and that the building would be owner-occupied in her loan application.

504.     Musheyev appraised the real property in connection with Jackson's mortgage application.

505.     Musheyev represented that in preparing the appraisal, he analyzed a copy of the contract for sale.

506.     After reviewing the contract for sale, Musheyev represented that the property was valued at $305,000, the exact amount listed on the contract for sale of the property.

507.     Musheyev deliberately overstated the value of the property.  Upon information and belief, the present value of the property is $150,000.

508.     H&Z was the title agent in connection with this transaction.

509.     Upon information and belief, an agent or employee of H&Z was present at the closing of this transaction.

510.     H&Z provided a title commitment in connection with transaction.  The title commitment noted that Linbrunner was the owner of the property at the time of the closing, having acquired the property "by deed from Gwendolyn Allen dated 08/18/2006 recorded on 09/07/2006 in Liber 12468 page 267."  According to public records, Linbrunner was not the owner of the property at the time of the closing.

511.     Upon information and belief,  Linbrunner sold the property to Shakim Brister on August 8, 2008, and the deed recorded on September 12, 2008, more than a month after Linbrunner closed the loan on the sale of the property to Jackson.  The title commitment did not include this transaction.  Brister then transferred the property to Jackson, the AmTrust borrower, after the closing of the AmTrust loan.

512.   Malik was responsible for serving as AmTrust's attorney in connection with this mortgage loan pursuant to AmTrust's Closing Instructions and she failed to follow the Closing Instructions.

513.   Malik failed to stop the transaction when the seller did not have title to the property at the time the mortgage loan closed, failed to prepare an accurate HUD-1 Settlement Statement, failed to distribute funds in accordance with the HUD-1 Settlement Statement, and failed to account for the funds that AmTrust had sent to her.

514.   Upon information and belief, Defendants and others known to them orchestrated this transaction.

***Transaction – 105-25 Remington Street, Jamaica, New York***

515.   This transaction involved a "flip" transaction whereby Denanauth Hansraj ("Hansraj") obtained a mortgage loan from AmTrust to purportedly fund the purchase of the property located at 105-25 Remington Street, Jamaica, NY from PRI International ("PRI") for $405,000.

516.   On or about April 25, 2008, AmTrust funded a mortgage loan for Hansraj's purchase of the property by disbursing a wire transfer to Malik, AmTrust's closing attorney, to fund a mortgage loan in the amount of $364,500.

517.   The property description is as follows:

> ALL that certain plot, piece or parcel of land, situate, lying and being in the Fourth Ward of the Borough and County of Queens, City and State of New York, known and designated on a certain map entitled "Map of Property at Jamaica, formerly known as the 'Codwise Farm' belonging to Joseph Wilde, surveyed 1870, S.A. Beers, C.E." and filed in the Office of the Register of the County of Queens on June 9, 1870, as Map No. 324 as and by the Lot No. 20 bounded and described as follows:

> BEGINNING at a point on the northeasterly side of Remington Street (formerly West Street) distant 300 feet northwesterly from the corner

formed by the intersection of the northeasterly side of Remington Street with the northwesterly side of South Street;

RUNNING THENCE northeasterly parallel with South Street, 100 feet;

THENCE northwesterly parallel with Remington Street, 25 feet;

THENCE southwesterly parallel with South Street 100 feet to the northeasterly side of Remington Street;

THENCE southeasterly along the northeasterly side of Remington Street 25 feet to the point or place of BEGINNING.

SUBJECT TO an easement over the most southerly 4 feet 1 inch of the above described premises in favor of the premises immediately adjoining on the south, for a distance of 80 feet from the building line on Remington Street; and

TOGETHER WITH an easement over the most northerly 1 foot 10 inches of the property immediately adjoining on the south, for a distance of 80 feet from the building line on Remington Street; said easements t be used as a means of ingress and egress for private automobiles only, for the owners or occupants of the respective properties.

518.    In connection with this transaction, Hansraj executed a Mortgage in favor of AmTrust in the amount of $364,500, and a Note payable to AmTrust in the amount of $364,500, both dated April 25, 2008.

519.    This mortgage loan was brokered by Streamline pursuant to the Master Broker Agreement.

520.    The Streamline loan officer who processed this loan was Fernando Chamorro.

521.    Upon information and belief, Judy Moses ("Moses") acted as the attorney for the Seller, PRI, in connection with this transaction and attended the closing.

522.    According to the HUD-1 settlement statement, there were no prior mortgage to be paid off in connection with this transaction and the Seller was to receive $398,955 in cash.

523.    Upon information and belief, this $398,955 was disbursed directly to Moses as PRI's attorney.

524.    Upon information and belief, Hansraj falsified his income, employment history, assets, and that the building would be owner-occupied in his loan application.

525.    At the time of the loan closing, PRI did not have title to the property.

526.    Upon information and belief, PRI used a portion of the loan proceeds to fund its purchase of the property.

527.    After using the funds obtained from AmTrust to fund its own purchase of the property for far less than the $405,000 price listed on its contract with Hansraj, PRI then transferred the property to Hansraj.

528.    George Cobblah ("Cobblah") appraised the real property in connection with Hansraj's mortgage application.

529.    Cobblah represented that in preparing the appraisal, he analyzed a copy of the contract for sale.

530.    After reviewing the contract for sale, Cobblah represented that the property was valued at $425,000, $20,000 more than the amount listed on the contract for sale of the property.

531.    Cobblah also misrepresented that the owner of public record was PRI, when in fact the owner of record was Ivan Ramkhelawan Singh.

532.    NMR was the title agent in connection with this transaction.

533.    Upon information and belief, an agent or employee of NMR was present at the closing of this transaction.

534.    NMR provided a title commitment in connection with transaction.  The title commitment noted that PRI was the owner of the property at the time of the closing, having acquired the property "by virtue of a deed made by IVAN RAMKHELAWAN SINGH presently being recorded in the Office of the City Register, Queens County," indicating that the Seller did

not have title to the property at the time of the closing.  According to public records,  Ivan Ramkhelawan Singh was the owner of the property at the time of the closing, and transferred the property to PRI on April 18, 2008.  The deed from Ivan Ramkhelawan Singh to PRI did not record until May 22, 2008.  PRI then transferred the property to Hansraj on 4/25/08, recorded on 5/22/08, almost a month after the AmTrust loan closed.

535.    Malik was responsible for serving as AmTrust's attorney in connection with this mortgage loan pursuant to AmTrust's Closing Instructions and she failed to follow the Closing Instructions.

536.    Malik failed to stop the transaction when the seller did not have title to the property at the time the mortgage loan closed, failed to prepare an accurate HUD-1 Settlement Statement, failed to distribute funds in accordance with the HUD-1 Settlement Statement, and failed to account for the funds that AmTrust had sent to her.

537.    Upon information and belief, Defendants and others known to them orchestrated this transaction.

### Transaction –7 Irvington Street, Valley Stream, New York

538.    This transaction is a "flip" transaction whereby Thomas Felice ("Felice") obtained a first and second mortgage loan from AmTrust to purportedly fund the purchase of the property located at 7 Irvington Street, Valley Stream, NY from J & J Alarcon Realty ("J & J Alarcon") for $560,000.

539.    On or about May 5, 2008, AmTrust funded mortgage loans for Felice's purchase of the property by disbursing a wire transfer to Malik, AmTrust's closing attorney, to fund a first mortgage loan in the amount of $417,000, and to fund a second mortgage loan in the amount of $86,950.

540.     The property description is as follows:

ALL that certain plot, piece or parcel of land, situate, lying and being in the Incorporated Village of Valley Stream, Town of Hempstead, county of Nassau and State of New York, bounded and described as follows:

BEGINNING at a point on the northerly side of Irvington Street, distant 100 feet westerly from the corner formed by the intersection of the northerly side of Gotham Street as measured along the northerly side of Irvington Street;

RUNNING THENCE northerly and parallel with the westerly side of Gotham Street, a distance of 130 feet;

THENCE westerly and parallel with the northerly side of Irvington Street, a distance of 60 feet;

THENCE southerly and again parallel with the westerly side of Gotham Street, a distance of 130 feet to the northerly side of Irvington Street;

THENCE easterly and along the northerly side of Irvington Street, a distance of 60 feet to the point or place of BEGINNING.

541.     In connection with this transaction, Felice executed a first Mortgage in favor of AmTrust in the amount of $417,000, and a Note payable to AmTrust in the amount of $417,000, both dated May 5, 2008.  Felice also executed a second Mortgage in favor of AmTrust in the amount of $86,950 and a Note payable to AmTrust in the amount of $86,950, both dated May 5, 2008.

542.     This mortgage loans were brokered by Artisan Mortgage Company, Inc. ("Artisan") pursuant to the Master Broker Agreement.

543.     The Artisan loan officer who processed this loan was Jim Barry.

544.     Carolyn Daley ("Daley") represented the Seller, J & J Alarcon, in connection with this transaction.

545.     Felice was given a buyer's allowance of $16,800 in connection with this transaction.

546.   According to the HUD-1 settlement statement, there were no prior mortgages to be paid off in connection with this transaction and the Seller was to receive $540,960 in cash.

547.   Upon information and belief, this $540,960 was disbursed directly to Daley as J & J Alarcon's attorney.

548.   At the time of the loan closing, J & J Alarcon did not have title to the property.

549.   Upon information and belief, J & J Alarcon used a portion of the loan proceeds to fund its purchase of the property on the date of the closing.  The property was deeded two times on May 5, 2008, with the second deed from J & J Alarcon to Felice.

550.   After using the funds obtained from AmTrust to fund its own purchase of the property for far less than the $560,000 price listed on his contract with Felice, J & J Alarcon then transferred the property to Felice.

551.   Thomas Harvey ("Harvey") appraised the real property in connection with Felice's mortgage applications.

552.   Harvey represented that in preparing the appraisal, he analyzed a copy of the contract for sale.

553.   After reviewing the contract for sale, Harvey represented that the property was valued at $560,000, the exact amount listed on the contract for sale of the property.

554.   Harvey deliberately overstated the value of the property.  The seller, J&J Alarcon, purchased the property for $345,000 on the same date as the closing of the AmTrust loan.

555.   Harvey represented that the owner of public record was J&W Realty & Construction, although J & J Alarcon is the Seller listed on the HUD-1.

556.   NMR was the title agent in connection with this transaction.

557.    Upon information and belief, an agent or employee of NMR was present at the closing of this transaction.

558.    NMR provided a title commitment in connection with transaction. The title commitment noted that J & J Alarcon was the owner of the property at the time of the closing, having acquired the property "by virtue of a deed made by EDWARD BOHM presently being recorded in the Office of the Nassau County Clerk," thereby indicating that the Seller did not have title to the property at the time of the closing. According to public records, Edward Bohm, was the owner of the property at the time of the closing, and transferred the property to J & J Alarcon on May 5, 2008. On May 5, 2008, J & J Alarcon transferred the property to Felice.

559.    Malik was responsible for serving as AmTrust's attorney in connection with this mortgage loan pursuant to AmTrust's Closing Instructions and she failed to follow the Closing Instructions.

560.    Malik failed to stop the transaction when the seller did not have title to the property at the time the mortgage loan closed, failed to prepare an accurate HUD-1 Settlement Statement, failed to distribute funds in accordance with the HUD-1 Settlement Statement, and failed to account for the funds that AmTrust had sent to her.

561.    Upon information and belief, Defendants and others known to them orchestrated this transaction.

### Transaction –9 Cypress Court, Brooklyn, New York

562.    This transaction involved a "flip" transaction whereby Abu Noushad ("Noushad") obtained a mortgage loan from AmTrust to purportedly fund the purchase of the property located at 9 Cypress Court, Brooklyn, New York from Hugo King ("King") for $675,000.

563.    On or about June 24, 2008, AmTrust funded mortgage loans for Noushad's purchase of the property by disbursing a wire transfer to Malik, AmTrust's closing attorney, to fund a first mortgage loan in the amount of $533,000, and to fund a second mortgage loan in the amount of $74,000.

564.    The property description is as follows:

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Brooklyn, County of Kings, City and State of New York, bounded and described as follows:

BEGINNING at a point on the northerly side of a private right of way known as Cypress Court, formerly known as Briguglio Court, which said northerly side of said right of way is a line drawn at right angles to Crescent Street and distant 228 feet 10 1/2 inches northerly from the corner formed by the intersection of the easterly side of Crescent Street with the northerly side of Etna Street, measured along the said easterly side of Crescent Street a point therein distant 70 feet 6 inches easterly from the easterly side of Crescent Street;

RUNNING THENCE northerly parallel with Crescent Street and part of the distance through a party wall, 92 feet 6 inches;

THENCE easterly at right angles to Crescent Street, 24 feet;

THENCE southerly parallel with Crescent Street, 92 feet 6 inches to the northerly side of said private right of way;

THENCE westerly along said northerly side of private right of way, 24 feet to the point or place of BEGINNING.

565.    In connection with this transaction, Noushad executed a first Mortgage in favor of AmTrust in the amount of $533,000, and a Note payable to AmTrust in the amount of $533,000, both dated June 24, 2008.  Noushad also executed a second Mortgage in favor of AmTrust in the amount of $74,000 and a Note payable to AmTrust in the amount of $74,000, both dated June 24, 2008.

566.    This mortgage loans were brokered by Artisan pursuant to the Master Broker Agreement.

79

567. The Artisan loan officer who processed this loan was James Tagliarino.

568. Azoulay represented the Seller, King, in connection with this transaction.

569. Noushad was given a buyer's allowance of $40,500 in connection with this transaction.

570. According to the HUD-1 settlement statement, there were no prior mortgages to be paid off in connection with this transaction and the Seller was to receive $618,111.25 in cash.

571. Upon information and belief, this $618,111.25 was disbursed directly to Azoulay as King's attorney.

572. Upon information and belief, Noushad falsified his income, employment history, assets, and that the building would be owner-occupied in his loan application.

573. At the time of the loan closing, King did not have title to the property.

574. Upon information and belief, King used a portion of the loan proceeds to fund his purchase of the property on the date of the closing.

575. After using the funds obtained from AmTrust to fund his own purchase of the property for far less than the $675,000 price listed on his contract with Noushad, King transferred the property to J & J Alarcon, and J & J Alarcon then transferred the property to Noushad.

576. Kester Darlington ("Darlington") appraised the real property in connection with Noushad's mortgage applications.

577. Darlington represented that in preparing the appraisal, he analyzed a copy of the contract for sale.

578. After reviewing the contract for sale, Darlington represented that the property was valued at $675,000, the exact amount listed on the contract for sale of the property.

579.   Darlington deliberately overstated the value of the property.  The seller, King, sold the property to J&J Alarcon for $360,500 one month after the date of the closing of the AmTrust loan.  J&J Alarcon then transferred the property to Noushad.

580.   NMR Advantage Abstract was the title agent in connection with this transaction.

581.   Upon information and belief, an agent or employee of NMR Advantage Abstract was present at the closing of this transaction.

582.   NMR Advantage Abstract provided a title commitment in connection with transaction.  The title commitment noted that King was the owner of the property at the time of the closing.  However, King transferred the property to J & J Alarcon, and J & J Alarcon then transferred the property to Noushad.  Both deeds were recorded on July 24, 2008, after the closing of the AmTrust loan.

583.   Malik was responsible for serving as AmTrust's attorney in connection with this mortgage loan pursuant to AmTrust's Closing Instructions and she failed to follow the Closing Instructions.

584.   Malik failed to stop the transaction when the seller did not have title to the property at the time the mortgage loan closed, failed to prepare an accurate HUD-1 Settlement Statement, failed to distribute funds in accordance with the HUD-1 Settlement Statement, and failed to account for the funds that AmTrust had sent to her.

585.   Upon information and belief, Defendants and others known to them orchestrated this transaction.

**Transaction – 80-32 88th Road, Jamaica, New York**

586.   This is a transaction whereby Luz Rodriguez, Patricia Rodriguez and Pedro Guzman (collectively, "the Borrowers") obtained a mortgage loan from AmTrust to purportedly

fund the purchase of the property located at 80-32 88th Road, Woodhaven, New York from Ernest and Samaris Alvarado ("the Alvarados") for $495,000.

587.    On or about July 15, 2008, AmTrust funded mortgage loans for the Borrowers' purchase of the property by disbursing a wire transfer to Malik, AmTrust's closing attorney, to fund a first mortgage loan in the amount of $396,000, and to fund a second mortgage loan in the amount of $46,000.

588.    The property description is as follows:

> All that certain plot, piece or parcel of land, situate, lying and being in the Borough and County of Queens, City and State of New York, being known as Lot No. 375 on a certain map entitled "Hitchcock's Map of Union Course Park in the Town of Jamaica, Queens County, Long Island" which said map was filed on July 24, 1889 as Map No. 278 in the Office of the Clerk, now Register, of Queens, more particularly bounded and described as follows:

> BEGINNING at a point on the southerly side of 88th Road, formerly known as 4th Street distant 325 feet easterly from the corner formed by the intersection of the southerly side of 88th Road with the easterly side of 80th Street, formerly known as Shaw Avenue;

> RUNNING THENCE southerly parallel with 80th Street 100 feet;

> THENCE easterly, parallel with 88th Road, 25 feet;

> THENCE northerly again parallel with 80th Street, 100 feet to the southerly side of 88th Road;

> THENCE westerly along the southerly side of 88th Road 25 feet to the point or place of BEGINNING.

589.    In connection with this transaction, the Borrowers executed a first Mortgage in favor of AmTrust in the amount of $396,000, and a Note payable to AmTrust in the amount of $396,000, both dated July 15, 2008. The Borrowers executed a second Mortgage in favor of AmTrust in the amount of $46,000, and a Note payable to AmTrust in the amount of $46,000, both dated July 15, 2008.

590.     These mortgage loans were brokered by Streamline pursuant to the Master Broker Agreement.

591.     The Streamline loan officer who processed these loans was Fernando Chamorro.

592.     Upon information and belief, the Borrowers falsified their income, employment history, assets, and that the building would be owner-occupied in their loan application.

593.     Marianne Gonzalez ("Gonzalez") acted as the attorney for the Sellers, the Alvarados, in connection with this transaction and, upon information and belief, attended the closing.

594.     According to the HUD-1 settlement statement for the first mortgage, there was one prior mortgage to be paid off in the amount of $132,980.67 in connection with this transaction, and the Sellers were  to receive $347,261.33 in cash.

595.     Upon information and belief, this $347,261.33 was disbursed directly to Gonzalez as the Alvarados' attorney.

596.     According to the HUD-1 settlement statement for the second mortgage, the Borrowers were to receive $41,569.79 in cash.

597.     Keith Hilbert ("Hilbert") appraised the real property in connection with the Borrowers' mortgage application.

598.     Hilbert represented that in preparing the appraisal, he analyzed a copy of the contract for sale.

599.     After reviewing the contract for sale, Hilbert represented that the property was valued at $495,000, the exact amount listed on the contract for sale of the property.

600.     NMR was the title agent in connection with this transaction.

83

601.   Upon information and belief, an agent or employee of NMR was present at the closing of this transaction.

602.   Malik was responsible for serving as AmTrust's attorney in connection with this mortgage loan pursuant to AmTrust's Closing Instructions and she failed to follow the Closing Instructions.

603.   Malik failed to prepare an accurate HUD-1 Settlement Statement, failed to distribute funds in accordance with the HUD-1 Settlement Statement, and failed to account for the funds that AmTrust had sent to her.

604.   Upon information and belief, Defendants and others known to them orchestrated this transaction.

***Transaction –324 Ridgewood Avenue, Brooklyn, New York***

605.   This is a transaction whereby Jesus Fernandez ("Fernandez") obtained a mortgage loan from AmTrust to purportedly fund the purchase of the property located at 324 Ridgewood Avenue, Brooklyn, New York from Theresa Salazar ("Salazar") for $590,000.

606.   On or about November 25, 2008, AmTrust funded a mortgage loan for Fernandez's purchase of the property by disbursing a wire transfer to Malik, AmTrust's closing attorney, to fund a mortgage loan in the amount of $501,500.

607.   The property description is as follows:

ALL that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situated lying and being in the Borough of Brooklyn, County of Kings, City and State of New York, bounded and described as follows:

BEGINNING at a point on the southerly side of Ridgewood Avenue distant 56 feet 11-3/4 inches easterly from the corner formed by the intersection of the southerly side of Ridgewood Avenue with the easterly side of Richmond Street;

84

RUNNING THENCE southerly parallel with Richmond Street, 50 feet 1 inch;

THENCE easterly at right angles to Richmond Street, 21 feet 6 inches;

THENCE northerly parallel with Richmond Street and part of the distance through a party wall 52 feet 10-1/2 inches to the southerly side of Ridgewood Avenue;

THENCE westerly along the southerly side of Ridgewood Avenue 21 feet 8 inches to the point or place of BEGINNING.

608.    In connection with this transaction, Fernandez executed a Mortgage in favor of AmTrust in the amount of $501,500, and a Note payable to AmTrust in the amount of $501,500, both dated November 25, 2008.

609.    This mortgage loan was brokered by Resource One pursuant to the Master Broker Agreement.

610.    The Resource One loan officer who processed this loan was Louis Beria.

611.    Fernandez utilized a falsified earnest money check, in the amount of $90,000, check number 969082520, payable to "Nanette Aridas as Attorney," dated July 1, 2008.

612.    Russo acted as the attorney for the Seller, Salazar, in connection with this transaction and attended the closing.

613.    The purchase contract, dated July 2008, expressly stated that Russo, as Salazar's attorney, was to hold the earnest-money deposit in a segregated bank account.

614.    The HUD-1 Settlement Statement also noted that this earnest money had been paid.  Upon information and belief, Russo's client, Salazar, signed the HUD-1 certifying that it was true and accurate during the closing and in front of Russo.

615.    By attending and participating in the closing and by helping her client review the documents and sign the HUD-1, Russo fraudulently represented to Malik and AmTrust that she

had deposited the earnest-money check in a segregated bank account and that the check was valid when the check had actually been falsified.

616.     According to the HUD-1 settlement statement, there was a prior mortgage in the amount of $382,273.64 to be paid off in connection with this transaction and the Sellers were to receive $109,287.52 in cash.

617.     Upon information and belief, this $109,287.52 was disbursed directly to Russo as Salazar's attorney.

618.     Matthew J. Pane ("Pane") appraised the real property in connection with Fernandez's mortgage application.

619.     Pane represented that in preparing the appraisal, he analyzed a copy of the contract for sale.

620.     After reviewing the contract for sale, Pane represented that the property was valued at $610,000, the exact amount listed on the contract for sale of the property.

621.     The original contract for sale, dated 7/2008, stated that the purchase price of the property was $610,000.  The rider to contract for sale, dated 11/20/08, changed the price to $590,000.  However, the HUD-1 settlement statement for the transaction states that the contract price is $518,500.

622.     Gladiator Abstract was the title agent in connection with this transaction.

623.     Upon information and belief, an agent or employee of Gladiator Abstract was present at the closing of this transaction.

624.     Malik was responsible for serving as AmTrust's attorney in connection with this mortgage loan pursuant to AmTrust's Closing Instructions and she failed to follow the Closing Instructions.

625.   Malik failed to prepare an accurate HUD-1 Settlement Statement, failed to distribute funds in accordance with the HUD-1 Settlement Statement, and failed to account for the funds that AmTrust had sent to her.

626.   Upon information and belief, Defendants and others known to them orchestrated this transaction.

**Transaction – 1014C Kelly Street, Bronx, New York**

627.   This is a transaction whereby Arash Gilardi ("Gilardi") obtained a mortgage loan from AmTrust to purportedly fund the purchase of the property located at 1014C Kelly Street, Bronx, New York from Kelly 2005, LLC ("Kelly") for $599,000.

628.   On or about November 24, 2008, AmTrust funded a mortgage loan for Gilardi's purchase of the property by disbursing a wire transfer to Malik, AmTrust's closing attorney, to fund a mortgage loan in the amount of $449,250.

629.   The property description is as follows:

ALL that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Borough and County of Bronx, City and State of New York, bounded and described as follows:

BEGINNING at the corner formed by the intersection of the southerly side of East 165th Street and the easterly side of Kelly Street;

RUNNING THENCE southerly along the easterly side of Kelly Street, 85 feet;

THENCE easterly at right angles to the easterly side of Kelly Street, 75 feet;

THENCE northerly and parallel to Kelly, 19.63 feet;

THENCE continuing northerly and at right angles to the southerly side of East 165th Street, 70.45 feet to the southerly side of East 165th Street;

THENCE westerly along the southerly side of East 165th Street, 70.26 to the corner, the point or place of BEGINNING.

630.    In connection with this transaction, Gilardi executed a Mortgage in favor of AmTrust in the amount of $449,250, and a Note payable to AmTrust in the amount of $449,250, both dated November 24, 2008.

631.    This mortgage loan was brokered by Resource One, pursuant to the Master Broker Agreement.

632.    The Resource One loan officer who processed this loan was Ray Carrasco.

633.    Milton D. Ottensoser ("Ottensoser") acted as the attorney for the Seller, Kelly, in connection with this transaction and attended the closing.

634.    According to the HUD-1 settlement statement, there were no prior mortgages to be paid off in connection with this transaction and the Seller was to receive $596,104 in cash.

635.    Upon information and belief, this $596,104 was disbursed directly to Ottensoser as Kelly's attorney.

636.    Upon information and belief, Gilardi falsified his income, employment history, assets, and that the building would be owner-occupied in his loan application.

637.    Mary Ann Maiorana ("Maiorana") appraised the real property in connection with Gilardi's mortgage application.

638.    Maiorana represented that in preparing the appraisal, she analyzed a copy of the contract for sale.

639.    After reviewing the contract for sale, Maiorana represented that the property was valued at $600,000, $1,000 more than the purchase price listed on the contract for sale of the property.

640.    Gladiator Abstract was the title agent in connection with this transaction.

641.    Upon information and belief, an agent or employee of Gladiator Abstract was present at the closing of this transaction.

642.    Gladiator Abstract provided a title commitment in connection with transaction.

643.    Malik was responsible for serving as AmTrust's attorney in connection with this mortgage loan pursuant to AmTrust's Closing Instructions and she failed to follow the Closing Instructions.

644.    Malik failed to prepare an accurate HUD-1 Settlement Statement, failed to distribute funds in accordance with the HUD-1 Settlement Statement, and failed to account for the funds that AmTrust had sent to her.

645.    Upon information and belief, Defendants and others known to them orchestrated this transaction.

***Transaction – 17 Stewart Avenue, Hempstead, New York***

646.    This is a transaction whereby Angelica Villamar ("Villamar") obtained a mortgage loan from AmTrust to purportedly fund the purchase of the property located at 17 Stewart Avenue, Hempstead, New York from Raul Rivas ("Rivas") for $400,000.

647.    On or about November 21, 2008, AmTrust funded a mortgage loan for Villamar's purchase of the property by disbursing a wire transfer to Malik, AmTrust's closing attorney, to fund a mortgage loan in the amount of $320,000.

648.    The property description is as follows:

> ALL that certain plot, piece or parcel of land, situate, lying and being in Incorporated village of Hempstead, County of Nassau and State of New York, known and designated as and by Lot No. 18 and 19 in Block No. 28 on a certain map entitled, "Map of Property known as The Remsen Farm situated in the Village of Hempstead, Nassau County, formerly Queens County, L.I. surveyed march 12, 1891 by William E. Hawhurst, surveyor and filed in the Office of the Clerk of the County of Queens on July 15,

1891 as Map No. 38, Case No. 283, which said lots are more particularly bounded and described as follows:

BEGINNING at the corner formed by the intersection of the westerly side of Stewart Avenue with the southerly side of Harvard Street;

RUNNING THENCE in a general southerly direction along the westerly side of Stewart Avenue, a distance of 50.00 feet;

THENCE in a general westerly direction at right angles to the westerly side of Stewart Avenue, a distance of 100.00 feet;

THENCE in a generally northerly direction and along a line running parallel with the westerly side of Stewart Avenue, a distance of 50.00 feet to the southerly side of Harvard Street;

THENCE in a general easterly direction along the southerly side of Harvard Street a distance of 100.00 feet to the corner first above mentioned and the point or place of BEGINNING.

649.    In connection with this transaction, Villamar executed a Mortgage in favor of AmTrust in the amount of $320,000, and a Note payable to AmTrust in the amount of $320,000, both dated November 21, 2008.

650.    This mortgage loan was brokered by Resource One pursuant to the Master Broker Agreement.

651.    The Resource One loan officer who processed this loan was Ray Carrasco.

652.    Villamar also utilized a falsified earnest money check, in the amount of $80,000, check number 769354807, payable to "Paul Rivas" dated October 14, 2008.

653.    Nicholas Pellegrini ("Pellegrini") acted as the attorney for the Seller, Rivas, in connection with this transaction and attended the closing.

654.    The purchase contract, dated 10/14/08, expressly stated that Pellegrini, as Rivas' attorney, was to hold the earnest-money deposit in a segregated bank account.

655.   The HUD-1 Settlement Statement also noted that this earnest money had been paid.  Upon information and belief, Pellegrini's client, Rivas, signed the HUD-1 certifying that it was true and accurate during the closing and in front of Pellegrini.

656.   By attending and participating in the closing and by helping his client review the documents and sign the HUD-1, Pellegrini fraudulently represented to Malik and AmTrust that he had deposited the earnest-money check in a segregated bank account and that the check was valid when the check had actually been falsified.

657.   According to the HUD-1 settlement statement, there was one prior mortgage to be paid off in connection with this transaction in the amount of $247,205 and the Seller was to receive $149,217 in cash.

658.   Upon information and belief, this $247,205 was disbursed directly to Pellegrini as Rivas's attorney.

659.   Upon information and belief, Villamar falsified her income, employment history, assets, and that the building would be owner-occupied in her loan application.

660.   Maiorana appraised the real property in connection with Villamar's mortgage application.

661.   Maiorana represented that in preparing the appraisal, she analyzed a copy of the contract for sale.

662.   After reviewing the contract for sale, Maiorana represented that the property was valued at $400,000, the exact amount listed on the contract for sale of the property.

663.   Maiorana deliberately overstated the value of the property.

664.   NMR was the title agent in connection with this transaction.

665.    Upon information and belief, an agent or employee of NMR was present at the closing of this transaction.

666.    NMR t provided a title commitment in connection with transaction.

667.    Malik was responsible for serving as AmTrust's attorney in connection with this mortgage loan pursuant to AmTrust's Closing Instructions and she failed to follow the Closing Instructions.

668.    Malik failed to prepare an accurate HUD-1 Settlement Statement, failed to distribute funds in accordance with the HUD-1 Settlement Statement, and failed to account for the funds that AmTrust had sent to her.

669.    Upon information and belief, Defendants and others known to them orchestrated this transaction.

## Jury Demand

Plaintiff hereby respectfully requests a jury for all claims properly decided by a jury.

WHEREFORE, Plaintiff AmTrust Bank prays that the Court order the following relief in its favor and against the Defendants as follows:

1.    An award of compensatory damages in an amount to be determined at trial against Pankaj Malik, Malik & Associates, P.C., Artisan, Streamline, Genesis, Link One, Global Financial, Resource One, Acorn, SI, NMR, Alderdice, Pellegrini, and Russo.

2.    A finding that they are jointly and severally liable for the compensatory damages sustained by AmTrust and an award of punitive damages in an amount to be determined at trial against Pankaj Malik, Malik & Associates, P.C., Artisan, Streamline, Genesis, Link One, Global Financial, Resource One, Acorn, SI, NMR, Alderdice, Pellegrini, and Russo.

3.      An award of attorney fees in an amount to be determined at trial against Pankaj

Malik, Malik & Associates, P.C., Artisan, Streamline, Genesis, Link One, Global Financial,

Resource One, Acorn, SI, NMR, Alderdice, Pellegrini, and Russo.

4.      An Order requiring Artisan, Streamline, Genesis, Link One, Global Financial,

Resource One, Acorn, and SI (the "Brokers") to repurchase each of the Subject Loans from

AmTrust, requiring the Brokers to hold AmTrust harmless and to indemnify AmTrust, and

providing that AmTrust shall recover from the Brokers all of its losses, including, without

limitation, recovery of the amount of the funds AmTrust loaned the Defaulting Borrowers and

Borrowers in connection with each of the Subject Loans, plus all costs, fees, interest and

expenses, including reasonable attorneys' fees as set forth in Section X of the Master Broker

Agreement.

5.      For all such other such legal or equitable relief as is just.

Dated:  November 4, 2009
        New York, New York

                                THOMPSON HINE LLP
                                Attorneys for Plaintiff AmTrust Bank


                                By: _____
                                Joseph W. Muccia
                                Sunny H. Kim
                                335 Madison Avenue, 12th Floor
                                New York, New York, 10017
                                212-344-5680

                                AND

                                Steven S. Kaufman
                                William W. Jacobs
                                Laura L. Watson
                                3900 Key Center
                                127 Public Square
                                Cleveland, OH  44114-1291
                                216-566-5500

# EXHIBIT A

# AmTrust Mortgage Banking

## Master Broker Agreement

This Agreement is made and entered into this _16th_ day of _August_, 20_07_, by and between AmTrust Bank, a federal savings bank *(hereafter called "Lender")* and _Link One Mortgage Bankers LLC_ *(full legal name)*, a(n) _Limited Liability Corp in New York_ *(State and Legal entity type)*, hereafter called "Broker".

> WHEREAS, Broker is engaged in the business of receiving single family residential first mortgage loan applications from individuals;

> WHEREAS, Lender is engaged in the business of underwriting and funding single family residential first mortgage loans;

> WHEREAS, the parties desire to establish a non-exclusive relationship whereby Broker may submit to Lender, on behalf of its customers, loan applications (and related materials) for consideration for underwriting and possible funding by Lender in accordance with this Agreement;

> NOW, THEREFORE, in consideration of the mutual promises, covenants and undertakings hereinafter provided, Broker and Lender agree as follows:

## I.  INCORPORATION OF SELLER'S GUIDE ON GEMSTONE

1.1. All provisions contained in the Seller's Guide located on Lender's Gemstone web-site, as amended, supplemented, or revised from time to time by Lender, are hereby incorporated by reference into this Agreement and shall be binding upon the parties. Each change to the Seller's Guide is effective when placed on Gemstone or sent to broker, whichever first occurs, and is deemed accepted by Broker by its use of Gemstone thereafter.  Specific reference in this Agreement to particular provisions of the Seller's Guide or Gemstone and not to other provisions does not mean that those provisions of the Seller's Guide or Gemstone not specifically cited herein are not applicable.
In the event of an inconsistency or discrepancy between the Agreement and Seller's Guide, the provisions of the Seller's Guide shall govern and control.  All terms not otherwise defined herein shall have the same meaning as such terms have in the Seller's Guide unless the context clearly requires otherwise.

1.2. Broker acknowledges that they have been provided access to Lender's Gemstone web-site and the Seller's Guide thereon prior to execution of this agreement and agrees to be bound by and comply with all applicable provisions of the Seller's Guide as amended, supplemented, or revised from time to time by Lender.

## II.  DEFINITIONS

2.1 Except for the words and terms elsewhere defined in this Agreement, all words and terms, especially capitalized words and terms, shall have the meanings as defined in the Seller's Guide.

## III.  FUNDING OF LOANS

3.1. It is the intention of the parties hereto for Lender to fund, at Lender's sole discretion, certain Mortgage Loan Applications offered to it by Broker, which Mortgage Loan Applications qualify under the requirements set forth by Lender in the Seller's Guide, modifications thereto, and in any other particular programs.  Lender retains the discretionary right to approve or reject any such Mortgage Loan Applications.  Notwithstanding anything to the contrary contained herein or in the Seller's Guide, it is agreed that Lender shall only fund approved Mortgage Loan Applications from Broker under loan programs for which Broker has been approved by Lender.

## IV.  USE OF THE GEMSTONE MORTGAGE BANKING WEB-SITE

4.1     Gemstone is a private computer network system owned by Lender, and the use thereof is restricted to individuals expressly authorized to use it by Lender.  Any actual or attempted unauthorized use of the Gemstone system (including without limitation the actual or attempted access to information concerning loans placed on Gemstone by any person or entity other than Broker) by Broker or any of its agents or employees, or anyone who gains access to Gemstone through Broker or its facilities, or its agents or employees by any means (whether authorized or unauthorized) is strictly prohibited.

4.2     Lender has the absolute right to enter information and data, troubleshoot and repair problems and to view and monitor any and all data and other information on Gemstone at any time without further notice or consent.

-1-                     Wholesale Lending WSL:099 ( Revised: 04/23/2007)

4.3     Lender will provide Broker with log-in IDs and passwords for use by its duly authorized officers and employees and other persons or entities specifically authorized by it to access information about the Broker's loans on Gemstone.

4.4     Broker agrees to comply with all security requirements established by Lender and to implement security procedures adequate to insure that only authorized persons have access to the log-in IDs and passwords assigned to Broker or persons identified by Broker.

4.5     Broker agrees to promptly notify Lender when any person or entity previously authorized by Broker to use any log-in ID and/or password assigned to Broker for use of Gemstone is no longer employed by Broker or authorized to use Gemstone, and, in such circumstance, Broker must secure new log-in IDs and passwords from Lender.

4.6     Lender shall not be responsible for any unauthorized use of log-in IDs or passwords, and Broker assumes all responsibility for control of the use of the log-in IDs and passwords assigned to Broker or persons identified by Broker.  Lender has no responsibility for verifying the authority of any person or entity using assigned log-in IDs or passwords.

4.7     Broker hereby releases Lender and its shareholders, officers, directors, employees, agents and attorneys from any and all liability for loss, cost, damage, expense, liability or claims (whether direct, indirect, special or consequential or otherwise) resulting from the use of Gemstone by Broker, its agents, employees, users (whether authorized or not) or any person or entity who obtains access thereto through Broker or any facilities in its possession or control.

4.8     Although Lender intends that Gemstone should be accessible outside of as well as during normal business hours, some or all of Gemstone may not be available at certain times due to system maintenance or repairs, interruption of power or communication sources, problems associated with the internet or for other reasons.  Lender does not insure or guarantee access to Gemstone at any time.  Gemstone is updated and transactions are processed only during Lender's normal business hours.  Neither Lender and its officers, directors, employees and agents, nor its service providers nor their respective subsidiaries, parent corporations or affiliates shall be liable for any direct, indirect, special or consequential, economic or other damages arising in any way out of the use of Gemstone by Broker or any of its officers, employees or agents or any person who obtains access to Gemstone through Broker, or the installation, use or maintenance of any equipment, software, internet browser or access software associated with Gemstone.

4.9     Broker is liable and responsible for all transactions that Broker, or any person or entity using log-in IDs or passwords acquired as a result of the i) authorization by Broker, or ii) affiliation with Broker, or iii) direction of Broker, makes or authorizes, even if the person or entity using any such log-in ID or password has not been authorized by Broker to use the log-in ID or password or has exceeded any authority Broker has given to such person or entity.

4.10     Broker agrees that it is assuming the risk that information on Gemstone may be unavailable or inaccurate, either through mechanical, electronic or human error or otherwise.  In addition to any indemnification obligations contained in this Agreement or elsewhere, Broker hereby waives and releases Lender, its shareholders, officers, directors, employees, agents and attorneys, from any and all claims and causes of action for, relating to or resulting from any inaccurate or unavailable information on Gemstone.

## V.     REGISTRATION

5.1  Lender shall be obligated to review only Mortgage Loan Applications and HELOC Applications, and their respective Underwriting Packages, that Broker has Registered with Lender in accordance with the provisions of this Agreement and procedures established by Lender as set forth in the Seller's Guide.

## VI.     DELIVERY OF UNDERWRITING PACKAGES

6.1  Broker shall deliver to Lender, and Lender shall receive for underwriting and review, Underwriting Packages originated by Broker in accordance with Lender's Seller's Guide.  After Broker delivers an Underwriting Package to Lender, Broker shall not thereafter offer the Mortgage Loan Application being a part thereof to any other lender or purchaser, and Lender shall thereafter have the exclusive right to fund the Mortgage Loan  made or to be made pursuant to such Mortgage Loan Application unless and until Lender expressly declines to make such Mortgage Loan.  Any and all Underwriting Packages delivered by Broker to Lender during the term hereof, and any and all Mortgage Loans made by Lender pursuant to any such Underwriting Package, shall be originated, funded, made and acquired on and subject to the terms and provisions of this Agreement and the Seller's Guide.  Broker acknowledges that Lender intends to rely on Broker's agreement to assign to Lender Underwriting Packages which have been Registered with Lender in accordance with this Agreement and the Seller's Guide and that Lender may, without notice to Broker, make binding commitments to or agreements with others in reliance upon Broker's obligations pursuant to this Agreement.  Except as otherwise specifically provided herein, after an Underwriting Package has been Registered with Lender, Lender shall review such Underwriting Package in accordance with this Agreement and the Seller's Guide; provided that this Agreement imposes

no requirement that Broker Register any Underwriting Package with Lender or that Lender accept for Registration any Underwriting Package from Broker, or that Lender make any Mortgage Loan to any applicant referred to Lender by Broker, except as otherwise expressly provided herein.

## VII.   FUNDING OF MORTGAGE LOANS

7.1   **General Conditions.**   Lender will fund only those Mortgage Loan Applications or HELOC Applications eligible for the Mortgage Loan Programs offered by Lender set forth in the Seller's Guide or elsewhere on Gemstone, and fully complying with the standards established by Lender in the Seller's Guide or elsewhere on Gemstone. Broker acknowledges that Lender reserves the right to alter, add, or delete Mortgage Loan programs from time to time, with or without notice to Broker, and Broker accepts responsibility for knowing what Mortgage Loan Programs are offered by Lender at any given time.

7.2   **Broker's Compensation.**   Subject to the full satisfaction of the conditions specified in this Agreement, in the Seller's Guide, or elsewhere on Gemstone, Lender shall deposit with the Approved Closing Agent at Funding for each Mortgage Loan or HELOC for payment to Broker the Broker's compensation amount for such Mortgage Loan established pursuant to the Seller's Guide and Lender's applicable charts published on Gemstone for such purposes, and Broker shall deposit with the Approved Closing Agent for such Mortgage Loan for payment to Lender all fees, charges and other amounts due from Broker to Lender with respect to such Mortgage Loan.

7.3   **Remaining Mortgage Loan Documents.**   On or after the Closing Date, and within the time frame set forth in the Seller's Guide, Broker shall deliver to Lender such additional Mortgage Loan Documents for the to be funded Mortgage Loan or HELOC as may be required by this Agreement or the Seller's Guide and/or Closing Instructions, including, but not limited to, the Underwriting file, preliminary disclosures, all Loan Documents filed for record and the applicable Title Insurance Policy.

## VIII.   REPRESENTATIONS AND WARRANTIES

8.1   **Representations and Warranties; Mortgage Loan.**   Broker hereby incorporates by reference all representations and warranties set forth in the Seller's Guide and in the Agreement (collectively the "Reps") and represents and warrants to Lender, as to each Mortgage Loan or HELOC to be funded by Lender pursuant hereto (as of the Closing Date and the Funding Date thereof unless otherwise stated), that such Mortgage Loan and HELOC complies in all respects with the Reps as then set forth in this Agreement and the Seller's Guide at the time of the funding of such Mortgage Loan or HELOC by Lender, which includes any and all additional representations and warranties added to the Seller's Guide after the effective date of this Agreement.

8.2   **Representations and Warranties; Broker.**   Broker represents and warrants to Lender, as of the date of this Agreement, and as of each Closing Date as follows:

(a)   Broker is duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation, and is duly licensed, qualified and in good standing in each Mortgaged Property State in which Mortgaged Property securing a Mortgage Loan Registered by Broker with Lender pursuant hereto is located.

(b)   Broker has full corporate, partnership or other applicable power and authority to execute and deliver this Agreement and to perform its obligations in accordance herewith.

(c)   The execution, delivery and performance of this Agreement by Broker and the consummation of the transactions contemplated hereby have been duly and validly authorized by Broker.

(d)   This Agreement evidences the valid, binding and enforceable obligations of Broker, subject to bankruptcy laws and other similar laws of general application. All requisite corporate or other action has been taken by Broker to make this Agreement valid, binding and enforceable upon Broker in accordance with their terms.

(e)   No approval, authorization, order, license, franchise or consent of, or registration or filing with, or notice to, any governmental authority or any other Person is required in connection with the execution, delivery or performance by Broker of this Agreement.

(f)   Broker has never been disqualified, excluded or suspended from (i) selling loans to FNMA or FREDDIE MAC, (ii) being able to originate loans intended to be guaranteed or insured by HUD, the VA or any other governmental agency, nor (iii) having loans originated by it insured in whole or in part by any primary mortgage insurance company.

(g)   The execution and delivery of this Agreement and the consummation of the transactions contemplated by this Agreement are in the ordinary course of business of Broker and will not result in the breach or violation of any term or provision of the charter, articles of incorporation, regulations, by-laws or other organizational document of Broker or result in the breach or violation of any term or provision of, or conflict with or constitute a default under, or result in the acceleration of any obligation under, any agreement, indenture, loan or credit agreement or other

instrument to which Broker is a party or Broker or its property is subject, or result in the violation of any law, rule, regulation, order, judgment or decree to which Broker or any of its property is subject.

(h) There is no action, suit or other proceeding pending or, to the best knowledge of Broker, threatened, at law or in equity, or by or before any judicial, legislative, executive or administrative court, agency or authority, or any arbitrator, which seeks damages by reason of, or seeks to prevent or hinder consummation of, the transactions contemplated hereby, or wherein an unfavorable determination, ruling or finding would adversely affect the transactions contemplated hereby, or any Mortgage Loan, any Mortgage Loan Document, or any Mortgaged Property, or which would adversely affect the business or financial condition of Broker or any Mortgagor.

(i) Broker has not in connection with this Agreement entered into any agreement, incurred any obligation, made any commitment or taken any action which might result in a claim for or an obligation to pay a sales or brokerage commission, finder's fee or similar fee or compensation with respect to this Agreement or the transactions contemplated hereby; Broker shall indemnify and hold Lender harmless from and against any claim of any broker, agent, finder or other person who makes any such claim.

(k) Broker has taken, or will take or cause to be taken, with respect to each and every Mortgage Loan and HELOC funded by Lender, all actions necessary for error free origination and processing of such Mortgage Loans on and through Broker's systems, software programs, document preparation, and any ancillary process which relates to the origination, closing and/or sale of residential mortgage loans. This representation, warranty and covenant in no way limits the applicability of any other representation, warranty or covenant contained herein.

(l) Neither this Agreement nor any statement, report or other document furnished or to be furnished by Broker pursuant to this Agreement or in connection with the transactions contemplated hereby contains any material untrue statement of fact or omits to state a material fact necessary to make the statements contained herein or therein not misleading.

8.3     **HELOCs.**    Broker acknowledges and agrees that, except as otherwise specifically provided in this Agreement, i) all HELOCs are in compliance with applicable state law and regulation and ii) the representations and warranties to Lender, which are set forth in this Agreement and the Seller's Guide as of the date of each Mortgage Loan Registration and Funding are true, correct and complete as of the date of this Agreement and on each HELOC Funding Date, subject to the following modifications:

(a)     The following terms, as defined in this Agreement or in the Seller's Guide, shall be substituted for the following defined terms wherever said terms are used in the Agreement or the Seller's Guide, but solely for purposes of the applicability thereof to HELOCS and HELOC Loan Programs (and not for purposes of applicability of the Agreement to any Mortgage Loan or Mortgage Loan Program):  HELOC for "Mortgage Loan"; "HELOC Note" for "Mortgage Note"; "HELOC Mortgage" for "Mortgage"; "HELOC Loan Document" for "Mortgage Loan Document"; "Mortgaged HELOC Property" for "Mortgaged Property", and "Mortgaged HELOC Property State" for "Mortgaged Property State".

8.4     **Survival.** All Reps., whether contained herein or in the Seller's Guide, shall be true and correct as of each Mortgage Loan Closing Date and shall survive each Mortgage Loan Closing and the termination of this agreement.

IX.     **PURCHASE OF MORTGAGE LOANS and HELOCs BY BROKER**

9.1     (a) Broker agrees that upon written request Broker shall purchase, at the Repurchase Price as set forth in the Seller's Guide, any Mortgage Loan sold to Lender pursuant to this Agreement for any of the following reasons:

(i) Lender determines that Broker failed to deliver to Lender the proper Mortgage Loan Documents pursuant to this Agreement and the Seller's Guide.

(ii) Lender determines there is any evidence of fraud in the origination and/or closing of the Mortgage Loan by x)  Broker or its employees, directors, officers, agents, vendors, service providers and independent contractors (including without limitation, settlement agents); or y) the Borrower.

(iii)  Lender determines the Mortgage Loan is not eligible under the Mortgage Loan Program for which it was registered and delivered by the Broker.

(iv) Lender determines that Broker failed to observe or perform, or breached, in any material respect any of the representations, warranties or agreements contained in this Agreement, the Seller's Guide, or Agency guidelines with respect to a particular Mortgage Loan.

(v) Lender determines the Mortgage Loan to be a "High Cost Loan" as defined in this Agreement or the Seller's Guide.

(vi) Fannie Mae, Freddie Mac or any other third party investor determines that Lender is required to repurchase said Mortgage Loan from such entity for any reason involving the origination or closing of the Mortgage Loan.

(b) Anything contained in this Agreement or the Seller's Guide or on Gemstone to the contrary notwithstanding, it is understood and agreed that the Reps set forth in this Agreement and in the Seller's Guide shall survive and continue in force for the full remaining life of each Mortgage Loan, notwithstanding the restrictive or qualified enforcement of the mortgage or any restrictive or qualified language contained in any assignment of mortgage. Upon discovery by Broker of a breach of any of the Reps or of a defect with respect to the Mortgage Loan, Broker has a duty to give prompt written notice to Lender, and in any event no later than ten (10) days after such discovery. Within thirty (30) days after Broker's giving such notice, or its receipt of notice from Lender of any such breach of a Rep or of a defect with respect to the Mortgage Loan, Broker shall promptly cure such breach or defect in all material respects or purchase the affected loan at a price as specified herein or within the Seller's Guide or otherwise in Gemstone. If, however, Lender determines, in its sole discretion, that Broker is unable to cure the breach or defect within thirty (30) days after notice of any breach of a Rep or defect or that the breach or defect cannot be cured without affecting the resale value of said Mortgage Loan, Broker shall immediately purchase the Mortgage Loan on the terms set forth herein, or within the Seller's Guide or otherwise on Gemstone.

9.2   Upon payment in full of a Mortgage Loan within the time frame set forth in the Seller's Guide, then, within 30 days after the earlier of Broker's discovery or Broker's receipt of notice of such event, Broker shall repay to Lender any and all compensation theretofore received by Broker from Lender with respect thereto, with interest thereon at the rate interest set forth in the Seller's Guide.

9.3   Upon any purchase of a Mortgage Loan or HELOC by Broker, Broker shall also assume all servicing obligations in connection therewith.

9.4   Any determination by Lender and any rejection, return or demand by the persons identified in section 1.6.4 of the Seller's Guide, shall be conclusive, non-rebuttable and incontestable as to Broker.

9.5   It is understood that this Agreement creates an ongoing non-agency relationship between the parties. If any amount due Lender from Broker remains outstanding more than thirty (30) days after it is due, Broker hereby authorizes Lender to deduct from any subsequent compensation hereunder such amounts due Lender. This provision is in addition to any other rights or remedies Lender may have pursuant to this Agreement, the Seller's Guide or at law or in equity.

## X.   MISCELLANEOUS

10.1   All costs and expenses incurred in connection with Broker's transfer and delivery of the Mortgage Loans to Lender, including without limitation, fees payable to or at the direction of Lender, and Broker's legal fees, shall be paid by Broker. Without in any way limiting the foregoing, Lender is hereby authorized to deduct or set off any fees, costs, expenses or other amounts payable by Broker to or at the direction of Lender from or against any amount payable by Lender to Broker. In any event, no Mortgagor shall have any obligation to pay Lender any fee, cost, expense or other amount which is to be paid by Broker to or at the direction of Lender.

10.2   The appointment of trustees under any trust deeds or deeds of trust shall be subject to the approval of Lender.

10.3   (a) Broker hereby agrees to indemnify and hold harmless Lender, its successors and/or assigns, from any and all losses, liabilities, claims, damages, or costs of any nature, including without limitation attorneys' fees and costs, and actions suffered or incurred by Lender which arise out of, result from, or relate to: i) The breach by the Broker of any covenant, condition, term, obligation, representation or warranty contained in this Agreement, the Seller's Guide, or in any written statement, certificate, or Mortgage Loan Document furnished by the Broker pursuant to this Agreement or the Seller's Guide; or ii) any act or omission of Broker or any employee, vendor, service provider, or agent of Broker which adversely affects any Mortgage Loan registered with and funded by Lender hereunder. This indemnification shall survive any termination or cancellation of this Agreement.

(b) Without limiting the foregoing paragraph, Broker's obligation under this Agreement shall include reimbursing Lender for the costs and expenses associated with Lender's efforts to require Broker to purchase Mortgage Loans. In any and all actions with third parties in which Lender has the right to be indemnified hereunder, Lender shall have the complete and exclusive right to determine the conduct and defense of such legal proceeding or investigation with such third party including, without limitation, the right to compromise, settle, defend, or continue any such action.

(c) Broker agrees to indemnify Lender, its successors and/or assigns, from and against any errors and/or omissions as well as any and all losses, damages, penalties, fines, forfeitures, legal fees and related costs, judgments and other costs and expenses resulting from any breach, claim, demand, defense or assertion based on, arising out of, relating to or resulting from i) any unauthorized use of the Gemstone system by Broker or any of its partners, directors, members, shareholders, officers, agents, independent contractors or employees; or ii) any use of Gemstone by any person or entity using any log-in ID or password assigned to Broker or at the direction of Broker, regardless of whether or not such person or entity has been authorized by Broker to use such log-in ID or passwords or has exceeded any authority granted by Broker or iii)any use of Gemstone by any person or entity using any log-in ID or

password assigned to Broker, regardless of whether or not such person or entity has been authorized by Broker to use such log-in ID or passwords or has exceeded any authority granted by Broker

10.5   At all times during the term hereof, Broker shall maintain in full force and effect fidelity bond insurance issued by a company qualified to do business in each Mortgaged Property State and complying with the requirements of Fannie Mae and Freddie Mac and applicable state licensing laws, and shall deliver evidence of such insurance to Lender immediately upon execution and delivery hereof and at any time thereafter upon request by Lender.

10.6   Within sixty (60) days after the end of each of its fiscal years, Broker shall deliver to Lender a copy of its operating statement for such fiscal year and its statement of condition as of the end of such fiscal year, in each case certified by the chief executive officer or chief financial officer of Broker to be true, correct and complete.

10.7   Broker shall not disclose to any person or entity any information obtained by Broker from Lender (including without limitation any information obtained by Broker from the Gemstone system), its agents or employees relating to the business, operations, assets, liabilities, properties, financial condition, operating results, mortgage loan programs, mortgage loan originators or Brokers, suppliers, vendors or customers (borrowers or depositors) of Lender, or any part of the Gemstone Quick Reference Guide or of this Agreement, in each case without the prior written consent of Lender, except to Broker's agents or employees engaged in transactions contemplated hereby to the extent they have a need to know such information, or to Broker's accountants or attorneys to the extent they have a need to know such information, in each case provided that Broker has first notified each such person of its confidentiality obligations pursuant hereto and has obtained a corresponding confidentiality agreement and commitment from such person, or pursuant to subpoena; provided that Broker first provides a copy of such subpoena to Lender not less than fifteen (15) Business Days prior to delivery of or providing any information, documents or materials pursuant thereto.

10.8   (a) In the event of any failure by Broker to purchase any Mortgage Loan in accordance with the provisions hereof, or any breach by Broker of any of its representations or warranties herein, or any failure by Broker to perform any of its obligations pursuant hereto, Lender may, at its sole discretion, suspend, or by written notice to Broker, terminate this Agreement and, in such event, Lender shall have no further obligation to purchase any Mortgage Loan from Broker or any other obligation pursuant hereto, and Lender shall have any and all other rights and remedies to which it may be entitled hereunder, pursuant to the Seller's Guide or at law or in equity.

(b) In addition to and without limitation or prejudice to any other rights or remedies available to Lender pursuant to this Agreement, the Seller's Guide or at law or in equity, any breach, violation, failure to perform or default by Broker of any term or provision in this Agreement may result in termination of Broker's authorization to use Gemstone.

(c) Either Lender or Broker may terminate this Agreement by written notice to the other at any time, for any or no reason.  Upon any such termination, Lender shall have no further obligation to purchase any Mortgage Loan from Broker thereafter, but the terms, conditions and provisions of this Agreement shall continue to apply to any and all Mortgage Loans theretofore or thereafter purchased by Lender from Broker pursuant to this Agreement. Notwithstanding the foregoing sentence, If Lender terminates this Agreement without cause, Broker shall nevertheless deliver to Lender for purchase, and Lender shall purchase, all Mortgage Loans that have been Registered with Lender prior to such termination on and subject to the terms, conditions and provisions of this Agreement and any applicable provisions of Gemstone.

(d) In the event of a default by Broker under this Agreement, Lender may terminate this Agreement immediately and without any liability to Broker or any other person or entity for losses, expenses, costs, claims, obligations and liabilities arising directly or indirectly for or in connection with such termination.  In the event of termination pursuant to this paragraph, Lender may, at its sole option, and in addition to and without limitation of any other rights or remedies Lender may have pursuant to this Agreement at law, in equity or otherwise, (I) cancel its obligation with regard to any or all outstanding Registered Mortgage Loans and be released from any and all obligations to purchase any Mortgage Loan from Broker, or (ii) require Broker to deliver all or certain Mortgage Loans which have then been properly Registered, and Lender may withhold any payment due in connection with such Mortgage Loans until such time as Broker has fully and completely performed, to Lender's satisfaction, all of its duties and obligations with respect to all Mortgage Loans sold to Lender.

10.9   The representations and warranties and the indemnity contained in this Agreement, the Seller's Guide, or on Gemstone shall survive the sale of the Mortgage Loans and delivery of the Mortgage Loan Documents to Lender and the termination of this Agreement and shall inure to the benefit of any successor holder of the Mortgage Loans, notwithstanding any restrictive or qualified endorsement on any Mortgage Note or Assignment of Mortgage or the examination of the contents of an Underwriting Package or any Mortgage Loan Document.

10.10   (a) This Agreement, together with the Seller's Guide and all other applicable terms and provisions on Gemstone, constitutes the entire agreement of the parties with respect to the subject matter hereof, and its provisions cannot be waived, modified or amended except by written instrument signed by the party against which enforcement thereof is sought.  This Agreement supersedes and replaces any and all prior agreements between the parties hereto relating to the subject matter hereof, and applies to all Mortgage Loans heretofore or hereafter assigned, conveyed, transferred and/or delivered by Broker to Lender.

Wholesale Lending WSL:099 ( Revised: 04/23/2007)

(b) Broker shall comply with all terms, requirements, conditions and provisions of Lender's Seller's Guide, the Mortgage Loan Programs and all other applicable terms and provisions as set forth on Gemstone, as the same may be amended, restated or replaced from time to time by Lender in its sole discretion. It is specifically understood and agreed that, to the extent of any conflict between the terms of this Agreement and any terms or provisions set forth in the Seller's Guide or on Gemstone, including without limitation the terms and provisions of a Mortgage Loan Program applicable to a Mortgage Loan, the Seller's Guide and Gemstone shall govern.

10.11 It is agreed that Broker and Lender are not partners or joint venturers and that Broker is not acting as an agent for Lender in the origination and Brokering of Loans for Lender but shall have the status of and shall act in all matters hereunder as an independent contractor. Broker will originate Loans by its own means and according to its own methods and free from any control or right of control of Lender as to the manner or method. Broker shall determine the details and means of performing the services, in conformance with the Seller's Guide, regulatory requirements, operating procedures and specifications of the federal, state and local laws and regulations. Broker shall be responsible for the training of its employees and agents in conformity with the provisions of this Agreement, the Seller's Guide, and the federal, state and local laws and regulations, since Broker shall remain obligated to perform its duties hereunder and fulfill its representations, warranties and covenants.

10.12 Broker cannot assign this Agreement or its rights or obligations under this Agreement without the prior written consent of Lender, which Lender may withhold in its sole discretion, and any attempted assignment by Broker shall be void and of no force or effect, and shall be a default hereunder.

10.13 The parties hereby consent and submit themselves to the jurisdiction and venue in any State or Federal court located in the City of Cleveland, Ohio for purposes of any legal or equitable proceeding arising from, out of or in connection with this Agreement or any transaction contemplated hereby, and Broker hereby appoints the person who executes this Agreement on its behalf at the address set forth on the signature page hereof, as its true and lawful attorney-in-fact for the purpose of receiving service of process in or for any such legal proceeding, which appointment is coupled with an interest and is irrevocable. Broker may commence an action related to or arising from the Agreement or Seller's Guide in a location other than Cleveland, Ohio, only upon the written consent of Lender to do so, and without such consent Broker agrees that any such action shall be dismissed immediately by the court in which it is filed.

10.14 Except as prohibited by law, the parties shall, and they hereby do, after consultation with their respective counsel, expressly waive trial by jury in any litigation arising out of, connected with or relating to this Agreement or the relationship created hereby or any transaction contemplated hereby. With respect to any matter for which a jury trial cannot be waived, the parties agree not to assert any such claim as a counterclaim in, nor move to consolidate any such claim with, any action or proceeding as to which a jury trial is waived.

10.15 If any judicial action is commenced to enforce this Agreement, the prevailing party in such action shall be entitled to recover its costs and expenses, including reasonable attorneys' fees.

10.16 This Agreement shall be construed and enforced in accordance with the laws of the State of Ohio.

10.17 The captions and headings used in this Agreement are for convenience only and do not in any way limit, amplify, or otherwise modify or affect the interpretation of the provisions of this Agreement.

10.18 The terms "herein", "hereof" or "hereunder" or similar terms used in this Agreement refer to this entire Agreement and not to the particular provision in which the term is used.

10.19 If any provision of this Agreement becomes subject to interpretation by a court, administrative body or arbitrator, the parties agree that such court, administrative body or arbitrator, interpreting or considering such provision should not apply any presumption or rule of construction that the terms of a document be more strictly construed against the party which itself or through its counsel or other agent prepared the same, as all parties hereto have participated in the preparation of the final form of this Agreement through review by their respective counsel and the negotiation of changes in language in any provision deemed unsuitable or inadequate or inappropriate as initially written, and, therefore, the application of such presumption or rule of construction would be inappropriate and contrary to the intent of the parties.

10.20 This Agreement shall not be deemed to confer in favor of any person or entity not a party hereto any rights whatsoever as third party beneficiary.

10.21 The parties acknowledge and agree that this Agreement shall not be recorded or filed in any public records or files, except by Lender to enforce the terms hereof, and any recording or filing by any person, whether or not a party to this Agreement, shall be considered null and void and a default hereunder.

10.22 TIME IS OF THE ESSENCE OF THIS AGREEMENT. However, if the final date of any period which is provided for in this Agreement or on Gemstone falls on a Saturday, Sunday or legal holiday under the law of the United States or the State of Ohio, such period shall be extended to the next day Business Day.

10.23  Each party agrees to execute and deliver such instruments and take such actions as the other party may, from time to time reasonably request, in order to effectuate the purposes and to carry out the terms of this Agreement including, without limitation, any and all documents deemed necessary or advisable by Lender with respect to participation by Broker in Lender's eSign (electronic documentation) program, as set forth in the Seller's Guide.

10.24  As a condition of participating in the eSign program, and notwithstanding anything to the contrary contained in this Agreement or the Seller's Guide, Broker agrees to be bound by all terms and conditions relating to the origination of eSign loans, including all representations, warranties and/or covenants relating to eSign, set forth in the Seller's Guide.

10.25  All rights and remedies of Lender under this Agreement are distinct from, and are cumulative with, any other rights or remedies under this Agreement or afforded by law or equity, and any and all such rights and remedies may be exercised concurrently, independently or successively, in such order and manner as Lender may elect. Without in any way limiting the foregoing, Lender may deduct or set off any and all amounts payable by Broker to or at the direction of Lender from or against any amount payable by Lender to Broker.

10.26  All demands, notices and communications hereunder shall, unless otherwise expressly allowed, be in writing (including facsimile transmissions) and shall be deemed to have been duly given by a party to the other party if facsimile transmitted or mailed (or couriered), as the case may be, to the facsimile number or address for such other party as shown on the signature pages hereof, or such other number or address as may have hereafter been furnished from such other party by like notice.  In addition to the foregoing, with regard to any notice or communication relating to Gemstone, such notice or communication shall also be deemed to have been duly given by Lender to Broker when such notice or communication is made available to Broker through Gemstone.  Any such demand, notice or communication hereunder to a party shall be deemed to have been received on the date actually delivered or received or, with respect to Gemstone, posted on the Gemstone web site.

10.27  In the event of a conflict between the requirements of Fannie Mae and Freddie Mac with regard to any of Broker's obligations hereunder, the requirements of Fannie Mae shall take precedence over the requirements of Freddie Mac

In Witness Whereof, the parties hereto have caused this Agreement to be duly executed and sealed as of the day and year first above written.

| BROKER: | LENDER: |
|---|---|
| *Link One Mortgage Bankers LLC* | AmTrust Bank |
| By: *David Goldenberg* | By: |
| (Print or Type Name) | (Print or Type Name) |
| Signed: | Signed: |
| Title: *President* | Title: **LAKSHMI J. THIRUVADI**  Manager – Client Management Department |
| Date: *08/16/07* | Date: **AMTRUST BANK** |
| Address: *380 North Broadway* | Address: 1801 East Ninth Street |
| *Suite 400* | 200 AmTrust Bank Plaza |
| *Jericho, NY 11753* | Cleveland, OH  44114 |
| Telephone: *516-495-1400* | Telephone:      (888) 321-6446 |
| Fax: *516-342-4075* | Fax:    (216) 588-5965 |

# AMTRUST MORTGAGE BANKING

## Broker Designation Agreement

This Broker Designation Agreement ("Designation Agreement") is hereby entered into this ___16th___ day of __August__, 20_07_, by and between **AmTrust Bank**, a federal savings bank, 1801 East Ninth Street, Suite 200, Cleveland, Ohio 44114 ("Designator") and _Link One Mortgage Bankers LLC_ ("Designee" and, with Designator collectively the "Parties").

In accordance with the provisions of Section 6050H-1 of the Regulations of the Internal Revenue Service (the "Regulation"), the Parties hereby enter into this Designation Agreement to clarify the 1098 reporting responsibilities of Designator and Designee.

For each mortgage loan transaction as to which Designator will be the "lender of record" (as defined in the Regulation) as identified on the loan documents, the Designee will provide a return of information Form 1098 return Mortgage Interest Statement ("Form 1098") for the amount of all points which each "payor of record" (as defined in the Regulation) pays in connection with his/her mortgage loan, regardless of who ultimately receives the points or any portion thereof. The Designator shall provide a Form 1098 for each such mortgage loan for all interest paid by each payor of record with respect to his/her mortgage loan.

The parties agree that this Designation Agreement applies only to interest or points paid in cash by each payor of record and does not apply to interest or points financed by the Designator as part of the mortgage loan transaction.

Designator represents and warrants with respect to each such mortgage loan that the Designator has not loaned and will not lend to any payor of record, as part of the mortgage loan transaction, the funds with which to pay for any points which the payor of record will pay and which will be subject to reporting.

This Designation Agreement shall apply to all mortgage loans originated by the Designee and closed in the name of Designator in this calendar year and in each calendar year thereafter until termination of the Master Broker Agreement executed between Parties. The Parties agree that individual designation agreements will not be drawn up for each mortgage loan which is table funded or purchased by Designator, but the parties will rely on the Designator's records of loans originated by Designee and closed in the name of Designator.

Designator: _Link One Mortgage Bankers LLC_

Signed: _(signature)_
(Authorized Signature)

Name: _David Goldenberg_
(Please Print or Type)

Title: _President_
(Please Print or Type)

Date: _09/16/07_

Designee:

**AmTrust Bank**

Signed _(signature)_
(Authorized Signature)

Name: _LAKSHMI J. THIRUVADI_
(Please Print or Type)

Title: Manager – Client Management Department
(Please Print or Type)

Date: _____

Wholesale Lending WSL: 120 (Revised 04/23/2007)

# EXHIBIT B

# MASTER CLOSING INSTRUCTIONS

## WHOLESALE

These Master Closing Instructions, issued by or on behalf of **AmTrust Bank,** a federal savings bank, **and** the Lender identified in the Supplemental Closing Instructions, if different than AmTrust Bank, are for closing the loan referenced in the Supplemental Closing Instructions. In closing this loan, you and, if applicable, your agent, must follow the instructions and satisfy the conditions set forth in these Master Closing Instructions, the Supplemental Closing Instructions and, if the loan has been designated to use an electronic mortgage note, the special E-Document Closing Instructions, all of which, taken together, constitute the closing instructions. Do not proceed unless you are fully prepared to follow these instructions. You, as the Closing Agent, are responsible for contacting the Closing Contact named in the Supplemental Closing Instructions to obtain answers to any questions prior to commencement of closing or that arise during the closing. Any and all modifications to the Closing Instructions must be in writing and executed by AmTrust Bank.

**UNLESS OTHERWISE INDICATED HEREIN, LENDER, AS USED THROUGHOUT THESE MASTER CLOSING INSTRUCTIONS AND THE SUPPLEMENTAL CLOSING INSTRUCTIONS, SHALL MEAN OR INCLUDE AMTRUST BANK, 1801 EAST 9TH STREET, SUITE 200, CLEVELAND, OHIO 44114, REGARDLESS OF WHETHER OR NOT AMTRUST BANK IS NAMED AS THE LENDER OR MORTGAGEE ON THE SECURITY INSTRUMENT, OR IS PURCHASING THE LOAN FROM THE LENDER NAMED AS SUCH ON THE TOP OF THE FIRST PAGE OF THE SUPPLEMENTAL CLOSING INSTRUCTIONS AT OR FOLLOWING CLOSING.**

The Closing Agent is liable for losses incurred by AmTrust Bank as a result of closing a loan with the knowledge that errors were contained in any documents or instructions. If the Closing Agent determines that a loan cannot be closed in accordance with these Closing Instructions (including the Title Insurance Policy and other requirements), do not close without further instructions from AmTrust Bank. An attempt has been made to provide, with the Supplemental Closing Instructions, complete and correct forms necessary to close the loan. However, if any required forms are missing, or appear to be incorrect, or if obsolete forms have been included, please call the Closing Contact as identified in the Supplemental Closing Instructions.

Lender may sell its loans to investors in the secondary market. In so doing, Lender relies on Closing Agent's strict compliance with the Master Closing Instructions and Supplemental Closing Instructions. It is the Closing Agent's responsibility to ensure compliance with the Master Closing Instructions and Supplemental Closing Instructions.

When instructed to alert, notify and/or contact anyone herein or in the Supplemental Closing Instructions and/or E-Sign Closing Instructions, Closing Agent must do so by telephone and wait for further instruction from Closing Contact before proceeding to close the loan.

With respect to a loan that involves an e-Note, Closing Agent must also comply with the E-Sign Closing Instructions. In such a case, **DO NOT** have the borrower(s) execute a paper note. If there is an unexecuted paper note present at the e-Sign closing, the Closing Agent must destroy it. Only the executed e-Note is valid. However, if a paper note is executed by the borrower(s), **DO NOT** have the borrower(s) electronically sign an e-Note.

1.      **FRAUD PREVENTION.**

1.1      Closing Agent has special knowledge that the Lender cannot obtain from any other source. Lender is relying on Closing Agent to communicate to Lender any material fact known or suspected which may arise during or out of the closing and settlement process. Closing Agent has a duty to provide Lender

precise and correct information, and to alert Lender to facts and events that might affect Lender's decision to make the loan. By way of example only and not intended as a completed list, information relating to an adverse change in the value or title of the property, changes to the sales contract (if purchase), changes to the financing, contributions of funds not identified in these or the Supplemental Closing Instructions by persons other than the Borrower, payouts not supported by a recorded instrument against title or specifically authorized by the closing instructions, bankruptcy, or enforcement of creditor's rights are material to Lender. If Closing Agent becomes aware of any material information, the Closing Agent shall suspend loan closing and immediately contact the Closing contact and disclose the information to the Closing Contact.

1.2     If Closing Agent or anyone in Closing Agent's office is a party to the transaction, is a family member, relative or affiliate of any of the parties to the transaction, or has a conflict of interest, Closing Agent must obtain Closing Contact's written consent before closing.

1.3     If Closing Agent has reason to believe there is a fraud or scheme related to the transaction, Closing Agent shall suspend loan closing and immediately notify Closing Contact.

1.4     Information related to the Borrower, Seller, Real Estate Broker, Builder, Mortgage Broker, Title Insurer, Closing Agent, or the property may be a material inducement to Lender for making the loan. If Closing Agent knows that any such party to the transaction made a material misstatement or discovers a falsehood before, during or after closing, Closing Agent shall immediately notify the Closing Contact. If the closing has not been completed, Closing Agent shall suspend the closing.

1.5     If Closing Agent knows or believes that any document has been tampered with, falsely generated, bears an incorrect or falsified date, bears different names and/or addresses for the same party, bears a fictitious name, or if a party's handwriting is not consistent throughout the file, Closing Agent must suspend closing and immediately notify the Closing Contact.

1.6     If the Borrower or Seller appear to be coerced, under undue influence, to lack capacity to understand the transaction, or are confused about the transaction, Closing Agent must suspend closing and immediately notify the Closing Contact.

1.7     The Borrower(s) must be able to read, or have read to him/her, and understand the loan documents and the nature of the transaction.

1.8     To comply with the USA Patriot Act, the Bank Secrecy Act, and regulations promulgated by the Secretary of the Treasury, Lender has established a customer identification program. The reason for this program is to ascertain and verify the Borrower's and any other Signatory's true identity. To this end, and because the Closing Agent has face-to-face contact with the Borrower, Closing Agent must perform the following activities for each Borrower and Signatory:

    (a)     explain to the Borrower that information is being obtained to verify identity;

    (b)     complete the Identity Affidavit, either electronically or manually, in accordance with the instructions accompanying it;

    (c)     for U.S. residents, obtain a copy of an **unexpired** government-issued identification that bears a photograph or similar safeguard;

    (d)     for non-U.S. residents, obtain a copy of one or more of the following containing a photograph; a copy of an **unexpired** government-issued document evidencing nationality or residence and bearing a photograph; and/or an **unexpired** passport with passport number and country of issuance; and/or an **unexpired** alien identification card;

    (e)     if a customer is unable to produce an unexpired form of acceptable identification, contact the Closing Contact for assistance in independently verifying the true identity of the customer;

    (f)     for corporations, partnerships, trusts, limited liability companies, and other persons that are

not individuals, obtain from the state of incorporation certification of good standing and a copy of the resolution authorizing such entity to enter into the specific loan transaction duly certified by a corporate official, a government-issued business license, Partnership Agreement, Trust Agreement, as applicable, or, in the case of a limited liability company ("LLC"), the operating agreement showing that the LLC has the authority to enter into this type of transaction;

      (g)    if Closing Agent cannot form a reasonable belief that the true identity of the Borrower is known, suspend closing and immediately contact the Closing Contact; and

      (h)    include in the closing package, returned pursuant to the supplemental Closing Instructions, copies of all identifying information provided by the Borrower, copies of all documents relied on to establish the Borrower's true identity, and any documents pertaining to the resolution of any discrepancy in the identifying information obtained.

1.9    Closing Agent must obtain Borrower's acknowledgement that no third party is paying the Borrower to lend credit or identity to the transaction.

1.10    If Closing Agent has knowledge or any reason to believe that there is, or will be, any secondary financing not set forth in the Supplemental Closing Instructions placed on the property, or that any monies Borrower is required to pay or deposit at closing are not from the Borrower's own funds or a bona fide gift, the Closing Agent shall suspend loan closing and immediately notify Closing Contact.

1.11    Closing Agent is only to accept Borrower funds from Borrower's deposit accounts in the financial institutions verified and disclosed on Fannie Mae Form 1003, Freddie Mac Form 65, or from the account and institution specified elsewhere in these Closing Instructions. If Borrower funds come from a different institution or an out-of-state institution, Closing Agent must suspend closing and immediately notify Closing Contact.

1.12    All funds must pass through escrow and should be noted on the HUD-1 Settlement Statement. Copies of down payment checks or funds needed to close must be sent to Closing Contact for approval prior to disbursement of loan proceeds. The name and address on Borrower's down-payment check must match Borrower's name and address.

1.13    If the property has been subject to a closing  or transfer of title within one year prior to the current transaction or if the Closing Agent knows or has reason to believe that it is the subject of an intended concurrent or subsequent transaction, Closing Agent must notify Closing Contact and obtain Closing Contact's written consent to close.

1.14    If this is an owner-occupied property transaction and Closing Agent has knowledge of the Borrower owning and occupying another property not subject to sale, or that the Borrower does not intend to occupy the property, the Closing Agent shall obtain the written consent of Closing Contact to proceed with the closing. Closing Agent shall also notify Closing Contact if Closing Agent has knowledge of previous, concurrent, or subsequent transactions involving the Borrower or the property.

1.15    If the Mortgage Broker and the property Seller are the same, or are owned or controlled by, or affiliated with, the same person, Closing Agent must not proceed with closing and must immediately notify Closing Contact.

1.16    Closing Agent must immediately inform the Closing Contact if the Borrower previously had an interest in the property or if other parties to the transaction such as the Real Estate Agent, Mortgage Broker, Appraiser, or Closing Agent have or had an interest in the property.

1.17    If a business entity is the Seller, Closing Agent must confirm that the Borrower does not control, and is not related to, or affiliated with such business entity. Closing Agent shall obtain and provide to Closing Contact the names of the principals of the Seller.

1.18    If this is a purchase transaction, Closing Agent must confirm a property inspection has occurred; if no real estate commission is payable, provide the Closing Contact with an explanation.

1.19   If the real estate commission appears excessive for the market area, Closing Agent must notify the Closing Contact prior to closing.

1.20   All Borrowers must execute IRS Form 4506 or 4506-T.

1.21   Closing Agent must confirm the preliminary Title Commitment or Binder is correct, or issue a corrected Title Commitment or Binder and immediately contact the Closing Contact if the owner, as shown on the Title Commitment, is different from the Seller on the Purchase Contract. The closing must not proceed if the sale is subject to Seller acquiring title.

1.22   Closing Agent must be an approved agent with the Title Insurer whose name appears on the Title Commitment and Binder.

1.23   If there are material or significant changes to the sales price or the escrow, Closing Contact must approve the same prior to closing. Closing Agent must confirm the sales price on the contract matches the sales price on the HUD-1 Settlement Statement.

1.24   Closing Agent must not make disbursements from the loan proceeds unless they are specifically authorized by these or the Supplemental Closing Instructions. Closing Agent shall immediately stop the closing and notify the Closing Contact of any request for unusual payments to be disbursed from the proceeds of the loan, whether listed on the HUD Settlement Statement or not.

1.25   Closing Agent must sign the HUD-1 or HUD-1A Settlement Statement. No changes to the HUD-1 Settlement Statement are permitted unless the Closing Contact provides its express approval of such changes. Such changes include, but are not limited to, changes in the sales price of the property, changes in the disbursement of the seller's proceeds, and changes to the payoff amounts of existing liens on the property.

1.26   Closing Agent must disburse Seller's proceeds only to the Seller, its authorized agent or attorney in fact.

1.27   Borrower must sign all verification documents and certify that the information in the verifications is accurate.

1.28   Closing Agent must return recordable documents and the final Title Policy to AmTrust Bank in a timely manner, but in any event no later than 30 days after the date of closing. Failure to deliver these documents in a timely manner will result in a claim being filed with the Title Insurer.

1.29   Closing Agent must not allow the Borrower to sign any document containing blanks.

1.30   If actual settlement charges on the HUD-1 Settlement Statement exceed the Good Faith Estimate by 10% or more, Closing Agent must notify the Closing Contact prior to closing.

1.31   If the legal documents are incomplete or inconsistent with other information in the mortgage file, Closing Agent must immediately notify the Closing Contact.

1.32   Closing Agent must ensure all documents have proper signatures.

1.33   For all attorney-closing states, a copy of the Errors & Omissions policy must be submitted to Closing Contact five (5) days prior to the closing, unless one has been previously submitted.

1.34   Closing Agent agrees to and accepts its fiduciary duties to AmTrust Bank and other parties to the transactions, including without limitation those duties referenced in this Section 1.

1.35   Closing Agent must sign the Supplemental Closing Instructions to acknowledge receipt of these Master Closing Instructions and the Supplemental Closing Instructions and to affirm that the Closing Agent has read, understands and accepts all conditions of conducting the settlement.

2. **INSURED CLOSING.** All Closing Agents and attorneys approved to issue title insurance must provide an Insured Closing Protection Letter, issued to AmTrust Bank, that is in full force and effect and that protects AmTrust Bank from failure to comply with all closing instructions, and from fraud or dishonesty by Closing Agent. In connection with the closing and settlement of any loan closing, the Insured Closing Protection Letter must be issued in the form authorized for use in the state in which the subject property is located. In those states where acceptable, AmTrust Bank accepts Errors and Omissions policies covering attorneys who act as closing agents. Such Errors and Omissions policy must be issued by a company, and be in a form and in an amount, acceptable to AmTrust Bank, and be delivered to AmTrust Bank five (5) days before the closing.

3. **CLOSE AND DELIVER AS INSTRUCTED AND REQUIRED.** As Closing Agent, you must close the transaction in strict conformity with the Master Closing Instructions and the Supplemental Closing Instructions and, if applicable, with the E-Document Closing Instructions which augment the Supplemental Closing Instructions. If this transaction involves a sale, the Closing Agent must also provide a copy of the signed sales contract with the Closing Package. The Closing Agent must see that the parties follow all terms and conditions of the sales contract. Closing Agent must immediately advise the Closing Contact prior to closing the loan (i) if any sales contract provision conflicts with these Closing Instructions, or (ii) if the title insurance commitment discloses, or you are otherwise aware of, any recent (within the 12 months prior to closing ) or impending change in ownership of the Property. You must obtain written authorization from the Closing Contact approving any deviation from these Master or Supplemental Closing Instructions. No seller paid costs, secondary financing, or third party contributions are allowed unless specifically authorized in the Supplemental Closing Instructions. Except as otherwise provided, all completed, executed legal documents, evidence of satisfaction of closing conditions, and all related disclosures (the "Closing Package") must be delivered within two (2) business days after the closing date to the Post-Closing Department of AmTrust Bank.

AmTrust Bank-Park Plaza
Warehouse/Table Funded (Post Close), Suite 200
Mail Code OH98-0302
1111 Chester Avenue, Cleveland, OH  44114

Delivery of the Closing Package to any other party may result in the indefinite suspension of your company from providing settlement services to Lender. Furthermore, AmTrust Bank will charge Closing Agent one-hundred dollars ($100) per day commencing on the  3rd business day after the closing date as compensatory damages for failure to deliver the Closing Package in accordance with these closing instructions. By acceptance of these Instructions you agree that this is a reasonable estimate of the damage that such delay will cause AmTrust Bank, and does not limit the extent or nature of AmTrust's other remedies.

4. **COMMITMENT FOR TITLE INSURANCE AND POLICY.** The loan documents have been prepared based upon the Commitment for Title Insurance, Attorney Opinion Letter (applicable in IA and MA only), Affidavit of Title if applicable or other acceptable documentation (the "Title Commitment"). The Mortgagee Policy of Title Insurance (the "Title Policy") must be written through the same company that issued the Title Commitment previously furnished with respect to this transaction. If the Title Commitment does not comply with the following requirements, Closing Agent must either (i) amend it to comply, (ii) provide a new Title Commitment that complies or (iii) agree, in writing, to provide AmTrust Bank a subsequent Title Policy. In any event, the Title Policy must comply with the following requirements:

4.1 The date of the Title Commitment must not be more than ninety (90) days before the settlement date. If the Title Commitment has expired, Closing Agent must not close the loan. Closing Agent must provide a new Title Commitment prior to closing. The Title Commitment must have an authorized counter-signature by a validating officer or authorized signatory.

**BARCODE**

4.2     The Title Policy must insure that Lender, identified as such at the top of the first page of the Supplemental Closing Instructions, its successors or assigns, has a first and superior deed of trust or mortgage lien, or lien created by any other approved security instrument (the "Security Instrument"), or, if applicable, also a second priority mortgage lien for any second mortgage loan or Home Equity Line Of Credit that is originated together with the first mortgage loan, and must insure over all title exceptions which would jeopardize the marketability of title.  The Title Policy must be on the standard ALTA Loan Policy (Rev. 10-17-92 or Rev. 06-17-06, where approved) using the Short Form unless it is not available in the State where the Mortgaged Property is located.  Closing Agent is required to satisfy the requirements in Section V, Chapter 2 of the Fannie Mae Single Family Selling and Servicing Guide, as amended from time to time.

4.3     In the Title Policy, the name of the "Proposed Insured" must identify the Lender, identified as such at the top of the first page of the Supplemental Closing Instructions, exactly as shown on the Mortgage Note with the following additional phrase:

        "Its successors and/or assigns as defined in Paragraph 1 (a) of the Conditions and Stipulations of this policy."

4.4     The amount of the coverage in the Title Policy must equal at least the loan amount indicated in the Supplemental Closing Instructions.  If the loan has potential capitalized interest or negative amortization, the coverage must equal the highest outstanding balance possible under the terms of the loan.

4.5     In a refinance transaction, the name of the "Proposed Borrower" on the Title Commitment and Title Policy must exactly match the Grantee's name(s) indicated on the last deed of transfer and as borrower(s) on the loan documents. If the Proposed Borrower's name on the loan documents is different than how that party is vested in title to the property, Closing Agent must call the Closing Contact for further instructions.  Likewise, in a purchase transaction, the name of the "Proposed Borrower" on the Title Commitment and Title Policy must exactly match the borrower(s) name on the loan documents.  If the Proposed Borrower's name on the loan documents is different than how that party's name is shown on the Title Commitment, Closing Agent must call the Closing Contact for further instructions.  **IN EITHER CASE, CLOSING AGENT MUST NOT CLOSE THE LOAN WITHOUT RESOLVING THE DISCREPANCY.**

4.6     The legal description in the Security Instrument must match the legal description in the Title Commitment and the Title Policy.  If a survey is available and the legal description on the survey does not match the legal description on the Title Commitment and the Title Policy, **CLOSING AGENT MUST NOT CLOSE THE LOAN WITHOUT RESOLVING THE DISCREPANCY.**

4.7     The "Estate Insured" must read FEE SIMPLE unless provided otherwise in the Supplemental Closing Instructions.  The Title Policy must insure against any loss or damage sustained or incurred by reason of a lack of a right of access to and from the land.  Any easements providing access to the property must be insured as part of the estate, and not shown as an exception on Schedule "B".

4.8     The **Title Policy cannot** contain:

        (a)     Any exception for taxes, assessments or other charges currently due and payable.

(b)     Any exception for liens or possible liens including but not limited to mortgages, judgments or bankruptcies, mechanic's, or materialman's, artisans or similar liens, or lis pendens.

(c)     Any general exception as to unrecorded easements or rights of way.

(d)     Any general exception as to matters of survey including unrecorded easements or rights of way. If a survey is not required, then the Title Policy must include an ALTA Form 9 endorsement or its equivalent.

(e)     Any exception for party walls unless such exception also affirmatively insures the rights of the Borrower in and to the use of said party walls in common with others.

(f)     Any exceptions to the dower, courtesy, homestead, community property or other statutory marital rights, if any, of the spouse of any individual mortgagor. In all cases where any rights of dower or courtesy may affect the taking of title to the property, the Title Policy is to provide affirmative title insurance that the lien of the Security Instrument has priority over any statutory rights of dower or courtesy. In those situations, the following language is to be included in the policy/binder: "This policy/binder insures, up to the face amount hereof, that the Insured shall incur no loss or damage as a result of the exercise or attempted exercise, of dower or courtesy rights."

(g)     Any exception for the rights or claims of parties in possession.

(h)     The reservation of mineral rights or the existence of oil and gas leases, unless affirmatively insured over in a manner acceptable to Closing Contact.

(i)     Limits or conditions affecting access of the Mortgaged Premises to public roads.

(j)     Any exception to title if the Security Instrument and other loan documents are signed by an Attorney in Fact under a Power of Attorney.

4.9     Any easement, encroachment, right-of-way or restriction constituting an exception must be specifically described on Schedule "B". Any easement or right-of-way indicated on Schedule B must be located on the survey unless Closing Contact approves otherwise after notification from the Title Insurance Company or its agent. If the survey does not show easements which are on the Title Commitment, either (i) remove said item(s) as exceptions from Title Commitment or (ii) have surveyor locate and identify said items on an amended survey and obtain AmTrust Bank's approval of said location. A surveyor's letter is not sufficient in lieu of removing the exception.

4.10    The Title Policy must be received by AmTrust Bank no later than 30 days after date of closing. Short Form Loan Title Policy, where approved, should be delivered to AmTrust Bank with the Closing Package whenever possible, but in no event later than specified above.

**5     TITLE POLICY EXCEPTIONS.** If the Title Policy will contain exceptions other than those listed below, Closing Agent must contact the Closing Contact prior to the closing of loan. In addition to the survey, it may be necessary for Closing Agent to forward a copy of recorded documentation so that Closing Contact can determine whether a waiver will be required before closing and disbursement. The permitted exceptions are as follows:

(a)     Taxes not yet due and payable.

(b)     Restrictions, which are not violated as of the date of closing, with insurance that future violations will not cause a forfeiture or reversion of title.

(c)     Above-surface public utility easements along one or more of the property lines, provided the exercise of the rights thereunder do not interfere with any of the buildings or improvements located on the mortgaged property.

(d)     Customary public utility subsurface easements which are in place and do not extend under any buildings or other improvements on mortgaged property.

(e)     Mutual easement agreements recorded in the public records which establish joint driveways, joint garages, party walls, water wells, septic systems, or other private utility systems constructed partly on the mortgaged property and partly on adjoining property, provided the easement agreement allows all future owners, their heirs and assigns forever, unlimited use without restriction of these joint driveways, garages, party walls, wells and other systems.  (A copy of recorded agreements must be forwarded with closing documents.)

Note: If survey reveals joint driveway, garage, water well, septic system or other private utility system, then such an agreement must be recorded.

(f)     Encroachments:

    (i)     On mortgaged property by improvements on adjoining property where such encroachments do not exceed one (1) foot, do not touch any buildings and do not interfere with the use of any improvements on mortgaged property.

    (ii)    On adjoining property by driveways belonging to mortgaged property where such encroachments do not exceed one (1) foot, provided there exists a clearance of at least ten (10) feet between the buildings on the mortgaged property and the property line affected by the encroachment.

    (iii)   On adjoining property by eaves and overhanging projections attached to improvements on mortgaged property where such encroachments do not exceed one (1) foot provided there exists a clearance of at least ten (10) feet between the buildings on the mortgaged property and the property line affected by the encroachment.

    (iv)    On adjoining property by hedges and removable wooden or wire fences belonging to the mortgaged property.

    (v)     By garages or improvements, other than those which are attached to or a portion of the main dwelling structure, over easements for public utilities, provided such encroachment does not interfere with the use of the utility easement or the exercise of the rights of repair and maintenance in connection therewith.

(g)     An exception for rights of tenants in possession, or rights of tenants under unrecorded or recorded leases is **unacceptable** except as follows:

    (i)     Remaining term of lease is less than twelve (12) months and Title Policy so states.

    (ii)    The rights of tenants under unrecorded or recorded leases must be fully subordinated to the security instrument.

    (iii)   The Title Policy must affirmatively insure the priority of Lender's lien over the rights of tenants under leases.

    (iv)    If leases are not already in existence, delay consummation thereof until after execution and recordation of the Security Instrument.

Closing Agent **must** determine **prior** to loan closing that these requirements are met.  If unable to comply with these requirements, Closing Agent must notify the Closing Contact and **NOT** close the loan.

(h)     If the Title Policy will contain an exception for oil, water, mineral or other subsurface rights, the policy must affirmatively insure that the exercise of such rights will not result in damage to the property or impairment of the use of the property for residential purposes.  In addition, a certification, as follows, will be required from the Closing Agent: "The known facts do not indicate exercise, or impending exercise, of such outstanding rights in such a manner as to materially alter the contour of the mortgaged property or impair its value or usefulness for its intended purposes, and generally such

outstanding rights are similar to those customarily acceptable to prudent lending institutions, informed buyers, and lending attorneys in the community."

5.1   If the mortgaged property is served by a private water and/or sewer system, Schedule "B" of the Title Policy must contain the following affirmative coverage: "With respect to the private utility system documents of public record, there are no provisions which could result in a superior lien on the subject property ahead of the insured mortgage, or which could create a lien of which would take priority over the interest of the mortgagee acquired through a deed in lieu or through foreclosure." Closing Agent must confirm with the Title Company that it will provide the foregoing affirmative coverage prior to closing the loan.  If Closing Agent cannot satisfy this requirement, Closing Agent must notify the Closing Contact and **NOT** close the loan.

5.2   Below is a list of the Policy endorsements which are required.  Closing Agent must review the Title Insurance Commitment, the mortgage note and the Security Instrument to determine which Endorsements are appropriate.  Closing Agent is expected to issue only those endorsements which are applicable to a particular loan; **DO NOT** use endorsements which are not applicable (e.g., do not use a Variable Rate Endorsement for a fixed rate loan or a Balloon Payment Endorsement for a loan which has no balloon payment).  Contact the Closing Contact if there are any questions or if guidance is needed.

| Type of Loan/Collateral | Type of Policy or Endorsement - As Applicable |
| --- | --- |
| Adjustable Rate | Variable Rate Mortgage Endorsement – Form 6 or equivalent on all loans with variable (adjustable) interest rate. |
| Balloon Payment | For loans with balloon payment at maturity – Endorsement that balloon payment is valid and enforceable and enforceability is not affected by existence of conditional right to refinance. |
| Leasehold Estate | For loans where Mortgaged Property is a leasehold estate – FNMA West Region – CLTA 107.5 Endorsement; Other States – ALTA Leasehold Policy. |
| New Construction | For construction-permanent loans – Street Assessments (Additional Coverage) Endorsement – Form 1 or equivalent.  Pending Disbursements Clause. |
| Condominium | For loans where Mortgaged Property is a condominium unit, ALTA 4 Endorsement or equivalent. |
| Planned Unit Development | For loans where Mortgaged Property is part of a PUD – ALTA 5 Endorsement or equivalent. |
| Manufactured Homes | For loans where Mortgaged Property is a manufactured home – Must identify and insure that manufactured home is part of real property.  ALTA 7 Endorsement or equivalent. |
| Loans on Property in Florida | For all loans where Mortgaged Property is in Florida – Florida Form 9 Endorsement or equivalent. |
| Texas Cash Out Refinances | Mortgage Policy Form T-2 supplement by Equity Loan Mortgage Endorsement (Form T-42), including optional coverage provided by |

Paragraph 2(f), and Supplemental Coverage.  No exceptions or deletions to coverage in Paragraphs 2(a) through (e) of Form T-42.

All Mortgage Loans     Gap Endorsement/Coverage.

Environmental Protection     Lien Endorsement – Form 8.1 or equivalent.

5.3     The following language (or similar language having the same meaning) **must appear** in every binder and final Title Policy:

"THIS POLICY/BINDER SPECIFICALLY GUARANTEES THAT ANY PAST, PRESENT OR FUTURE VIOLATION OF THE RESTRICTIONS, COVENANTS, BUILDING SETBACK LINES, EASEMENT AREAS, WIDENING STRIPS, PARTITION WALLS OR OTHER LIMITATIONS AND RESTRICTIONS WILL NOT WORK A FORFEITURE OR REVERSION OF THE TITLE OR RESULT IN A LIEN OR CHARGE SUPERIOR TO THE INTEREST OF THE MORTGAGEE TO BE INSURED HEREIN, AND THAT THE SAME HAVE NOT BEEN VIOLATED AS OF THE DATE OF THIS POLICY/BINDER."

6.     **SURVEY REQUIREMENTS (WHERE APPLICABLE).**  A copy of the survey must be included in the Closing Package when required by the Title Insurance Company in order to remove any survey exceptions. A copy of the survey must also be included in the Closing Package any time the Borrower is charged for a survey on the HUD 1.  The following survey requirements must be met when a survey is required:

(a)     Survey must be no more than 120 days old as of the date of closing.

(b)     Survey must show the address of the mortgaged property, location of buildings, driveways, fences, easements, encroachments, setback lines, beginning point, relation to adjacent properties and street intersections, north point, surveyor's original seal, lot and block number, recorded map information and indicate property abuts public street with permanent access.

(c)     Survey need not contain certification by surveyor as to whether property is located in a flood hazard area.

(d)     If the legal description on the survey does not match the legal description on the Security Instrument and Title Commitment, refer to section 4.6 of these Master Closing Instructions.

7.     **HAZARD INSURANCE REQUIREMENTS.**  Closing Agent must determine whether the required coverage, as specified in the Supplemental Closing Instructions, is in force on the date of closing.  An **original** Homeowner's Policy, Certificate of Insurance, or an application for insurance in the amount indicated in the Supplemental Closing Instructions is required with a paid receipt for one (1) year's premium. Except when required by state law, binders are unacceptable.  If the hazard insurance premium is due within 60 days after closing, the Closing Agent must collect the annual premium at closing and remit payment to the insurance company unless the Borrower produces a receipt or cancelled check evidencing payment in full.  Name(s) of insured and address of property on the Hazard Insurance Policy must be identical to the mortgagee(s) named and the property address shown in the Security Instrument.

8.     **CONDOMINIUMS:** Before closing the loan, the Closing Agent must verify that the following coverage exists.

(a)     A "Master" or "Blanket" policy of property insurance equal to full replacement value or guaranteed replacement cost of the condominium project, including, without limitation, all common areas, affording coverage for loss or damage by fire, flood and other hazards.

(b)     A comprehensive policy of public liability insurance covering all of the common areas and commercial spaces in the condominium project.

(c)    The insured must be the Owners Association of the condominium project, on behalf of the owners of the condominium units and their mortgagees.

(d)    The Borrower(s) must provide the Closing Agent with a Certificate of Insurance or Memorandum from the insurance carrier evidencing inclusion of the mortgaged unit in the condominium and evidence that Lender, identified as such at the top of the first page of the Supplemental Closing Instructions, its successors and assigns, as indicated in the attached Supplemental Closing Instructions, is named as additional insured.  This documentation must be included in the Closing Package.

9.    **FLOOD INSURANCE**.  If flood insurance is required and the flood insurance premium is due within 60 days after closing, the Closing Agent must collect the annual premium at closing and remit payment to the insurance company unless the Borrower produces a receipt or cancelled check evidencing payment in full.

Where flood insurance is required, name, address of property, amount of coverage, and loss payee should be the same as in hazard insurance policy.  If the amount of coverage is less than the hazard insurance policy, it must be the maximum amount of flood coverage available by law.  The following should be included with closing documents:

(a)    Copy of Application for Flood Insurance dated on or prior to the date of closing or original Flood Insurance Policy.  (On condominium loans, a "blanket" policy of flood insurance in the name of the Owners Association and designated trustee must be provided with closing documents.)

(b)    Receipt indicating payment of first annual premium.

(c)    If original policy not enclosed, certification by Flood Insurance Agent that original policy, when issued will be forwarded to AmTrust Bank.

(d)    If the mortgaged property is located in a Special Flood Hazard Area and does not already have flood coverage, the loan closing must not occur until flood insurance is in effect.

10.    **REAL ESTATE TAX REQUIREMENTS**: Closing Agent must determine if any Real Estate Taxes are due on the subject property within 60 days after closing.  If taxes are due, the Closing Agent must collect the required taxes next due and remit payment to the appropriate tax collection agency.  These funds SHOULD NOT be sent to Lender.

11.    **TRUTH-IN-LENDING**: All closings are subject to compliance with the Truth-in-Lending Act and Regulation Z, as amended.  Closing Agents are expected to be familiar with Regulation Z so they may discuss the disclosure with the borrowers if necessary. Closing Agent must deliver the final Truth-in-Lending Disclosure Statement, based on exact figures, to the Borrower(s) to review and sign at closing prior to signing any other loan documents.  A copy of the Final Truth-in-Lending Disclosure Statement must be provided to the Borrower(s).  The Closing Agent must return the original, signed, Disclosure Statement with the Closing Package.   If the closing will take place on a day other than that set forth in the Truth-in-Lending Disclosure Statement, prior to closing the loan, the Closing Agent must obtain corrected loan documents showing a date which matches the date of the Disclosure Statement.  Notify the Closing Contact if any portion of the Truth-in-Lending Disclosure Statement appears to be inaccurate.

**Right of Rescission**: When a loan is being closed to refinance a lien on the Borrowers' primary residence, or is a new home equity line of credit, the Borrower(s) and each person holding an ownership interest in the mortgaged property (collectively "Eligible Persons") has the right to rescind the transaction until midnight of the third business day (including Saturdays) following the signing of all closing documents. The right of rescission does not apply to that portion of the HELOC proceeds that are applied toward the purchase of a Borrowers' primary residence.

Three (3) business days prior to disbursement of the loan, the Closing Agent must deliver a completed copy of the Truth-in-Lending Disclosure Statement and two (2) copies of the Notice of Right to Rescind to each Eligible Person. In addition, there will be a third copy of the Notice of Right to Rescind for the Eligible Persons to sign acknowledging receipt of the Notices. The disbursement of the loan proceeds may be completed on the fourth (4) business day if the Loan has not been rescinded. Before disbursing funds, Closing Agent must confirm with the Closing Contact that the Loan has not been rescinded.

The Notice of Right to Rescind form containing the Certificate of Confirmation IS NOT ACCEPTABLE. If a Certificate of Confirmation is part of the Notice of Right to Rescind, Closing Agent must use a Notice that DOES NOT include such a certification. The Notice of Right to Rescind, with the signature(s) of the Eligible Persons evidencing receipt of the Notices, must be included in the Closing Package. **The rescission period may not be waived.**

If a loan is subject to possible rescission, verify with the Lender that the loan has not been rescinded prior to disbursing any funds. If any one of the Eligible Persons elects to rescind the transaction, take no further action. You are not authorized by Lender to accept a rescission and must instruct the Eligible Person(s) to send the signed Notice of Right to Rescind to the Lender named as such in the Supplemental Closing Instructions. Upon rescission, Closing Agent must return any and all funds to AmTrust Bank immediately using the following wiring instructions:

> **AmTrust Bank** ABA #2410 70433
> Acct. #146205
> Re: Loan Number/Customer Name(s)
> Attn: Wholesale Lending

12. **HUD-1 SETTLEMENT STATEMENT**. CLOSING COSTS AND PREPAID ITEMS. The HUD 1 is required under the Real Estate Settlement Procedures Act (RESPA) and Regulation X. Closing Agent must be familiar with the Act and the Regulations because they impose on the Closing Agent the responsibility for completing and delivering the HUD-1 Settlement Statement to the purchaser and the seller in accordance with RESPA requirements. Closing Agent agrees to comply with all applicable provisions of RESPA.

    Closing Agent must include all applicable charges in connection with the closing on the Settlement Statement, including but not limited to prepaid items, closing costs, yield spread premium and other items that are paid outside of the closing. The Settlement Statement must reflect by whom, to whom, and the amount(s) paid. The charges must agree with the sales contract and the costs of the loan as provided by Lender or a third party loan originator, if applicable.

    Prepaid items include initial escrow deposits for taxes and insurance, interim interest, first annual hazard insurance premium and flood insurance, if applicable. All other charges incident to the loan closing, unless otherwise specified, are considered closing costs. On all conventional loans all prepaid items must be paid by the Borrower(s), unless the Borrower has a written agreement with the seller which provides that the seller pays such amounts.

13. **ESCROW FOR COMPLETION.** No loan should close with funds escrowed for completion or repairs unless Closing Contact has given prior written approval. If approved, escrowed funds must be held by the Closing Agent who will act as escrow agent. Requirements for escrow documentation will vary based on the type of loan. Closing Agent must not release any escrowed funds without the express written consent of Closing Contact.

14. **TITLE HELD BY TRUSTEE.** If title to the Mortgaged Property is or will be held by a Trustee, the following requirements must be satisfied:

(a)    All documents must be signed by the Trustee on behalf of the Trust.  The Borrower(s) must also sign, as individuals, the following documents:
- Note
- Final Truth-in-Lending Disclosure Statement
- Security Instrument (i/e., Mortgage or Deed of Trust)
- Notice of Right to Cancel, if applicable
- HUD Settlement Statement

(b)    If the Borrower is also the Trustee, it is acceptable to have the Borrower sign once if the verbiage is written on the signature line as in the following example:
*John Smith, signing as individual and Trustee of the John Smith Trust dated October 5, 2001.*
Or the borrower may sign twice, once as individual and once as Trustee.  In this case, the signatures must be affixed in the following way:

| | |
|---|---|
| *John Smith* | *John Smith, Trustee* |
| John Smith, individually | John Smith, Trustee for the John Smith Trust dated October 5, 2001. |

(c)    If there is more than one Trustee and/or more than one Borrower, each must sign the required documents in the manner stated in section (b) above.

The Closing Agent must make certain that the Trustee(s) and each Borrower sign the documents in the manner stated above.

Please Note:  The loan cannot close with E-Documents if title to the Mortgaged Property is held by a Trust or if any borrower is a Trust.  Any loan involving a Trust must be closed using paper documents.

15.    **POWER OF ATTORNEY.**  If a Power of Attorney is used in connection with a loan closing the following minimum requirements must be satisfied.

(a)    Power of Attorney must be recorded, if required by applicable law, prior to the recording of the Security Instrument and a copy of the recorded form must be forwarded with closing documents. (If recorded copy is not available, a copy of executed instrument and recorder's receipt will be acceptable.)

(b)    Power of Attorney form should grant the authority to Attorney-In-Fact to purchase, execute a note, and encumber real estate, naming the specific property and it must be valid at closing.

(c)    All closing documents must be signed by Attorney-in-Fact named in the Power of Attorney

(d)    All requirements of state law concerning the form, execution, and acknowledgment of Powers of Attorney, must be complied with.

(e)    In their own handwriting.  Attorney-in-Fact named in the Power of Attorney should sign the exact wording as printed below the signature line.  See example below.

Please Note:  the loan cannot close with E-Documents if an Attorney-in-Fact is signing documents for any Borrower.  Any loan involving a Power of Attorney must be closed using paper documents.

Closing Agent must the following language for signature lines and acknowledgment paragraphs for individuals using a power of attorney:
(When Jane Smith has Power of Attorney for John Doe)

*John Doe by Jane Smith, POA*
John Doe, by Jane Smith, Power of Attorney or Attorney in Fact

This instrument was acknowledged before me on the ____day of _____, ____   JANE SMITH AS ATTORNEY -IN-FACT ON BEHALF OF JOHN DOE.

The Closing Agent must make certain that the person acting as attorney-in-fact signs "John Doe, by Jane Smith Power of Attorney or Attorney in Fact."

16.   **MINORS.**  Lender will not lend to minors under any circumstance.

17.   **SIGNING WITH MARK**.  If it is necessary for a Borrower to sign with his/her mark, the signatures of two witnesses (with names of witnesses typed under signatures) are required.

18.   **NON-BORROWING SPOUSE, DOMESTIC PARTNER, OR CIVIL UNION PARTNER.** Where applicable, when there is a non-borrowing spouse, domestic partner, or civil union partner who has interest in the property to be mortgaged created by statute, court opinion, or otherwise, Lender requires that the borrower and non-borrowing spouse, domestic partner, or civil union partner execute the security instrument or, where applicable, waive or subordinate their interest in the property to the mortgage loan.

19.   **SECONDARY FINANCING.**  No loan is to close with secondary financing unless said secondary financing is specifically provided for in the Supplemental Closing Instructions with respect to this loan.

| | |
|---|---|
| To Closing Agent:<br>Malik & Associates, PC<br>75-35 31st Ave Ste 206A<br>East Elmhurst, NY 11370<br>Attn: LISA FERRANTE | Lender<br>SI Mortgage Company<br>51650 Oro Road<br>Shelby Twp., MI 48315<br>Closing Contact: AmTrust Bank, Mortgage<br>Consulting Center<br>Telephone No. 1-800-360-4045 |
| Telephone No. 586-802-7302<br>Fax No. 586-262-0156<br>Escrow/Reference No. | Process No./Loan No. 1746638<br>P&P Invoice No. W1746638 |

# SUPPLEMENTAL CLOSING INSTRUCTIONS
### WHOLESALE
**THIS IS A REDRAW! PLEASE MAKE SURE THE "RE-DRAWN" DOCUMENTS ARE EXECUTED AT CLOSING.**

Prepare and close the loan described above in accordance with the requirements set forth in the Master Closing Instructions and these Supplemental Closing Instructions. If this loan has been designated to use electronic mortgage loan documents ("E-Documents"), special E-Documents Closing Instructions are attached which also must be satisfied. In the event the Master Closing Instructions, the Supplemental Closing Instructions and the E-Documents Closing Instructions conflict, the E-Documents Closing Instructions will prevail over the others and the Supplemental Closing Instructions will prevail over the Master Closing Instructions as to the specific matter of conflict, only. All other provisions in the Master Closing Instructions, including, but not limited to the Fraud Provisions, shall remain in full force and effect. Closing Agent must close the loan pursuant to The Master and Supplemental Closing Instructions prior to the Closing Documents Expiration Date indicated below. In the event this loan does not close by this date, or if the loan documentation does not conform to the information stated herein, do not close the loan without obtaining permission from Closing Contact.

**UNLESS OTHERWISE INDICATED HEREIN, LENDER, AS USED THROUGHOUT THESE SUPPLEMENTAL CLOSING INSTRUCTIONS AND THE MASTER CLOSING INSTRUCTIONS, SHALL MEAN OR INCLUDE AMTRUST BANK, 1801 EAST 9TH STREET, SUITE 200, CLEVELAND, OHIO 44114, REGARDLESS OF WHETHER OR NOT AMTRUST BANK IS NAMED AS THE LENDER OR MORTGAGEE ON THE SECURITY INSTRUMENT OR IS PURCHASING THE LOAN, AT OR FOLLOWING CLOSING, FROM THE LENDER NAMED AS SUCH AT THE TOP OF THE FIRST PAGE OF THESE SUPPLEMENTAL CLOSING INSTRUCTIONS.**

### SECTION I: LOAN INFORMATION

Scheduled to Close/Date of Papers:  November 12, 2008     Estimated Funding Date:  November 12, 2008
Borrower(s): Gurdeep Singh

Sellers(s): ACRO DELIGHT INC

Property Address:    104-23 133rd Street, South Richmond Hill, NY 11419
Mailing Address (if different than Property Address):   40-20 78th Street, Elmhurst, NY  11373

Legal Description: See Attached Exhibit

Loan Amount: $519,000.00
Sales Price: $650,000.00
Down Payment: N/A
Secondary Lien Amount: N/A
Interest Rate Expiration Date: November 17, 2008
Loan Type: AmTrust-WS:(10031) Conforming 30 year Fixed Rate
Occupancy: Owner Occupied, Primary

Initial Interest Rate: 7.500
Term/Months Amortized: 360 / 360
Initial Principal and Interest: $3,628.92
Margin: N/A
Index: N/A
Periodic Interest Cap: N/A

First Payment Date: January 1, 2009
Final Payment Date: December 1, 2038

Closing Documents Expiration Date:   December 11, 2008

## SECTION II: CLOSING AND DELIVERY

YOU MUST READ ALL CLOSING INSTRUCTIONS THOROUGHLY PRIOR TO COMMENCING THE CLOSING AND CONTACT IMMEDIATELY IF, FOR ANY REASON, YOU CANNOT COMPLY WITH THEM PRIOR TO THE CLOSING DOCUMENTS EXPIRATION DATE.  If you cannot close the loan by the Closing Documents Expiration Date, you must return this package to Lender.  All documents must be signed by the Borrower(s) in person.  You must obtain the proper identification as instructed in the Master Closing Instructions.

In addition to the requirements in the Master Closing Instructions, you, as Closing Agent, must halt the closing proceedings (do not fund the loan or file any documents) and immediately call the Closing Contact if you or your employees or agents observe any of the following:

- **Seller not in title:** If the Seller of the property, as identified on the HUD-1 Settlement Statement and the Purchase Agreement, is not the owner of record, or if the County or Parish land records show that the Seller is not in title at least one year prior to the closing date.
- **Borrower not in title:** On a refinance (either cash-out or rate and term), if the Borrower (or if there are co-Borrowers, then one of them) has not been in title for at least 12 months prior to the closing date.
- **Disbursements from closing proceeds other than to clear title:** If funds are to be disbursed for any reason other than (i) to individuals or entities specifically mentioned in the Sales Contract, (ii) to pay off or otherwise ensure that Lender has a first and superior deed of trust or mortgage lien, or, if applicable, also a second priority mortgage lien for any second mortgage loan or Home Equity Line Of Credit that is originated together with the first mortgage loan, (iii) to pay fees to individuals or entities that are customary and or prevalent for standard mortgage lending transactions (iv) to pay off legitimate mechanics or materials liens, tax liens or judgment liens or (v) to pay down or off creditors of the Borrower required to satisfy underwriting conditions.
- **Disbursements from closing proceeds on the Seller's side of the HUD-1:** If disbursements are to be made to entities controlled by, owned by and/or affiliated with the Seller or any other party.

- **Disbursements from closing proceeds to pay off mortgages to a private individual, a limited liability company or other entity identified in the title commitment as having a mortgage lien which was recorded less than 90 days prior to the closing date.**

When instructed to alert, notify and/or contact anyone herein or in the Master Closing Instruction and/or E-Sign Closing Instructions, Closing Agent must do so by telephone and wait for further instruction from Closing Contact before proceeding to close the loan.

With respect to a loan that involves an e-Note, Closing Agent must also comply with the E-Sign Closing Instructions.  In such a case, DO NOT have the borrower(s) execute a paper note.  If there is an unexecuted paper

note present at the e-Sign closing, the Closing Agent must destroy it. Only the executed e-Note is valid. However, if a paper note is executed by the borrower(s), DO NOT have the borrower(s) electronically sign an e-Note.

If the seller is an entity other than a natural person, you must obtain the appropriate authorizing and organizational documents for the seller, as set forth in Section 1.8 (f) of the Master Closing Instructions. For example, obtain the articles of incorporation of a corporation, articles or organization and operating agreement for a limited liability company, or partnership agreement for any general or limited partnership. By conducting this closing, you agree to obtain such documents, retain them in your file for this transaction, and deliver copies thereof if requested by AmTrust Bank.

1.    Except as otherwise specifically provided, deliver all completed, executed legal documents, evidence of satisfaction of closing conditions and related disclosures (herein referred to as the "Closing Package") within two (2) business days after the closing date to the Post-Closing Department of AmTrust Bank.

AmTrust Bank-Park Plaza
Warehouse/Table Funded (Post Close), Suite 200
Mail Code OH98-0302
1111 Chester Avenue, Cleveland, OH 44114

Delivery of the Closing Package to any other party may result in the indefinite suspension of your company from providing settlement services to Lender. Furthermore, AmTrust will charge Closing Agent one-hundred dollars ($100) per day commencing on the 3rd business day after the closing date as compensatory damages due to your failure to deliver the Closing Package in accordance with these closing instructions, without limitation as to the extent or amount of AmTrust's other remedies.

2.    Vesting on the Security Instrument/Deed of Trust must match the vesting on the final title policy.

3.    Any person who signs the security instrument must also sign and date the Final Truth in Lending. Do not proceed with closing if any changes occur to the master closing instructions without contacting the Lender for authorization.

4.    A signed Security Instrument/Deed of Trust must be uploaded to AmTrust.

5.    A copy of the hazard insurance policy or binder must be uploaded to AmTrust within 24 hours of funding.

6.    A Final, signed HUD-1 must be uploaded to AmTrust within 24 hours of funding.

7.    A Customer ID form for all Borrowers, POAs, and Trustees must be completed in its entirety and uploaded to AmTrust.

8.    Any person who signs the mortgage must sign and date the Notice of Right to Cancel.

9.    All At Close Conditions that are stipulated in the Closing Instructions must be uploaded to AmTrust.

10.   Closing Agent must prepare Borrower's and Seller's HUD-1 Settlement Statement with Certification of Receipts and Disbursements and obtain all applicable parties signatures. One original must be delivered with Closing Package.

11.   Borrower(s) must sign and date page 5 of the Residential Loan Application (1003) and, if included in the 1003, page 6. Closing Agent must approve, and Borrower(s) must initial any revisions or corrections made to this document. The 1003 must be delivered to AmTrust Bank with the Closing Package.

12.   Closing Agent must obtain and include in the loan package a Title V Septic System Compliance Certificate, if applicable.

13.   The name of the mortgagor(s) on the first page of the Mortgage, Deed of Trust or other Security Instrument (herein referred to as "Security Instrument") and all riders, as well as the signature(s) on these documents, must match the name of the property owner(s) vested on the last deed of transfer, the Title Commitment and the Title Policy. If this is a purchase transaction, the name(s) must match the purchaser(s) names as shown on the deed. If these names do not match, DO NOT CLOSE THE LOAN and contact the Closing Contact immediately.

14.   The Closing Agent must ensure that the Truth-in-Lending Disclosure and the Notice of No Oral Agreements are signed prior to the execution of the Note and Security Instrument.

15. The information transmitted to the Closing Agent by way of the enclosed loan documents includes elements of the Borrower(s) nonpublic personal financial information. ALL information about the Borrower(s) is to be regarded as STRICTLY PRIVATE and CONFIDENTIAL and is not to be further disseminated or disclosed in any form (including but not limited to mailing lists) under any circumstances. If you retain any copies of this information, it must be stored in a secure environment.

16. Settlement Agent to complete, if applicable, the required information at the bottom of the legal description for all recorded documents in the following states: Assessor's Identification Number (CA), Assessor's Parcel Number (NV), Assessor's Property Tax Parcel of Account Number (WA), Parcel Identification Number (KY, PA, VA & WI), Parcel Number (DE (Kent County), FL, IL, MT, NC, OH, & TN), Tax Map Number (HI, NJ & NY).

17. SETTLEMENT AGENT TO CALCULATE AND APPLY ANY REISSUE OR DISCOUNTED RATE TO THE TITLE POLICY FOR WHICH THE BORROWER MAY BE ELIGIBLE.

18. The Settlement Agent must insure that the Truth-in-Lending Disclosure and the Notice of No Oral Agreements are signed prior to the execution of the Note and/or Contract.

19. Borrower(s) must sign and date the Residential Loan Application (1003). Closer must approve any revisions and any corrections to be initialed by borrower(s). Return with closing documents.

20. The information transmitted to you by way of the enclosed loan documents includes elements of the borrower's nonpublic personal and financial information. All information about the borrower is to be regarded as STRICTLY PRIVATE and CONFIDENTIAL and is not to be further disseminated or disclosed under any circumstances. If you are unwilling or unable to safeguard the borrower's information, please immediately notify the Lender for instructions on the return of the closing document package.

21. The escrow/closing fee (or the fee charged for conducting or attending the closing) charged to Borrower by Settlement Agent has been included as a prepaid finance charge in the Truth in Lending disclosure pursuant to federal regulations effective October 1, 1998. Do not increase or decrease this fee without Lender's prior written consent. If no escrow/closing fee is shown in these closing instructions, then no escrow/closing fee will be charged to Borrower by Settlement Agent.

22. Settlement Agent to Prepare and Fully Execute... Borrower's and Seller's HUD-1 Settlement Statement with Certification of Receipts and Disbursements. Remit three (3) signed certified copies and one (1) original.

23. ACCEPTABLE TITLE INSURANCE INCLUDING APPLICABLE ALTA COVERAGE

24. PROVIDE COMPLETED CUSTOMER IDENTIFICATION DATA FORM

25. PROVIDE FINAL SIGNED, TYPED AND DATED RESIDENTIAL LOAN APPLICATION

26. NO SUBORDINATE FINANCING

27. VERIFY THAT SELLER(S) ARE OWNER OF RECORD FOR THE SUBJECT PROPERTY

28. A COPY OF HOMEOWNERS INSURANCE TO BE SENT BACK WITH ORIGINAL CLOSING PACKAGE TO AMTRUST

29. ALL ORIGINAL DOCUMENTS MUST BE OVERNIGHTED WITHIN 72 HOURS OF CLOSE TO AMTRUST BANK TEAM 1 OPERATIONS SUPPORT, 1111 CHESTER AVE, MAIL CODE: OH98-0302, PARK PLAZA, CLEVELAND, OH 44114

30. FINAL TITLE POLICY TO BE SENT TO AMTRUST BANK

31. PROVIDE AMTRUST COPY OF HOME OWNERS INSURANCE WITH CLOSING PACKAGE

32. seller paid closing cost ($19500), cannot exceed max for the registered prgm/ltv/cltv, nor can it exceed actual closing costs and if any inspections are required per the sales contract, they must be submitted to the loan file and they must be satisfactory

33. Provide all applicable riders and disclosures, per product description and investor guidelines and Proof GFE and TIL disclosed within compliance and provide Patriot Act disclosure and Please have the borrower sign and provide all required RESPA, Compliance, Federal and State disclosure forms/notices prior to or at close. (including Fair Act, credit score, and mtg servicing disclosures) and need all initial signed/dated loan disclosures as well and need a signed 2-4 family rider

## SECTION III:  LOAN FEES AND ESCROWS

A.  **Fees Paid at Closing.** The following fees must be indicated in Section III, "Loan Fees and Escrows", on the HUD-1 Settlement Statement. The term "POC" means "paid outside of closing". The term "deducted" means that the Lender has deducted the fee from the dollar amount funded.  All fees not marked "POC" or "deducted" must be collected from the indicated parties.

| | Borrower | Seller | Lender / Third Party |
|---|---|---|---|
| Loan Origination Fee (Paid to SI Mortgage Company) | $5,190.00 | | |
| Loan Discount (Paid to SI Mortgage Company) | $4,783.80 | | |
| Appraisal Fee (Paid to PERFECT APPRAISAL):POC | $550.00 | | |
| Credit Report (Paid to SI MORTGAGE COMPANY) | $20.55 | | |
| Table Funding (Admin) Fee (Paid to AmTrust Bank):Deducted | $250.00 | | |
| Loan Set Up Fee (Paid to AmTrust Bank):Deducted | $455.00 | | |
| Yield Spread Premium (Paid to SI Mortgage Company):Deducted | | | -$12,975.00 |
| Processing fee (Paid to SI MORTGAGE COMPANY) | $525.00 | | |
| Flood Certification Fee (Paid to SI MORTGAGE COMPANY) | $9.00 | | |
| Prepaid Interest(7.500%) 11/12/2008-12/01/2008 @ $106.64/day:Deducted | $2,026.16 | | |
| Hazard Insurance Reserves:Deducted | $256.74 | | |
| City Tax Reserves:Deducted | $434.08 | | |
| Aggregate Accounting Adjustment:Deducted | -$388.20 | | |
| Courier/overnight/messenger fee (Paid to MALIK ASSOCIATES) | $75.00 | | |
| Escrow/closing fee (Paid to NMR ADVANTAGE ABSTRACT) | $75.00 | | |
| Attorney's Fees (Paid to MALIK  ASSOCIATES) | $850.00 | | |
| Owner's Title Policy (Paid to NMR ADVANTAGE ABSTRACT) | $2,648.00 | | |
| Lender's Title Policy (Paid to NMR ADVANTAGE ABSTRACT) | $653.00 | | |
| Title Endorsements (Paid to NMR ADVANTAGE ABSTRACT) | $100.00 | | |
| Title Search (Paid to NMR ADVANTAGE ABSTRACT) | $620.00 | | |

### See Attached Fees Paid at Closing Exhibit to Closing Instructions

| | |
|---|---|
| Sub-Total of Items Deducted: | -$9,941.22 |
| Amount of Net Funding: | $528,941.22 |

**BORROWER/SELLER FEES FOR THE SAME ITEM MAY APPEAR ON DIFFERENT LINES**
Fees indicated as deducted have been or will be subtracted from the check/draft/wire transfer and must be paid at closing by the indicated parties.

**BROKER COMPENSATION PAID BY LENDER (YEILD SPREAD PREMIUM):**  On an e-Sign refinance, if the loan should fail to close electronically, for any reason, then the Broker Compensation paid by Lender listed on the Settlement Statement  as POC will be reduced at funding by the lesser of $250.00 or the amount of the Yield Spread Premium.  You must prepare and deliver a new HUD 1 or

HUD 1A to the borrower with the adjusted Broker Compensation listed on the Settlement Statement. A borrower acknowledged copy must be provided to Lender as soon as possible.

B.    <u>Interest and Escrow Fees.</u>  Pre-paid interest will be deducted from the dollar amount funded.  Collect this amount from the Borrower(s), if needed, to pay the full purchase price to the Seller(s) or to satisfy loan expenses.

The Borrower(s) must pay all prepaid items, including interest, unless specified otherwise in the sale agreement between Borrower(s) and Seller(s) or in writing from the Lender.

Collect interest @  106.6400 per day from date of funding (including funding date) to (but not including) the 1st day of the month prior to the first payment due date. Estimated Prepaid Interest: 2,026.16

Escrow Reserves:
☐ Escrows will be collected once construction is completed.
☐ Escrow reserves are waived.
☒ Collect the following escrow reserves and show these amounts on the HUD-1 or HUD-1 A Settlement

Statement under Section L. 1000.  Reserves Deposited With Lender:
3 mos Hazard Insurance @ $85.58 per month = $256.74
2 mos City Tax @ $217.04 per month = $434.08

| | |
|---|---|
| **Aggregate Accounting Adjustment** | -$388.20 |
| **Total Initial Escrow Deposit** | $302.62 |

C.    <u>Issuance of Separate Checks.</u>  Separate checks must be issued as follows:

| $ | to |
|---|---|
| $ | to |
| $ | to |
| $ | to |
| $ | to |
| $ | to |

D.    Mortgage Broker Fees. The following amounts have not been deducted from the check/draft/wire transfer funding the loan. Collect and issue a separate check for each of the following amounts payable to:

|  | Borrower | Seller | Lender/ Third Party |
|---|---|---|---|
|  |  |  |  |

All Mortgage Broker Fees should be shown on lines 808-815 of the HUD-1. If the Mortgage Broker is being paid a yield spread premium, it should also be indicated on lines 808-815 of the HUD-1, but shown as "POC".

E.    Special Instructions Regarding Closing Fees:

## SECTION IV: LOAN DOCUMENTS

Documents applicable with respect to the above-referenced loan are being delivered herewith to you on behalf of Lender.  Closing Agent must ensure that all documents are properly execute and must deliver a copy of all documents in the closing package (excluding the Master and Supplemental Closing Instructions), whether executed or not, to the borrower(s).  If this loan is designated to use E-Documents, refer to the E-Documents Closing Instructions for information about accessing the E-Documents on Gemstone. All documents must be signed using the exact name(s) as is shown on the documents. If you have information or reason to believe that the name(s) are incorrect, please contact the Closing Contact immediately.  No corrections, erasures, changes or substitutions may be made to the loan documents without the Lender's approval.  Please complete any necessary items and return these loan documents (except the Master Closing Instructions) with the Closing Package. If the borrower(s) have a Right of Rescission, please refer to the Truth-in-Lending section of the enclosed Master Closing Instructions regarding the Notice of Right to Rescind.

Closing agent is required to notarize all applicable documents.

All closing agents and attorneys approved to issue title insurance must provide an Insured Closing Protection Letter, issued to AmTrust Bank, that is in full force and effect and that protects AmTrust Bank from failure to comply with all closing instructions, and from fraud or dishonesty by Closing Agent.  In connection with the closing and settlement of any loan closing, the Insured Closing Protection Letter must be issued in the

form authorized for use in the state in which the subject property is located.    In those states where acceptable, AmTrust Bank accepts Errors and Omissions policies covering attorneys who act as closing agents.  Such Errors and Omissions policy must be issued by a company. and in a form and in an amount, acceptable to AmTrust Bank, and be delivered to AmTrust Bank five (5) days before the closing.

<u>SUBMIT THE SECURITY INSTRUMENT AND ALL RIDERS FOR RECORDING WITHIN ONE (1) BUSINESS DAY AFTER SIGNING.  AMTRUST EXPECTS TO RECEIVE THE RECORDED SECURITY INSTRUMENT AND ANY RIDERS, FROM EITHER THE RECORDING OFFICE (PURSUANT TO YOUR INSTRUCTIONS) OR FROM YOU WITHIN 90 DAYS AFTER FUNDING.</u> (See Section II. Paragraph 1: Closing/Funding Conditions for delivery address).

Deliver all completed, executed legal documents applicable to this loan, evidence of satisfaction of closing conditions and related disclosures in the order listed on the attached stacking order no later than two (2) business days after the closing date as set forth in Section II, Paragraph 1: Closing/Funding Conditions.
* Redraw Notice
* Master Closing Instructions-Wholesale
* Supplemental Closing Instructions-Wholesale
* URLA Residential Loan Application - 2005
* Addendum To Loan Application
* E-Note Closing Instructions (Wholesale)
* Stacking Order (Wholesale)
* Answers to Most Frequently Asked TIL Questions
* TIL (RESPA Transaction)
* Notice of No Oral Agreements (IA/MU/TX/WA)
* Initial Escrow Account Disclosure Statement
* Amortization Schedule - Letter Length
* Security Instrument and Signature Instruction Checklist WSL:449g
* Security Instrument Conventional (MERS)
* FNMA/FHLMC 1-4 Family Rider (MU)
* Limited Power of Attorney WSL:464g
* Borrower's Closing Certification
* Affidavit of Compliance with Smoke Detector (NY)
* Creation Notice-Trans/Term Tax Acct (NY)
* Customer Identification Data Form (WSL288g Wholesale)
* Hazard Insurance Letter
* Notice of Assign/Sale/Transfer
* Real Property Insurance Escrow Account Disclosure
* Tax Escrow Acct Designation of Mortgage (NY)
* Attorney Selection Notice
* Correction Agreement
* Escrow Account Statement
* First Payment Letter (Regular)
* Tax and Hazard Insurance Record
* W-9 (All Borrowers)
* AmTrust Tax Authorization Letter

## SECTION V: INSURANCE REQUIREMENTS

Mortgagee's Clause in Title Policy must read: "SI Mortgage Company, its successors and/or assigns".  The policy must be an ALTA Loan Policy (Rev. 10-17-92 or Rev. 06-17-06, where approved, using the Short Form unless it is

not available in the State where the Mortgaged Property is located. ) or CALTA equivalents and include the following:

> \* Survey exceptions, are not acceptable. If a survey is not required then the Title Company must provide an ALTA 9 endorsement to its policy or the equivalent.
> \*ALTA Endorsement Form Number 8.1 or its equivalent-Environmental Protection, and such other Endorsements as are applicable to the transaction pursuant to the Master Closing Instructions.

☒   A countersigned Title Insurance Binder, Commitment or Mortgagee Policy in the amount of **$519,000.00**, insuring that the Security Instrument will be a first or second lien position (as applicable to the mortgage loan) subject only to the items stated in the Master Closing Instructions, must be included in the Closing Package. In addition to the requirements contained in the Master Closing Instructions, the Title Commitment must be amended as follows:

☒   **Hazard Insurance for Purchase.** At loan closing the Borrower(s) must provide an original Hazard Insurance Policy or Insurance Binder with a minimum coverage of $519,000.00, Guaranteed Replacement Cost, or a minimum of 80% of the Total Estimated Cost New which is located on page 2 of the Uniform Residential Appraisal Report (1004). Proof of payment for the first year's premium is required. These items must be included in the Closing Package.

☐   **Hazard Insurance for Refinance.** At loan closing, the Borrower(s) must provide an original Hazard Insurance Policy or Insurance Binder with a minimum coverage of $519,000.00, Guaranteed Replacement Cost, or a minimum of 80% of the Total Estimated Cost New which is located on page 2 of the Uniform Residential Appraisal Report (1004). If the existing policy is due to expire within 60 days of closing, the Borrower(s) must also provide a paid receipt for the next year's premium, or if escrowing, the next years premium must be collected on the HUD-1 Settlement Statement. These items must be included in the loan package returned to the Lender.

☐   **Hazard Insurance for Condominium.** At loan closing, the Borrower(s) must provide a Certificate of Insurance evidencing the condominium association's master policy providing coverage as required by the Master Closing Instructions.

☒   **Deductible and Mortgagee Clause.** The deductible for hazard insurance may not exceed $1,000.00 or 1.00% of the policy face value, whichever is greater, unless state law requires the Lender to permit a higher deductible. If you must obtain a separate policy or endorsement for hail, hurricane and/or windstorm protection, the deductible may not exceed $2,000.00 or 2.00% of the policy face value, whichever is greater, unless state law requires the Lender to permit a higher deductible. For Non-Condominium property types the policy must show S1 Mortgage Company, its successor or assigns, listed as Loss Payee or Mortgagee as follows:
    AmTrust Bank
    PO Box 11041
    Orange, CA 92856-8141
    Loan Number: 1746638

For Condominium property types, "SI Mortgage Company, its successor or assigns", must be listed as Additional Insured.

☐    **Flood Insurance.** Provide to Lender the Original Policy with Paid Receipt for the first year premium, with a minimum coverage of $ _____ or maximum available dollar amount with maximum deductible of the greater of $5,000.00, or 1% of the policy face value. If the existing policy is due to expire within 60 days of closing, you must also provide a paid receipt for the next year's premium, or if escrowing, the next year's premium must be collected on the HUD-1 Settlement Statement. If Borrower(s) has requested escrows for Tax and Hazard Insurance, they must also escrow for Flood Insurance if applicable. "SI Mortgage Company, its successors or assigns", must be listed as Loss Payee or Mortgagee in the manner stated above. These items must be included in the loan package returned to the Lender.

### SECTION VI: LOAN FUNDING (See note about Closing Contact on page 1)

These instructions cannot be amended by any oral agreements or discussions with anyone other than authorized personnel of the Closing Contact. Any deviations from these written instructions and the Master Closing Instructions are at the risk of Closing Agent.

Contact AmTrust Bank, Mortgage Consulting Center at 1-800-360-4045 for specific instructions regarding loan funding procedures. If funds are transferred but the transaction fails to close, contact the Closing Contact immediately and return all funds via wire transfer to AmTrust Bank using the following wire instructions:

> AmTrust Bank ABA #2410 70433
> Acct. #146205
> Re: Loan Number/Customer Name(s)
> Attn: Wholesale Lending

Interest at the per diem rate will be charged to the Closing Agent for failure to return funds timely.

### TO BE COMPLETED BY CLOSING AGENT:

On _____, I/we have closed this loan in accordance with the Lender's Master Closing Instructions, Supplemental Closing Instructions, and the E-Documents Closing Instructions if the Borrower(s) will execute E-Documents. Without limiting the foregoing, if the borrower(s) have executed an e-note, I/we hereby certify that no paper note has been executed and that I/we have destroyed all copies of the paper note which were brought to the closing. I hereby certify compliance with all of the conditions outlined in these instructions. In addition all required documentation, noted as such, are included in this closing package.

By: _____

    (Closing Agent Signature)

# FEES PAID AT CLOSING EXHIBIT TO
# SUPPLEMENT CLOSING INSTRUCTIONS

## CONTINUATION OF SECTION III:  LOAN FEES AND ESCROWS

|  | Borrower | Seller | Lender / Third Party |
|---|---|---|---|
| Recording fees (Paid to NMR ADVANTAGE ABSTRACT) | $450.00 | | |
| Doctax Stamps/Transfer Taxes- State (Paid to NMR ADVANTAGE ABSTRACT) | $9,960.75 | | |
| Courier/overnight/messenger (Paid to NMR ADVANTAGE ABSTRACT) | $125.00 | | |

| | |
|---|---|
| Sub-Total of Items Deducted: | -$9,941.22 |
| Amount of Net Funding: | $528,941.22 |

Supplemental Closing Instructions - Table
AmTrust Bank Wholesale

Page 11 of 11

(02/2008)
41529MU 05/08 Rev. 09/08
1746638